## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF VIRGINIA
## ABINGDON DIVISION

| | | |
|---|---|---|
| **JOHN DOE, AN INFANT, BY HIS NEXT FRIEND, REELIA WATSON,** | ) ) ) | |
| Plaintiff, | ) ) | Case No. 1:16CV00045 |
| v. | ) ) | **OPINION AND ORDER** |
| **RUSSELL COUNTY SCHOOL BOARD D/B/A RUSSELL COUNTY PUBLIC SCHOOLS, ET AL.,** | ) ) ) ) | By: James P. Jones United States District Judge |
| Defendant. | ) ) | |

*Monica H. Beck and Douglas E. Fierberg, The Fierberg National Law Group, PLLC, Lake Leelanau, Michigan, and Paul R. Thompson, III, The Thompson Law Firm, PLLC, Roanoke, Virginia, for Plaintiff; Christopher S. Dadak and Jim H. Guynn, Jr., Guynn & Waddell, P.C., Salem, Virginia, for Defendants Russell County School Board d/b/a Russell County Public Schools, Phillip Henley, and Kimberly Hooker; W. Ethan Stewart, Stewart Law Office, P.C., Norton, Virginia, guardian ad litem for Defendant Bobby Gobble.*

This civil case against a public school board and its employees arises out of a school custodian's long-term sexual abuse of the plaintiff, who was an elementary school student at the time of the events. The custodian, defendant Bobby Gobble, has pleaded guilty to numerous state charges and is currently serving a 100-year sentence of incarceration. In the instant case, the pseudonymously named minor plaintiff has asserted two claims under Title IX of the Educational Amendments of 1972, four claims pursuant to 42 U.S.C. § 1983

based on the violation of his Fourteenth Amendment substantive due process rights, and various state law claims. Russell County School Board, doing business as Russell County Public Schools, Phillip Henley, and Kimberly Hooker (collectively "School Defendants") have moved to dismiss the Complaint based on an asserted lack of standing and failure to state claims upon which relief can be granted. For the following reasons, the Motion to Dismiss will be denied as to the standing issue, and granted in part and denied in part as to the remaining issues.

I.

The Complaint alleges the following facts, which I must accept as true for the purpose of deciding the Motion to Dismiss.

Gobble was employed by the Russell County, Virginia, School Board ("School Board") as a janitor from 2006 until 2014. On February 12, 2014, Gobble was arrested and confessed to serial sexual abuse of four boys, one of whom was plaintiff John Doe. Gobble started abusing Doe in 2011, the year Doe began attending Lebanon Elementary School ("LES") as a nine-year-old third grader.

Gobble's abuse of Doe began on LES grounds. Gobble sexually abused Doe in the custodian's office and in the stock room. Gobble convinced Doe's grandmother, who had legal custody of Doe, to allow Doe to live with Gobble for more than a year, first at the home Gobble shared with his wife and later at the

home of Gobble's sister, who was also a custodian at LES. While Doe lived with Gobble, Gobble allegedly slept in the same bed as Doe and sexually abused him every night.

Henley, who was principal of LES while Doe was in third grade, allegedly knew that Gobble had Doe living with him and that he took the child on weekend trips. Henley failed to investigate this relationship and did not take any action. Henley incorrectly assumed, and did not question, that Gobble and Doe were related. Henley knew that Gobble had two other boys help him gather trash at LES after school hours. Henley required Gobble to keep the custodian's office door closed at all times.

Hooker, who was principal of LES during Doe's fourth grade year, knew Gobble spent substantial sums of money on and time with Doe, during and outside of school hours. Hooker frequently saw Gobble with Doe at football and basketball games after school hours. In the spring of that year, Hooker learned that a complaint had been filed with the Department of Social Services ("DSS") alleging that Gobble was abusing Doe. Hooker sat in on DSS' interviews of Gobble and Doe in which they denied that anything had happened between them. Following the interviews, Hooker told Gobble that if Doe was going to be at LES after school hours, he should be in the after-school program. Hooker did not

independently investigate the complaint and took no other action. DSS concluded that the complaint was unfounded.

Various teachers and other School Board employees witnessed Gobble acting inappropriately toward Doe and other male students. One teacher knew that Gobble's wife was jealous of Doe and was in the process of divorcing Gobble because of his relationship with Doe. Gobble told the teacher that his wife had called DSS about his living situation with Doe. The teacher witnessed that Gobble always had his hands on Doe. The teacher observed Gobble acting obsessively and overly friendly toward Doe and another one of his victims. The teacher observed Gobble touching the other victim, A.M., who appeared very uncomfortable around Gobble. Gobble had the teacher pass money to A.M. Despite this knowledge, the teacher allowed Gobble to spend time in her classroom with students and to remove students from her class and take them to the custodian's office.

Other teachers and School Board employees knew that Gobble and Doe slept in the same bedroom and that Gobble isolated himself with Doe on school property, drove Doe to and from school, took him on out-of-state trips, and bought him extravagant gifts. None of these teachers or staff members took any action or made any reports about Gobble's behavior toward Doe.

In the summer of 2013, a teacher visited her classroom to prepare for the upcoming school year. The lights were turned off when she entered. After about

ten minutes, she heard movement in the back of the room and found Gobble and Doe hidden behind stacked boxes. She took no action in response to this incident.

The same summer, a school resource officer recommended Gobble to coach a flag football team. The league coordinator learned that Doe lived with Gobble. The coordinator became increasingly uncomfortable with Gobble's behavior. At the beginning of the next school year, Gobble became very upset because Doe did not want to spend time with him. Gobble later told the coordinator that he was happy because Doe's little brother had taken Doe's place.

In July, 2013, Doe's mother regained custody of Doe, ended his sleepovers with Gobble, and reduced the amount of time the two were permitted to spend together. That fall, Doe began attending middle school and riding the bus to school. A bus driver employed by the School Board passed notes from Gobble to Doe such as, "Bobby loves you and misses you." Compl. ¶ 79, ECF No. 1.

In November, 2013, LES Principal Price, who is not a defendant in this case, noticed problems with the school's video surveillance system, including with the camera located outside the custodian office. On at least three occasions, Price arrived at school to find the system unplugged. A maintenance employee who investigated the problem told Price and an assistant principal that someone had flipped the switch on the power strip controlling the surveillance system. Price discussed the problem with Gobble and Gobble's sister. Price told them he did not

want anyone in his office and that he would clean his own office. After that discussion, the problems with the security system ceased. Price and the assistant principal suspected tampering but did not conduct any further investigation or discipline any employee.

The plaintiff alleges that the School Defendants allowed Gobble to have unsupervised and unrestricted access to LES, including its most isolated areas, at all times of the day and year. They allowed Gobble to have unrestricted and unsupervised access to LES students and to remove children from classes, often for long periods of time. The School Defendants permitted Gobble to be alone with Doe and other students in isolated areas of LES during and outside of school hours. They allowed Gobble to give students money and candy for helping him with custodial work.

On February 4, 2014, Gobble molested A.M. at LES, and A.M. told his parents about the incident that night. A.M.'s stepfather reported the incident to Principal Price, who notified the superintendant, who set in motion an investigation. Gobble was arrested about a week later. Doe's mother then questioned Doe about Gobble, and Doe told his mother that Gobble had sexually abused him. He stated that he had previously denied any abuse because Gobble had threatened to kill him and his mother if he told anyone.

After Gobble's arrest, a forensic examination of the custodian office computer, which Price said was an unauthorized computer, revealed files related to Doe and Gobble's other victims. Gobble's personal electronic devices contained hundreds of sexually explicit images. The Complaint alleges that Gobble produced and distributed child pornography of Doe and his other victims.

The United States Department of Education, Office of Civil Rights, and the Virginia Board of Education have repeatedly notified schools of the problem of sexual assault and have enacted various requirements and recommendations for training staff to recognize and respond to abuse and for handling reports of sexual harassment. The Complaint alleges that the School Defendants failed to heed these warnings and did not provide the required and recommended training for teachers, administrators, staff, students, or parents. The School Defendants had no written policies, procedures, or guidelines regarding reporting suspected abuse and neglect to DSS. The School Defendants had not designated a Title IX coordinator.

Since Gobble's arrest, the School Board has not offered Doe any counseling, assistance, or access to meaningful information. Doe alleges that he has suffered great psychological harm and will require therapy for the foreseeable future. The harm caused to Doe has restricted and will continue to restrict his access to educational opportunities.

The School Defendants have moved to dismiss the Complaint for lack of standing and failure to state claims upon which relief can be granted. The Motion to Dismiss has been fully briefed and orally argued and is now ripe for decision.

## II.

The School Defendants first contend that Reelia Watson, the next friend, lacks standing to prosecute the action. The Complaint alleges that Watson has Doe's best interests in mind, but there are no allegations in the Complaint regarding Watson's relationship to Doe. The School Defendants contend that the plaintiff has not pleaded facts showing that Watson is an appropriate next friend.

The issue raised by the School Defendants is not really one of standing. It is undisputed that Doe clearly meets the requirements for standing, but Doe, as a minor, does not have the legal capacity to file suit on his own. Federal Rule of Civil Procedure 17(b)(1) provides that capacity to sue is a question for the law of the individual's domicile. In addition, the Rules state,

> A minor or an incompetent person who does not have a duly appointed representative may sue by a next friend or by a guardian ad litem. The court must appoint a guardian ad litem — or issue another appropriate order — to protect a minor or incompetent person who is unrepresented in an action.

Fed. R. Civ. P. 17(c)(2).

Plaintiff Doe is a resident of Virginia. The Virginia statute addressing how a minor may sue states, in its entirety: "Any minor entitled to sue may do so by his

next friend. Either or both parents may sue on behalf of a minor as his next friend." Va. Code Ann. § 8.01-8. The Supreme Court of Virginia has concluded that the statute was not intended to change the common law. *Herndon v. St. Mary's Hosp., Inc.*, 587 S.E.2d 567, 569-70 (Va. 2003). In *Wilson v. Smith*, 63 Va. 493, 504-05 (1872), the court stated that

> [a]ny person may bring a suit in the name of an infant as its next friend, and ordinarily the court will recognize him as such next friend, and take cognizance of the case as properly brought and prosecuted. If it appear to the court that the suit is not for the benefit of the infant, or that the person named as next frie[n]d is not a suitable person for the purpose, the court may dismiss the suit without prejudice, or assign another person to prosecute it as next friend of the infant. And the court may, if it think fit, direct an enquiry by a commissioner to ascertain whether the suit be for the benefit of the infant, or whether the person prosecuting it as next friend be a fit person for that purpose.

At oral argument, counsel for Doe represented that Doe is currently in foster care. His mother is undergoing substance abuse treatment and does not have custody of her son. Doe's father is not involved in his life, and Doe's grandmother, with whom he previously lived, is now deceased. Doe's mother asked Doe's counsel to find a person who would be willing to serve as next friend. Doe's counsel suggested Watson, who agreed to serve in that capacity, and both Doe and his mother consented. Though Watson did not previously know Doe, he has talked with Doe, who is now almost fifteen years old. Watson is an experienced attorney who practices in this area of Virginia.

In these circumstances, I am satisfied that Watson is an appropriate next friend. Counsel for the School Defendants suggested that Doe's foster parent would be more appropriate, but foster parents have only temporary custody. The governing statute does not forbid an unrelated third party from serving as next friend, and the common law permits anyone to serve as next friend. I conclude that Watson is capable of competently serving as Doe's next friend, and I will deny the Motion to Dismiss for lack of standing.

III.

The School Defendants have also moved to dismiss the claims against them pursuant to Federal Rule of Civil Procedure 12(b)(6) for failure to state claims upon which relief can be granted. "The purpose of a Rule 12(b)(6) motion is to test the sufficiency of a complaint." *Edwards v. City of Goldsboro,* 178 F.3d 231, 243 (4th Cir. 1999). Rule 12(b)(6) does "not require heightened fact pleading of specifics, but only enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 570 (2007). "[I]t does not resolve contests surrounding the facts, the merits of a claim, or the applicability of defenses." *Republican Party of N.C. v. Martin,* 980 F.2d 943, 952 (4th Cir. 1992). In ruling on a motion to dismiss, the court must regard as true all of the factual allegations contained in the complaint, *Erickson v. Pardus*, 551 U.S. 89, 94 (2007),

and must view those facts in the light most favorable to the plaintiff, *Christopher v. Harbury,* 536 U.S. 403, 406 (2002).

## A. Count I.

Count I claims that the School Board's actions and inactions violated Title IX of the Educational Amendments of 1972, 20 U.S.C. §§ 1681-1688. The School Defendants argue that this claim should be dismissed because the allegations do not show that the School Board had actual knowledge that Gobble was abusing Doe. They contend that a principal's knowledge cannot be imputed to a school board for purposes of Title IX because principals in Virginia do not have the authority to hire and fire employees and thus are not proxies of the school board. They also argue that the facts known by Henley and Hooker were consistent with Gobble's role as Doe's caretaker and did not create actual knowledge of abuse.

The plaintiff responds that the 2013 DSS complaint gave Hooker actual knowledge of abuse, and her lack of response amounted to deliberate indifference. The plaintiff argues that an appropriate person's deliberately indifferent response to a report of sexual harassment can be imputed to the School Board under Fourth Circuit precedent. To the extent there is any question whether Hooker was an appropriate person under Title IX, the plaintiff contends that is a factual issue that cannot be determined on a motion to dismiss.

Title IX states that "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance." 20 U.S.C. § 1681(a).

> To establish a Title IX claim on the basis of sexual harassment, a plaintiff must show that (1) [he] was a student at an educational institution receiving federal funds, (2) [he] was subjected to harassment based on [his] sex, (3) the harassment was sufficiently severe or pervasive to create a hostile (or abusive) environment in an educational program or activity, and (4) there is a basis for imputing liability to the institution.

*Jennings v. Univ. of N.C.*, 482 F.3d 686, 695 (4th Cir. 2007). In *Gebser v. Lago Vista Independent School District*, 524 U.S. 274, 277 (1989), the Supreme Court held that under Title IX, a school district is not liable for damages based on sexual harassment of a student by a teacher "unless an official of the school district who at a minimum has authority to institute corrective measures on the district's behalf has actual notice of, and is deliberately indifferent to, the teacher's misconduct." The Court adopted that rule because the Title IX remedial scheme "is predicated upon notice to an 'appropriate person' and an opportunity to rectify any violation," see 20 U.S.C. § 1682, and the Court defined an "appropriate person" as "an official of the [federal funding] recipient entity with authority to take corrective action to end the discrimination." *Gebser*, 524 U.S. at 290.

In *Baynard v. Malone*, 268 F.3d 228, 238 (4th Cir. 2001), the Fourth Circuit held that a principal had constructive knowledge of a teacher's sexual relationship with a student, which was sufficient to support liability under 42 U.S.C. § 1983, but that the evidence could not have led a reasonable juror to find that the principal had the actual knowledge required under Title IX. The court of appeals also held that "no rational jury could find that [the principal] was invested with the power to take corrective action on behalf of the [the school board]" because a Virginia principal does not have "the power to hire, fire, transfer, or suspend teachers." *Id*. at 238-39 (citing Va. Code Ann. § 22.1-295(A)). "Simply put, Virginia has made an explicit policy decision that school principals do not exercise the powers of an employer on behalf of the school district." *Id.* at 239. Therefore, the Fourth Circuit held that the principal's knowledge of ongoing discrimination could not be imputed to the school board. *Id.*

More recently, in *Jennings*, the Fourth Circuit considered a Title IX claim against a university based on a coach's harassment of a student. The student had complained to the university's legal counsel, who was responsible for fielding sexual harassment complaints. *Jennings*, 482 F.3d at 700. The legal counsel dismissed the complaint and took no action. *Id.*

In an en banc decision, the Fourth Circuit held that the legal counsel's knowledge and lack of action were sufficient to impose liability on the university.

*Id.* at 700-01. "This notice and the University's failure to take any action to remedy the situation would allow a rational jury to find deliberate indifference to ongoing discrimination." *Id.* at 701. Importantly, the court of appeals did not mention *Baynard* and did not analyze whether the legal counsel had the power to hire, fire, transfer, or suspend the coach. The court instead relied solely on the standard stated in *Gebser*: "An institution can be held liable for a Title IX violation only if an official who has authority to address the alleged discrimination and to institute corrective measures has actual knowledge of discrimination in the institution's programs and fails adequately to respond or displays deliberate indifference to discrimination." *Jennings*, 482 F.3d at 700.[1]

*Jennings* appears to have impliedly overruled *Baynard* by applying a different analysis. *Jennings* involved a university rather than a public school, and it was a North Carolina case, so the Virginia statute relied upon in *Baynard* obviously did not apply. Even so, the full Fourth Circuit decided the *Jennings* case without ever mentioning the hiring and firing authority that was central to the panel's decision in *Baynard*. Based on *Jennings*, I conclude that *Baynard* is no longer good law as to Title IX.

*Gebser* did not declare that "corrective measures" are limited to terminating, transferring, or suspending the employee committing the harassment or abuse, and

---

[1]    I have omitted internal quotation marks, alterations, and citations here and throughout this opinion, unless otherwise noted.

the Third Circuit has found that "[t]he authority to supervise a teacher and to investigate a complaint of misconduct implies the authority to initiate corrective measures such as reporting her findings to her superior or to the appropriate school board official at the very least." *Warren ex rel. Good v. Reading Sch. Dist.*, 278 F.3d 163, 173 (3d Cir. 2002). The Eleventh Circuit has stated that the question of who is an appropriate person with authority to take corrective measures is a factual issue, but that the majority of circuits have concluded that principals have sufficient authority to impute liability to their school boards. *KB v. Daleville City Bd. of Educ.*, 536 F. App'x 959, 962-63 (11th Cir. 2013) (unpublished).

Based on the Complaint's allegations, it is plausible that Hooker could have taken corrective measures such as conducting an independent investigation or reporting Gobble's conduct to the School Board or to law enforcement. As the top supervisor and administrator at LES, she could have taken steps to prevent Gobble's access to Doe and other students on the LES grounds and to limit the time Gobble could spend at LES after hours. I find that such actions would qualify as corrective measures under *Gebser*. The Complaint alleges facts showing, at a minimum, that Hooker was an official with authority to institute corrective measures on the School Board's behalf, that she had actual notice of Gobble's misconduct based on the DSS report, and that she was deliberately indifferent to

Gobble's misconduct, which satisfies the requirements of *Gebser* and *Jennings*. I will deny the Motion to Dismiss as to Count I.

## B. Count II.

Count II charges the School Board with violating Title IX by failing to take corrective action after Gobble's arrest. The plaintiff claims that despite actual knowledge of abuse, the School Board failed to "provide, offer, recommend, or coordinate adequate health, psychological, counseling, and academic assistance and services to Plaintiff to minimize the harm he suffered," Compl. ¶ 110, and failed to terminate or discipline any School Board personnel as a result of their handling of the situation. According to the plaintiff, this inaction constituted deliberate indifference and materially impaired Doe's access to educational opportunities and benefits.

The School Board moves for dismissal of this count because (1) the Complaint does not allege that Doe was still a student of the Russell County public schools at the time of Gobble's arrest; (2) the Complaint does not allege that Doe requested counseling or accommodations; (3) the Complaint does not allege how disciplining employees could have prevented or minimized Doe's damages — in other words, there is no causal link between this alleged inaction and Doe's damages; and (4) the Complaint alleges that Doe did receive treatment, which has been or will be paid for by his mother.

The plaintiff responds that these purported shortcomings are not required elements of a Title IX claim. In its reply, the School Board contends that the asserted issues go to the fourth element of a Title IX claim, that there must be a basis for imputing liability to the School Board. Additionally, the School Board notes that being a student of its school system is a required element of a Title IX claim.

The Complaint alleges that Doe is a resident of Russell County and that after his fourth grade year, he began attending middle school and no longer attended LES. Though the Complaint does not expressly state that he attended a middle school operated by the School Board, that fact can be inferred by the Complaint's allegation that he rode one of the School Board's buses to the middle school during the school year in which Gobble was arrested.

There is no question that at the time of Gobble's arrest, the School Board unequivocally knew, based on Gobble's confession, that Gobble had abused Doe. Under the standard articulated in *Gebser*, and for the reasons stated as to Count I, liability can be imputed to the School Board in this case. At oral argument, counsel for the School Defendants appeared to agree that Title IX requires a school board to take action to remedy past sexual harassment of a student by an employee once the school board obtains actual knowledge of the harassment. The School Board cites no authority that would require a specific request for counseling in

order to trigger a duty to provide remedial services. I find that Count II states a plausible Title IX claim, and I will deny the Motion to Dismiss as to Count II.

## C. Count III.

Count III is a failure-to-train claim asserted against the School Defendants under 42 U.S.C. § 1983. Like Doe's other § 1983 claims, it is based on the violation of his Fourteenth Amendment substantive due process right to bodily integrity and to be free from sexual abuse by a school employee, as well as his property interest in a public education. The School Defendants argue that Count III should be dismissed because the allegations do not establish deliberate indifference or proximate cause.

"[T]here are limited circumstances in which an allegation of a 'failure to train' can be the basis for liability under § 1983." *City of Canton v. Harris*, 489 U.S. 378, 387 (1989). In the school context, the failure to train must amount to deliberate indifference to the rights of students, and the deficiency in training "must be closely related to the ultimate injury." *Id.* at 391. "Where a plaintiff claims that the [governmental body] has not directly inflicted an injury, but nonetheless has caused an employee to do so, rigorous standards of culpability and causation must be applied to ensure that the [governmental body] is not held liable solely for the actions of its employee." *Bd. of Cty. Comm'rs. v. Brown*, 520 U.S. 397, 405 (1997).

The School Defendants' "continued adherence to an approach that they know or should know has failed to prevent tortious conduct by employees may establish the conscious disregard for the consequences of their action — the 'deliberate indifference' — necessary to trigger [public entity] liability." *Id.* at 407. "Without notice that a course of training is deficient in a particular respect, decisionmakers can hardly be said to have deliberately chosen a training program that will cause violations of constitutional rights." *Connick v. Thompson*, 563 U.S. 51, 62 (2011). Notice can be established by showing that the need for the training and the risks of not providing the training were obvious. *See Canton*, 489 U.S. at 390; *Jordan ex rel. Jordan v. Jackson*, 15 F.3d 333, 341 (4th Cir. 1994).

I find that the plaintiff has adequately pleaded both deliberate indifference and causation. The Complaint references prior sexual harassment of a middle school student by a School Board employee, but that situation is likely too distinct from Gobble's behavior, in circumstances and in time, to evidence a pattern of sexual abuse within the school district. Nevertheless, given the extensive rules and guidance from the state and federal government on sexual harassment and sexual violence in schools alleged in the Complaint, I conclude that the plaintiff has plausibly asserted that the School Defendants' complete failure to train teachers and employees on how to spot, investigate, and address sexual assault amounted to deliberate indifference. A jury could find that the risk of sexual assault was so

obvious that no pattern of unconstitutional behavior by school staff was necessary to put the School Defendants on notice of the need to train employees.

The School Defendants assert that all teachers must receive some relevant training in order to be licensed in Virginia, but that argument amounts to a factual contention that does not appear on the face of the Complaint. At this procedural juncture, I am bound by the facts alleged in the Complaint, viewed in the light most favorable to the plaintiff. Moreover, even if true, the fact that teachers receive some training from other sources as a matter of course would not necessarily relieve the School Board of a duty to implement its own training program. Without examining evidence on the topic, I cannot say what particular training the School Board's teachers receive or whether that training satisfies the School Board's obligations under Title IX.

The School Defendants also argue that Gobble's status as Doe's caretaker, rather than any failure to train, was the true cause or moving force behind the abuse. But the Complaint alleges that the abuse started at the school, before Doe began living with Gobble. Evidence later presented may lead to the conclusion that a failure to train was not the proximate cause of Doe's injuries, but that is not an issue I can decide on a Motion to Dismiss. The Complaint's allegations are sufficient to state a failure-to-train claim, and I will deny the Motion to Dismiss as to Count III.

D. Counts IV and V.

Count IV asserts supervisory liability under § 1983 against Henley, and Count V asserts supervisory liability under § 1983 against Hooker. Each claim alleges that the respective principal had actual or constructive knowledge of conduct by Gobble that posed a pervasive and unreasonable risk of constitutional injury to Doe, and that the principal responded with deliberate indifference.

In order to establish liability under § 1983 in a case like this, a plaintiff must show that (1) the defendant in a supervisory position had knowledge (actual or constructive) that her subordinate was engaged in conduct that "posed a pervasive and unreasonable risk of constitutional injury to citizens like the plaintiff"; (2) the response by the defendant was so inadequate as to show deliberate indifference; and (3) there was a causal link between the inaction and the injury suffered by the plaintiff. *See Baynard*, 268 F.3d at 235. The School Defendants contend that the allegations fail to establish these three elements.

The Fourth Circuit has defined constructive knowledge as "[k]nowledge that one using reasonable care or diligence should have, and therefore that is attributed by law to a given person." *Hoschar v. Appalachian Power Co.*, 739 F.3d 163, 175 (4th Cir. 2014). The Complaint alleges that Henley and Hooker knew or should have known that Gobble was employing a multitude of grooming behaviors, was removing students from class and isolating them in secluded areas of LES, and was

inappropriately physical with and obsessive over Doe in particular. The Complaint further alleges that in addition to living with Doe, Gobble was taking inappropriate actions with respect to other male students who did not live with him, including giving them money and candy and having them "help" him at the school after hours.

To the extent that Henley and Hooker did not have actual knowledge of these incidents, the Complaint plausibly alleges that they could easily have learned about them by asking questions of LES teachers, or even by being more observant while at the school. A number of teachers allegedly witnessed Gobble's inappropriate behavior, and LES was equipped with a video surveillance system whose viewing monitors were located in the principal's office.

When Doe first began attending LES as a third-grade student, he was not living with Gobble. Later that school year, Henley learned that Doe had moved in with Gobble, who had worked at LES for about five years at that point. The two did not share a last name, and the Complaint does not allege any facts that would have justified an assumption that the two were related as family members. A jury could justifiably conclude that those facts put Henley on notice of an inappropriate relationship and obligated him to investigate with reasonable care and diligence. As explained above with respect to Count I, the Complaint plausibly alleges that

the report to DSS gave Hooker actual knowledge that Gobble's behavior posed an unreasonable risk of constitutional injury to Doe.

The School Defendants argue that Gobble's observed behavior toward Doe and other male students could have been innocent. They thus contend that they did not have actual or constructive knowledge of abuse. That is a factual matter to be later decided. The Fourth Circuit rejected a similar benign interpretation argument in *Baynard*. 268 F.3d at 235. The plaintiff has adequately pleaded actual or constructive knowledge.

It could also be reasonably concluded that the principals' failure to take any action, aside from Hooker sitting in on DSS' interviews and then suggesting to Gobble that Doe should be in the after-school program, was a deliberately indifferent response to mounting evidence of misconduct. Henley and Hooker may not have had the power to suspend or terminate Gobble, but there are numerous other steps they presumably could have taken to investigate the situation and halt the abuse. For instance, they might have alerted the boy's grandmother to Gobble's suspicious behavior; they might have instructed teachers not to allow Gobble to remove students from class; they might have restricted Gobble's after-hours access to the school and forbidden him from spending time with students behind closed doors; they might simply have asked more questions of LES

teachers and staff.[2]  It will have to be later decided in the case, based on the evidence, whether Henley and Hooker took appropriate action or whether their alleged failures to act amounted to deliberate indifference sufficient to impose supervisory liability.  The Complaint adequately alleges the three elements necessary for a supervisory liability claim, and I will deny the Motion to Dismiss as to Counts IV and V.

## E.  Count VI.

Count VI asserts a § 1983 claim against the School Defendants based on a special relationship theory.  The School Defendants move for dismissal of Count VI on the ground that the Fourth Circuit has stated that there is no special relationship between a student and a school.  The plaintiff argues that when a student is isolated and falsely imprisoned in secluded rooms within the school, that situation is more akin to institutionalization than to a typical student-school relationship.

The School Defendants cite *Stevenson ex rel. Stevenson v. Martin County Board of Education*, 3 F. App'x 25 (4th Cir. 2001) (unpublished).  In *Stevenson*, the court acknowledged that "if the state has a special relationship with an individual, the state has an affirmative duty to protect the individual from harm

---

[2]  At the summary judgment stage or at trial, the evidence may show that Henley and Hooker did some or all of these things.  I express no opinion on what the evidence may ultimately establish.

inflicted by third parties." *Id.* at 30. The court quoted the following explanation of

a special relationship set forth by the Supreme Court:

> [W]hen the State by the affirmative exercise of its power so restrains an individual's liberty that it renders him unable to care for himself, and at the same time fails to provide for his basic human needs — *e.g.,* food, clothing, shelter, medical care, and reasonable safety — it transgresses the substantive limits on state action set by . . . the Due Process Clause . . . . [I]t is the State's affirmative act of restraining the individual's freedom to act on his own behalf — through incarceration, institutionalization, or other similar restraint of personal liberty — which is the "deprivation of liberty" triggering the protections of the Due Process Clause, not its failure to act to protect his liberty interests against harms inflicted by other means.

*Id.* (quoting *DeShaney v. Winnebago Cty. Dep't of Soc. Servs.,* 489 U.S. 189, 197

(2001)). The *Stevenson* court noted that other circuits "have held uniformly that no

special relationship exists [between a school and a student] because the student is

not in physical custody and, along with parental help, is able to care for his basic

human needs." *Id.* at 30-31. The *Stevenson* court followed suit, holding that

"[w]hen a student attends public school, his liberty is not restrained to the extent

contemplated in *DeShaney.* Attending school is not the equivalent of incarceration

or institutionalization." *Id.* at 31.

Although the plaintiff presents a creative argument for an exception to this

general rule, he cites no authority for it. I do not believe that Gobble's act of

secluding Doe in the custodial office is equivalent to the state restricting a person's

liberty through incarceration. I find that the Complaint fails to plausibly allege a

special relationship between Doe and the School Defendants and will grant the Motion to Dismiss as to Count VI.

## F.  Count VII.

In Count VII, the plaintiff alleges that the School Defendants had a practice and de facto policy of allowing Gobble to remove students from regular school activities and confine them in secluded areas of the school where he could abuse them, and that this practice and policy created a danger for Doe and other students. According to the plaintiff, this practice and policy exhibited deliberate indifference and reckless disregard for Doe's constitutional rights.  The School Defendants argue that the Complaint at best shows inaction or omission and does not allege any affirmative act by the School Defendants that created or increased a danger, which is required to state a claim under this theory.  In response, the plaintiff asserts that allowing Gobble to remove students from class and take them to the custodian office is not mere inaction but an affirmative act.

"[T]o establish § 1983 liability based on a state-created danger theory, a plaintiff must show that the state actor created or increased the risk of private danger, and did so directly through affirmative acts, not merely through inaction or omission."  *Doe v. Rosa*, 795 F.3d 429, 439 (4th Cir. 2015).  The Fourth Circuit has emphasized that "affirmative acts" in this context are limited in scope, and courts should resist the temptation to recast inaction as affirmative action.  *Id.* at

441. In *Robinson v. Lioi*, a panel of the Fourth Circuit held that a police officer had committed the requisite kind of affirmative acts when he conspired with a suspect to evade arrest after a warrant had been issued, alerting the suspect to the warrant and refusing to arrest the suspect on the false premise that the warrant could not be found. 536 F. App'x 340, 344 (4th Cir. 2013) (unpublished). While the suspect remained free, he killed his wife. *Id.* at 341. On these alleged facts, the Fourth Circuit held that the plaintiff had stated a viable § 1983 claim against the police officer under a state-created danger theory. *Id.* at 345-46.

In this case, the plaintiff has alleged that individual teachers, who are not named as defendants, allowed Gobble to remove Doe and other students from their classes, for no apparent educational purpose, and to spend time with them in secluded areas of the school when they should have been in class. While those allegations may amount to affirmative acts that increased the danger of sexual assault, they were not acts committed by Henley, Hooker, or the School Board, the defendants against whom Count VII is asserted. The plaintiff does not allege that the School Defendants knew that teachers were allowing Gobble to remove students from classes and to spend time with them behind closed doors. Therefore, the Complaint fails to plausibly allege that the School Defendants created any practice or de facto policy regarding Gobble removing students from classes. At most, the Complaint alleges facts showing that the School Defendants failed to

take action in response to observed grooming behaviors and the report made to DSS. The Fourth Circuit has clearly indicated that a mere failure to act cannot support liability under a state-created danger theory. I will grant the Motion to Dismiss as to Count VII because that count fails to state a claim upon which relief can be granted.

## G. Qualified Immunity.

With respect to all of the § 1983 claims, Henley and Hooker assert that they are entitled to qualified immunity. A § 1983 claim requires proof of the following three elements: "(1) the deprivation of a right secured by the Constitution or a federal statute; (2) by a person; (3) acting under color of state law." *Jenkins v. Medford*, 119 F.3d 1156, 1159-60 (4th Cir. 1997). While state officials sued in their official capacities are not "persons" under § 1983, *Will v. Mich. Dep't of State Police*, 491 U.S. 58, 71 (1989), state officials sued in their individual capacities are "persons" within the meaning of the statute and are not absolutely immune from suit, *Hafer v. Melo*, 502 U.S. 21, 31 (1991). A government official sued in his individual capacity under § 1983 may, however, be entitled to qualified immunity. *Id.* at 25 ("[O]fficials sued in their personal capacities . . . may assert personal immunity defenses such as objectively reasonable reliance on existing law.")

Qualified immunity "shields government officials from liability for civil damages, provided that their conduct does not violate clearly established statutory

or constitutional rights within the knowledge of a reasonable person." *Meyers v. Balt. Cty.,* 713 F.3d 723, 731 (4th Cir. 2013). Qualified immunity is immunity from suit rather than merely immunity from liability; therefore, the question of qualified immunity should be decided before trial. *Id.* A defendant asserting qualified immunity has the burden of proving the defense. *Id.*

A court deciding the applicability of qualified immunity must determine "whether a constitutional violation occurred" and "whether the right violated was clearly established." *Tobey v. Jones*, 706 F.3d 379, 385 (4th Cir. 2013). A right can be clearly established even if there does "not exist a case on all fours with the facts at hand," as long as pre-existing law makes the right apparent. *Hunter v. Town of Mocksville*, 789 F.3d 389, 401 (4th Cir. 2015). Where a plaintiff "(1) allege[s] a violation of a right (2) that is clearly established at the time of the violation," a motion to dismiss on qualified immunity grounds must be denied. *Evans v. Chalmers,* 703 F.3d 636, 646 (4th Cir. 2012).

Here, the plaintiff has plausibly alleged that the School Defendants violated his Fourteenth Amendment substantive due process right to be free from sexual abuse at school. The Fourth Circuit has stated that "[u]nder established precedent," students have a right to bodily integrity and to be free from sexual abuse by state actors. *Doe v. Rosa*, 795 F.3d at 436-37 (citing *Hall v. Tawney*, 621

F.2d 607, 612-13 (4th Cir. 1980)).  Doe's constitutional right to be free from school-based molestation was clearly established at the time of these events.

The School Defendants argue that it was reasonable for them to view Gobble's actions as consistent with that of a caretaker, but that is a factual issue to be later decided and not a basis for granting qualified immunity.  Because the plaintiff has alleged the violation of a clearly established right, the request for qualified immunity is denied.

## H.  Counts IX and X.

Count IX asserts a state law negligence per se claim against Gobble, Henley, Hooker, and as-yet-unnamed defendants based on alleged violations of Va. Code Ann. §§ 18.2-371 and 16.1-228.  The first statute, section 18.2-371, provides that any adult who "willfully contributes to, encourages, or causes any act, omission, or condition that renders a child delinquent, in need of services, in need of supervision, or abused or neglected as defined in § 16.1-228" is guilty of a Class 1 misdemeanor.  Section 16.1-228 defines "[a]bused or neglected child" to include a child "[w]hose parents or other person responsible for his care creates or inflicts, threatens to create or inflict, or allows to be created or inflicted upon such child a physical or mental injury other than by accidental means."  The statute defines "[c]hild in need of services" as "a child whose . . . condition presents or results in a serious threat to the well-being and physical safety of the child."  *Id.*  A "[c]hild in

need of supervision" includes "[a] child who, while subject to compulsory school attendance, is habitually and without justification absent from school," if the school has satisfied certain requirements to procure regular attendance. *Id.*

Count X asserts a negligence per se claim against Henley, Hooker, and as-yet-unnamed defendants based on Va. Code Ann. § 63.2-1509(A), which states in relevant part:

> The following persons who, in their professional or official capacity, have reason to suspect that a child is an abused or neglected child, shall report the matter immediately to the local department of the county or city wherein the child resides or wherein the abuse or neglect is believed to have occurred or to the Department's toll-free child abuse and neglect hotline:
>
> . . . .
>
> 5. Any teacher or other person employed in a public or private school, kindergarten or nursery school[.]

Henley and Hooker invoke sovereign immunity as to these negligence per se claims. The plaintiff contends that the sovereign immunity inquiry raises factual questions that cannot be decided on a motion to dismiss.

The Supreme Court of Virginia has stated that "[t]he existence of sovereign immunity is a question of law." *Burns v. Gagnon*, 727 S.E.2d 634, 644 (Va. 2012). Four factors should be considered in determining whether a public employee is entitled to sovereign immunity:

> (1) the nature of the function the employee performs; (2) the extent of the governmental entity's interest and involvement in the function; (3) the degree of control and direction exercised by the governmental

entity over the employee; and (4) whether the alleged wrongful act involved the exercise of judgment and discretion.

*Id.* at 646.

In *Banks v. Sellers*, the Supreme Court of Virginia held that a public school "principal still performs a large number of discretional and managerial functions in the school and, therefore, is entitled to [sovereign] immunity." 294 S.E.2d 862, 865 (Va. 1982). In the more recent *Burns* case, however, the court found *Banks* not dispositive because the *Banks* court had not applied the four-factor test stated above. *Burns*, 727 S.E.2d at 646.

The defendant in *Burns* was a vice principal who had received a report that a fight would occur at the school but did not take any action in response to the report. *Id.* at 638. A student who was injured in the fight sued the vice principal for simple and gross negligence. *Id.* The *Burns* court focused its analysis exclusively on the fourth factor of the sovereign immunity test, noting that it was the only factor on which the parties disagreed. *Id.* at 646.

The court held that the vice principal was entitled to sovereign immunity because the vice principal's response to the report "involved the exercise of judgment and discretion." *Id.* Upon receiving the report, the vice principal had to decide whether, when, and how to respond. *Id.* Therefore, the court "conclude[d] that his response (or lack thereof) was not simply a ministerial act; instead, it was an act involving the exercise of judgment and discretion." *Id.*

In this case, the allegations show that Henley and Hooker exercised the same kind of discretion in responding to evidence of Gobble's sexual misconduct that the vice principal in *Burns* had exercised in responding to news that a fight would occur. Therefore, I find that the alleged facts as to the fourth factor support the application of sovereign immunity. As to the other three factors, I conclude that they also support the application of sovereign immunity. As school principals, Henley and Hooker performed governmental functions. The operation of public schools is a governmental function. *Lentz v. Morris*, 372 S.E.2d 608, 610 (Va. 1988). A school board "has official interest and direct involvement in the function of student instruction and supervision, and it exercises control and direction over [teachers and staff] through the school principal." *Id.* Henley and Hooker are entitled to sovereign immunity on the plaintiff's negligence per se claim. I will grant the Motion to Dismiss as to Counts IX and X.

## I. Count XI.

Count XI asserts a claim of gross negligence against Henley, Hooker, and as-yet-unnamed defendants. The School Defendants move to dismiss Count XI for failure to state a claim, arguing that the Complaint does not allege any actual knowledge of abuse by Henley and only alleges that Hooker knew of the complaint to DSS made by Gobble's wife. According to the School Defendants, although the Complaint alleges that a number of teachers and school personnel observed

Gobble's behavior, there is no allegation that any of them told Henley or Hooker what they had observed. They also argue that Hooker's act of sitting in on the DSS interviews of Gobble and Doe showed at least slight care, which undermines the claim of gross negligence.

Sovereign immunity does not completely insulate Henley and Hooker from liability for the plaintiff's state law claims. "Rather, the degree of negligence which must be shown to impose liability is elevated from simple to gross negligence." *Burns*, 727 S.E.2d at 646. "Gross negligence is a degree of negligence showing indifference to another and an utter disregard of prudence that amounts to a complete neglect of the safety of such other person." *Elliott v. Carter*, 791 S.E.2d 730, 732 (Va. 2016). "Several acts of negligence which separately may not amount to gross negligence, when combined may have a cumulative effect showing a form of reckless or total disregard for another's safety." *K.L. v. Jenkins*, No. 130786, 2014 WL 11398624, at *2 (Va. May 9, 2014) (unpublished) (overturning trial court's grant of demurrer on gross negligence claim arising out of sexual assault of child at summer camp). "Ordinarily, the question whether gross negligence has been established is a matter of fact to be decided by a jury. Nevertheless, when persons of reasonable minds could not differ upon the conclusion that such negligence has not been established, it is the court's duty to so rule." *Elliott*, 791 S.E.2d at 732. "Because the standard for

gross negligence in Virginia is one of indifference, not inadequacy, a claim for gross negligence must fail as a matter of law when the evidence shows that the defendants exercised some degree of care." *Id.*

I find that the Complaint states a plausible claim of gross negligence. The plaintiff has alleged sufficient facts to show that Henley and Hooker each had knowledge of grooming behaviors and misconduct by Gobble. The evidence may ultimately show that Henley and Hooker did not know about Gobble's inappropriate behavior or that they took some steps to curtail it, but it will take evdience to decide who knew what, when, and how they responded. A jury could reasonably conclude that simply sitting in on a DSS interview does not amount to even slight care sufficient to undermine the gross negligence claim against Hooker. According to the Complaint, Hooker took no steps to monitor Gobble or investigate the situation following the intreview. Viewing the allegations in the light most favorable to the plaintiff, Hooker's alleged response could be found to rise to the level of indifference required to support a gross negligence claim under Virginia law. Likewise, it could be found that Henley's failure to investigate or act upon evidence of an inappropriate relationship between Gobble and Doe amounted to deliberate indifference. I will deny the Motion to Dismiss as to Count XI.

J.  Counts XII and XIII.

Counts XII and XIII assert claims of assault and battery against Gobble and the School Board.  The School Board asserts that these claims are barred by sovereign immunity and that they fail to state viable claims of vicarious liability because Gobble's tortious actions were outside the scope of his employment.  The plaintiff argues that the School Board is not entitled to sovereign immunity because the provision of janitorial services is a proprietary function, not a governmental function.  The plaintiff further argues that because at least some of the assaults and batteries occurred on school grounds while Gobble was supposed to be performing custodial work, the assaults and batteries occurred in the scope of Gobble's employment, and the School Board can be held vicariously liable.

In Virginia, a governmental entity is generally immune from liability for torts associated with the performance of governmental functions, but not for torts associated with the performance of proprietary functions.  *Niese v. City of Alexandria*, 564 S.E.2d 127, 132 (Va. 2002).  "A function is governmental if it is directly tied to the health, safety, and welfare of the citizens."  *Id.*  In *Niese*, the Supreme Court of Virginia held that a city was immune from intentional tort liability based on rapes committed by a police officer during the investigation of a citizen's complaint because providing a police force is a governmental function. *Id.* at 133.

Maintaining public schools is also a governmental function. "The basis for a school board's immunity from liability for tortious injury has been generally found in the fact that it is a governmental agency or arm of the state and acts in a governmental capacity in the performance of its duties imposed by law." *Kellam v. Sch. Bd. of Norfolk*, 117 S.E.2d 96, 97 (1960). In *Kellam*, the Supreme Court of Virginia held that a school board was entitled to sovereign immunity on a slip-and-fall negligence claim asserted by a member of the public who had attended a concert hosted by a third party at a school. *Id.* at 100. If the maintenance of walkways on school grounds was considered a governmental function of the school board in *Kellam*, then the provision of custodial services in a school must also be considered a governmental function of the School Board here. Indeed, *Kellam* seems to imply that every action taken by a school board is governmental in nature. *Id.* at 97-98.

I find that sovereign immunity shields the School Board from liability for the assaults and batteries committed by Gobble, and I will grant the Motion to Dismiss as to Counts XII and XIII as to the School Board.

## K. Count XIV.

Count XIV asserts a claim of intentional infliction of emotional distress against Gobble and the School Board. The School Board invokes sovereign immunity as to this claim as well. For the reasons stated above, I find that this tort

claim is also barred by sovereign immunity.  I will grant the Motion to Dismiss as to Count XIV as to the School Board.

IV.

For the foregoing reasons, it is **ORDERED** that the Motion to Dismiss, ECF No. 19, is GRANTED IN PART AND DENIED IN PART.  It is GRANTED as to Counts VI, VII, IX, X, XII, XIII, and XIV of the Complaint and those counts are hereby dismissed as against the School Defendants.   In all other respects, the Motion to Dismiss is DENIED.

ENTER:  April 13, 2017

/s/  James P. Jones
United States District Judge