IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
Abingdon Division

| | | |
|---|---|---|
| JOHN DOE, an infant, by his next friend Reelia Watson, | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | Civil Action No.: 1:16-cv-00045 |
| RUSSELL COUNTY SCHOOL BOARD, ET AL., | ) ) | |
| Defendants. | ) | |

BRIEF IN SUPPORT OF KIM HOOKER'S, PHILIP HENLEY'S
AND RUSSELL COUNTY SCHOOL BOARD'S
MOTION FOR SUMMARY JUDGMENT

Russell County School Board (School Board), Phillip Henley (Henley), and Kimberly

Hooker (Hooker) (collectively the Defendants), by counsel, file this Brief in Support of their

Motion to Dismiss seeking summary judgment on the Plaintiff's Complaint pursuant to Rule 56

of the Federal Rules of Civil Procedure and in support state as follows:

**PROCEDURAL BACKGROUND AND ISSUE**

The Plaintiff filed a Complaint on December 8, 2016. (ECF No. 1) The Complaint

alleged fourteen counts in total. (*Id.*) As it relates to the Defendants, the Complaint alleged two

Title IX counts against the School Board, a failure to train 42 U.S.C. § 1983 (§ 1983) count

against the Defendants, a § 1983 count as to state-created danger against the Defendants, a §

1983 special relationship count against the Defendants, a § 1983 supervisory liability count

against Hooker, a § 1983 supervisory liability count against Henley, gross negligence count

against Hooker and Henley, negligence per se counts against Hooker and Henley, and respondeat

superior counts of assault, battery and intentional infliction of emotional distress against the

School Board. (*Id.*) The Defendants filed a motion to dismiss. (ECF No. 19.) This Court granted

the Defendants' motion to dismiss in part and dismissed the § 1983 counts of state-created danger and special relationship against the Defendants, the negligence per se counts as to Henley and Hooker, and the assault, battery, and intentional infliction of emotional distress as to the School Board. (ECF No. 43.) The claims that are still pending are: Title IX claim against the School Board, a post-February 2014 Title IX claim against the School Board, § 1983 failure to train claim against the Defendants, § 1983 supervisory liability claims against Henley and Hooker, and a gross negligence claim against Henley and Hooker.

**STATEMENT OF FACTS**

Henley was a principal at Lebanon Elementary School (LES) from 2005 until June 2012. (Henley Dep. Tr. 10:22-24.) Dennis Price (Price) was the assistant principal from 2006 until the Spring 2012 term when he served as part-time assistant principal at LES and part-time assistant principal at Lebanon High School. (Dennis Price Dep. Tr. 13:2-17.) Hooker was the principal of LES for the 2012-2013 academic year. (Kimberly Hooker Dep. Tr. 11:13-20.) Price became the principal at LES for the 2013-2014 school year. (Price Dep. Tr. 14:6-18.)

Bobby Gobble (Gobble) was first hired as a custodian at LES in May 2007. (Bobby Gobble Dep. Tr. 21:10-13.) He served as a custodian until July 8, 2011, when he was appointed the head custodian and his sister Brenda Helbert (Brenda) was transferred to LES to serve as a custodian. (Gobble Dep. Tr. 27:22-28:1, 29:6-15.)

In late 2011 or early 2012, Gobble became acquainted with John Doe. (Gobble Dep. Tr. 82:1-3.) John Doe helped Gobble with the trash towards the end of the school day. (Gobble Dep. Tr. 80:10-21.). John Doe and Gobble would talk during that time. (*Id.*) According to Brenda, John Doe's teacher would call the custodian's office and ask Gobble to help calm down John Doe. (Brenda Helbert Dep. Tr. 40:4-11.) The teacher once allowed Gobble to take John Doe out of the classroom and down to the custodian's office. (Helbert Dep. Tr. 46:10-12.)

According to Gobble, this culminated in John Doe staying the night after playing basketball on a field or court after school. (Gobble Dep. Tr. 259:12-24.) John Doe's grandfather, C., testified that Gobble would bring John Doe back to him and John Doe's grandmother from school and visited them four to six times before John Doe's first overnight stay at Gobble's home. (C. Dep. Tr. 64:14-18.)

According to Gobble, John Doe's first overnight visit occurred in March 2012. (Gobble Dep. Tr. 259:2-8.) At this time, John Doe's grandparents had legal custody of him. (Jane Doe Dep. Tr. 52:9-16.) However, Jane Doe would see John Doe and Gobble on a weekly, if not more often, basis and they would discuss John Doe's daily activities. (Jane Doe Dep. Tr. 43:12-44:13.) Jane Doe was aware John Doe helped Gobble with the trash, stayed with him after school, would go to football and basketball games with Gobble, took John Doe out of state to Bristol or Johnson City, Tennessee, and that Gobble would pay him for his help. (Jane Doe Dep. Tr. 47:1-9.) She also became aware that John Doe was spending nights with Gobble. (Jane Doe Dep. Tr. 52-55) She had no issues or concerns with these activities. (*Id.*). During this time, she never spoke with anyone at Russell County Schools regarding Gobble (*Id.*) Similarly, John Doe's grandfather, would see both John Doe and Gobble at least several times a week. (C. Dep. Tr. 64:19-23.) He was aware John Doe would go to and from school with Gobble, that John Doe would help Gobble with work at school, that Gobble paid him for helping him, and that John Doe was staying overnight at Gobble's home. (C. Dep. Tr. 45:15-25, 50:21-25.) During this time, the grandfather never spoke with anyone at Russell County Schools regarding Gobble. (C. Dep. Tr. 55:9-19.)

Gobble's relationship with John Doe continued through the summer. (Jane Doe Dep. Tr. 61:17-20.) Jane Doe dropped off John Doe at the school for him to help Gobble with Gobble's custodial work. (Jane Doe Dep. Tr. 62:17-23.) On July 27, 2012, Jane Doe regained custody of

John Doe. (Jane Doe Dep. Tr. 58:15-21.) Jane Doe continued to see Gobble a couple times a week and continued to discuss John Doe's daily activities with him. (Jane Doe Dep. Tr. 63:16-18.) During the summer, John Doe would continue to have overnight visits with Gobble. (Jane Doe Dep. Tr. 61:5-7.) She was also aware that Gobble took John Doe to Dollywood and had no concerns about the trip. (Jane Doe Dep. Tr. 64:3-11.)

During the fall of 2012, Jane Doe, now the legal guardian, would see Gobble one to two times a week and John Doe would continue to have overnight visits with Gobble. (Jane Doe Dep. Tr. 64:15-22.) Jane Doe recalls a DSS investigation in the fall of 2012. According to Jane Doe, Kathy Brickey (Brickey) and another worker came to check on her children's wellbeing and looked through the house. (Jane Doe Dep. Tr. 65:17-21.) She stated that she understood she was under investigation, not Gobble, and that they "where there to check on how [she] was taking care of the kids, *if the kids were there*, if the house was clean and all of that, and it had nothing to do with the allegations that were against [Gobble]." (Jane Doe Dep. Tr. 73:20-74:1(emphasis added).) DSS came to "see if [she] was letting [John Doe] stay over there all of the time and everything." (Jane Doe Dep. Tr. 76:18-22.) She was informed that this investigation was determined to be unfounded. (Jane Doe Dep. Tr. 73:2-3.) She never received any documentation from DSS regarding the investigation. (Jane Doe Dep. Tr. 75:20-22.)

Brickey, a former DSS employee, testified regarding her investigation. She states that Gobble's (former) wife, Charlene Gobble (Charlene) "came to the office and made a complaint that [Gobble] was spending too much time with a young man that he had kind of taken under his wing at school, and she told [DSS] the little boy was allowed to stay at their home, and she thought that it needed to be investigated, that it was affecting their marriage." (Brickey Dep. Tr. 14:19-24.) Charlene specifically was concerned because Gobble "wasn't sleeping with her anymore, he was sleeping in the room with the child." (Brickey Dep. Tr. 15:2-4.) DSS began its

investigation by going to the Gobble home. (Brickey Dep. Tr. 16:1-2.) Charlene met them there and showed DSS "where [Gobble] was sleeping, and . . . there was a small pallet beside the bed that the child slept on." (Brickey Dep. Tr. 16:14-16.) Next, they went to LES where they spoke with the principal. (Brickey Dep. Tr. 17:12-25.) The principal told them that "Gobble had taken the child under his wing", that "he looked up to Mr. Gobble as a kind of father figure" and that Gobble "made sure [John Doe] got home of the evenings and would take him to ball games." (Brickey Dep. Tr. 18:3-9.) Next, they interviewed Gobble who stated that "the mother had allowed him to come and take the child under his wing and to help him with things at school, rides home of the evening; that he was very fond of the child."' (Brickey Dep. Tr. 20:2-5.) As to John Doe's overnight visits, Gobble stated that "the mother was okay with that, that they were friends." (Brickey Dep. Tr. 20:10-11.)

After interviewing Gobble, Kincaid asked questions of John Doe with Brickey and the principal being present (Brickey Dep. Tr. 98:10-99:5.) Then Kincaid instructed Gobble to take John Doe in his personal vehicle and meet her and Brickey at Jane Doe's residence. (Brickey Dep. Tr. 25:10-13, 25:24-26:1.) Brickey and Kincaid reached the Jane Doe residence first and advised Jane Doe that they were "investigating a complaint that there was an inappropriate relationship between Mr. Gobble and the child." (Brickey Dep. Tr. 27:15-22.) DSS proceeded to interview Jane Doe who advised them that "she was aware that he was bringing . . . the child home, . . . that Mr. Gobble had become a friend of the family, that he had done a lot for the child, and that he had been to the house on several occasions for dinner, birthdays" and that John Doe "did spend a lot of time with Mr. Gobble, and that Mr. Gobble was present in the home quite a bit with dinners, birthdays, and that . . . him and the child had a special relationship" (Brickey Dep. Tr. 30:9-13, 34:5-9.) After that, she believes that they asked John Doe a couple of simple questions. (Brickey Dep. Tr. 34:22-35:8.) Before leaving, Brickey wrote a safety plan for John

5

Doe.  (Brickey Dep. Tr. 60:14-15.)  "The safety plan was for her to not let the child go back and spend the night with Mr. Gobble" and it was discussed with Jane Doe who signed the safety plan and retained a copy of it.  (Brickey Dep. Tr. 64:18-20, 71:13-22, 72:11-13).  DSS never notified law enforcement of its investigation.  (Brickey Dep. Tr. 85:5-13.)  To her knowledge, no one from DSS notified Russell County Schools regarding the safety plan.  (Brickey Dep. Tr. 87:17-25.)

During the investigation, DSS became aware that Gobble would give John Doe an allowance for helping Gobble with chores at the school.  (Brickey Dep. Tr. 102:3-8.)  She also assumed that Gobble would take John Doe to and from school.  (Brickey Dep. Tr. 133:2-10.)  As to her concerns regarding Gobble and John Doe, she never spoke with anyone from Russell County Schools about them.  (Brickey Dep. Tr. 65:19-22.)

Weeks or months later, Charlene came back to DSS and "complained again, because Mr. Gobble had moved out of the home and moved into another home, but . . . [Brickey] did hear her say that [John Doe] was still continuing to spend the nights with him."  (Brickey Dep. Tr. 40:11-23.)  DSS investigated that complaint as well but Brickey did not participate.  (Brickey Dep. Tr. 39:19-24.)

Following the October 2012 investigation, according to Jane Doe she did not talk to anyone at Russell County Schools regarding DSS.  (Jane Doe Dep. Tr. 77:8-10.)  Jane Doe did not talk to Gobble nor did she talk to John Doe's grandfather about the investigation.  (Jane Doe Dep. Tr. 77:4-7, 78:5-7.)  At some point, she was advised by DSS that Charlene Gobble, then-Gobble's wife, was repeatedly making complaints to DSS about the situation.  (Jane Doe Dep. Tr. 73:6-22.)  Following this investigation, John Doe continued to spend time with Gobble, would continue to help Gobble with work at school, would continue to be transported by Gobble,

and to the extent he was spending nights with Gobble it was with Jane Doe's permission. (Jane Doe Dep. Tr. 78:10-79:18.)

Charlene recalls that John Doe first came to their home on a Friday night and that both of Gobble's nephews were there. (Charlene Gobble Dep. Tr. 31:10-14.) They were playing video games until late in the evening, 10 or 11 o'clock, when she was informed that he would stay the weekend. (Charlene Dep. Tr. 31:16-21.) She recalls John Doe's grandmother calling "all the time" and talking to Gobble (Charlene Dep. Tr. 36:17-19). While a specific timeline was difficult to understand, Charlene stated that John Doe would stay overnight with Gobble into 2013. (Charlene Dep. Tr. 44:14-18.)

Charlene recalls that in July 2012, Jane Doe came by their house and told Charlene that "she had a complaint, people was calling her and complaining because John Doe was staying with [Charlene], staying with [Gobble and Charlene]." (Charlene Dep. Tr. 42:16-23.) Charlene witnessed John Doe sitting on Gobble's lap, John Doe calling Gobble "daddy", and Gobble having his arms around John Doe. (Charlene Dep. Tr. 105:9-106:12.) She got a "funny feeling because of the way John Doe was sitting on [Gobble's] lap, and I didn't like that, and I know that." (Charlene Dep. Tr. 123:2-4.) She contacted Pam Kincaid at DSS who did not return her call, then talked to law enforcement who told her to contact DSS again, and then met with Kincaid. (Charlene Dep. Tr. 126:21-127:5.)

> Q: So when you talk about liability, you were worried that there might be the allegation of some kind of improper sexual conduct or something, right?
> A: Yes
> Q: Okay. And did you tell Ms. Kincaid that?
> A: I told her that I was worried, because him sitting on his, John Doe coming and sitting on his lap and calling him daddy."

(Charlene Dep. Tr. 105:2-11.)

> A: I told [Kincaid] that I was afraid something was going to lead to something and that's why I went to her.
> Q: Okay.

7

A: Cause I told her, I said I've got a funny feeling, I've been having a funny feeling, because the way the kid was sitting on his lap.

(Charlene Dep. Tr. 127:25-128:6.)

A: The only thing I told [Kincaid] was John Doe would try to sit on [Gobble's] lap and hug him and tell him that he's daddy, and I told her I did not believe in that, and I said that's the reason I was afraid on my legal rights, that's what I told her that I, that's the reason why, and if he got, cause he was sitting on, you know, comes and sits on his lap, I said could he, we get in trouble, and she said yes."

(Charlene Dep. Tr. 74:10-18.)

Kincaid and a couple other DSS employees came to her house and went through it, including the locations of where everyone was sleeping. (Charlene Dep. Tr. 56:13-25, 108:7-11.) However, Charlene never spoke to any Russell County School employee regarding Gobble, John Doe, or her concerns. (Charlene Dep. Tr. 74:19-75:4.)

Charlene and Gobble ended up having marital difficulties including three separations culminating in a divorce. (Charlene Dep. Tr. 47:24-48:4.)

Jane Doe testified that around January or February 2013, DSS, pursuant to Charlene Gobble's complaints, came to Jane Doe's residence to "check on the wellbeing of the children, *to make sure they were home* and all the kids were okay. *But their main concern was, you know, was John Doe staying home*." (Jane Doe Dep. Tr. 80:21-24 (emphasis added).) During that investigation, DSS asked her if John Doe would stay overnight with Gobble and if he had Jane Doe's permission to do so. (Jane Doe Dep. Tr. 84:21-85:6.) Jane Doe confirmed that John Doe would spend nights with Gobble and that he had her permission to do so. (Jane Doe 85:7-9.) DSS left telling her that "everything was okay." (Jane Doe Dep. Tr. 86:3-4.) Jane Doe never received any documentation from DSS regarding the investigation. (Jane Doe Dep. Tr. 87:15-17.)

Following that investigation, Jane Doe continued to allow Gobble to take John Doe to and from school, have him stay and help after school, possibly take him to sporting events, and also potentially allowed John Doe to stay overnight with Gobble as "it's possible he could have

[as she] had no reason not to . . . to think that there was any harm with John Doe being with [Gobble]." (Jane Doe Dep. Tr. 94:17-19 (ellipses in original).)  Between that second DSS investigation and June 2013, Jane Doe never advised Gobble, John Doe's grandmother, or John Doe that John Doe was not to spend the night with Gobble.  (Jane Doe Dep. Tr. 95:18-96:7.) She never communicated with anyone from Russell County Schools regarding the second DSS investigations.  (Jane Doe Dep. Tr. 96:11-13.)  Following John Doe's birthday on July 4, 2013, Jane Doe cut off communications between John Doe and Gobble because she "just got a bad feeling and just didn't want him around John Doe."  (Jane Doe Dep. Tr.103:4-6.)

John Doe's grandfather recalled that at the birthday party John Doe refused to leave with Gobble, and when his younger brother offered to go, John Doe intervened and said "No." (C. Dep. Tr. 84:6-20).  "So, we knowed something was wrong.  I mean anybody, you could tell, anybody would have knowed something was the matter then." (C. Dep Tr. 92:5-8.)  Specifically, "[Gobble]'s bound to have been touching places he shouldn't have never done to start with." (C. 94:14-16.)  He said "everyone" at the party suspected at that time that Gobble had inappropriately touched John Doe.  (C. Dep Tr. 84:21-24.).  He spoke with both Jane Doe and the plaintiff's grandmother regarding these suspicions.  He became even more suspicious when Gobble followed Jane Doe and John Doe at a football game in the fall. (C. Dep. Tr., 92:09-93:01.)  Jane Doe told the grandfather that the next day she was going to go to Russell County Schools and report that Gobble had engaged in inappropriate conduct, including touching, with John Doe:

> Q: Did [Jane Doe] tell you who she was talking to at the school?
> A: No.  No, sir, she didn't.  She just said she was going to the school, was going straight to the school and talk to the school, School Board and stuff.
> Q: To tell them about your suspicions as to Bobby Gobble?
> A: Yea, and . . . yeah, and she knowed something was the matter, too, that's the reason she was going to the school, so she went . . . she went over to the school.
> Q:  And just to be clear, your suspicions as to Bobble Gobble were that he had inappropriate intentions towards John Doe?

9

A:  He was doing stuff he shouldn't have been doing.
(C. Dep. Tr. 91:8-24.)

> A: . . and [Jane Doe] told me she was going to the school to see what could be done about it.
> Q: What could be done about inappropriate behavior, including touching, from Bobby Gobble to John Doe, is that right?
> A: Yeah, go over there and get something done about it to keep him away from John Doe.
> Q: That's what Jane Doe told you, is that correct?
> A: Yeah, she was . . . she was . . . went over there to talk to the school, because she called me and told me she'd been over there at the school different days, talking to the school over there.
> Q: But, specifically, to talk to the school about inappropriate behavior, including touching, between Bobby Gobble and John Doe?
> A: Yeah, that's what she was going to do over there at the school, talk to them about that.

(C. Dep. Tr. 100:18-101:10.)

When John Doe's grandfather spoke with John Doe's grandmother, she "couldn't believe that, that man could do something like that after being in [their] house, ate, sat down, eating food with food with us and talking to us, and seemed like such a good guy, but, he wasn't."  (C. Dep. Tr. 102:10-14.)

Gobble was regularly involved in the family life of Jane Doe and the grandparents from when they first met Gobble until July 4, 2013.  (C. Dep. Tr. 51:4-14, Jane Doe Dep. Tr. 45:16-46:20, 51:4-21, 65:2-5.)  He joined the family for birthdays and holidays.  (C. Dep. Tr. 78:7-11, Jane Doe Dep. Tr. 50:8-22, 104:21-24.)  They considered Gobble part of their family.  (Jane Doe Dep. Tr. 118:13-14.)

Henley only recalls one interaction involving John Doe which was when Gobble's nephews "introduced [John Doe] to him basically as [a] cousin."  (Henley Dep. Tr. 55:14-16.) Henley thought John Doe was "kin or a friend of the family" and this "in passing" interaction occurred February, March 2012.  (Henley Dep. Tr. 55:16-20.)  One of the nephews "said something to the effect that [they] are going to Bristol, [Gobble] is going to take [them] to Bristol to eat dinner."  (Henley Dep. Tr. 56:20-22.)  Henley "was under the assumption that they were

all kin." (Henley Dep. Tr. 56:23.)  In his statement to the police following Gobble's arrest, Henley stated that John Doe would "help gather trash and would also stay in [the] after-school program." (Henley Dep. Tr. 59:13-14.)  He also stated that Gobble told him that John Doe would come over to Gobble's house, which Henley assumed was to spend time with Gobble's nephews. (Henley Dep. Tr. 60:10-12.)  However, Henley never actually saw John Doe help with the trash nor did he ever see Gobble and John Doe together outside of school.  (Henley Dep. Tr. 62:5-10.)  No teacher ever expressed any concerns to Henley regarding Gobble and John Doe (Henley Dep Tr. 64:8-11.)

Hooker recalls a DSS investigation in the Spring of 2013, possibly April, when Pam Kincaid came to the school to interview Gobble and John Doe.  (Hooker Dep. Tr. 136:21-137:15.)  The Gobble interview is when Hooker first found out that John Doe was staying overnight with Gobble.  (Hooker Dep. Tr. 137:18-21.)  She recalls Kincaid asking Gobble about John Doe staying the night, Gobble spending money on John Doe, and why John Doe was spending the night.  (Hooker Dep. Tr. 137:19-24.)  Gobble explained that John Doe's mother was out of jail and that he was helping her out.  (Hooker Dep. Tr. 139:12-17.)  Hooker also recalls Kincaid asking John Doe whether Gobble did anything inappropriate with him and whether he was forced to stay with Gobble.  (Hooker Dep. Tr. 138:1-5.)  Hooker also asked Gobble more questions after the DSS interview  (Hooker Dep. Tr. 140:12-17.)  Kincaid later called Hooker and informed her that the investigation was unfounded.  (Hooker Dep. Tr. 140:21-22.)  Hooker called Jane Doe and relayed that Gobble had stated that Jane Doe had asked him to bring John Doe home and "take [John Doe] to here and there, to like these practices at the time, [John Doe's] little league baseball games in the spring."  (Hooker Dep. Tr. 141:23-142:3.)  Jane Doe confirmed that Gobble had her permission to do these things.  (Hooker Dep. Tr. 142:4.)  Hooker also referenced the DSS investigation to see if Jane Doe was comfortable with the

relationship given the investigation and Jane Doe informed her that "Absolutely. [Gobble's] helping me out." (Hooker Dep. Tr. 142:8-11.) Following Kincaid's report that the investigation was unfounded, Hooker "did go ask some of those . . . fourth grade teachers . . . did they feel anything was going on or were they uncomfortable, did they see anything." (Hooker Dep. Tr. 141:3-7.) None of the teachers expressed "any inclination there [was] a concern there" to Hooker regarding Gobble and John Doe. (Hooker Dep. Tr. 141:3-9.)

Hooker also put an end to students helping Gobble with the trash toward the end of the school day. (Hooker Dep. Tr. 123:1-9.) Some school employees testified to that effect as well. (Cecille Skeens Dep Tr. 42:19-43:3; Powers Dep. Tr. 130:2-8.)

School employees' knowledge regarding Gobble and John Doe was limited. Some employees knew that John Doe and other students would help Gobble with the trash toward the end of the school day. (Skeens Dep. Tr. 39:3-8, 39:14-22, Lora Chafin Dep. Tr. 23:21-24:1.). A teacher was aware that Gobble would give students money for helping him with the trash. (Chafin Dep. Tr. 25:22-26:1.) Another teacher recalled Gobble providing her with a bag of suckers that could be given to students who helped. (Kristi Clark Dep. Tr. 18:1-3.) Some employees were also aware that John Doe would help Gobble with trash or other work after school. (Skeens Dep. Tr. 50:11-22, Naomah McCoy Dep. Tr. 24:15-16.) One employee was aware that John Doe was with Gobble at the school over the summer. (Powers Dep. Tr. 114:5-7.) Some employees were also aware that John Doe was spending nights at the Gobble residence. (Skeens Dep. Tr. 51:10-14.) Some employees were also aware that Gobble purchased items, such as an Xbox or sneakers, for John Doe. (Skeens Dep. Tr. 58:3-11, Powers Dep. Tr. 66:24.) Some employees were also aware that Gobble would transport John Doe to and from school. (Skeens Dep. Tr.59:6-9.) Some employees were also aware that John Doe would help Gobble on the family farm. (Skeens Dep. Tr. 60:10-13, McCoy Dep. Tr. 28:16-18.) Some

employees were also aware that Gobble helped John Doe with participation in basketball or football teams or attending sporting events. (Skeens Dep. Tr. 61:6-9, Powers Dep. Tr. 71:23-24, 72:18-21.) Some employees were aware that Gobble would bring John Doe food at lunch. (Skeens Dep. Tr. 61:20-23, Kristi Clark Dep. Tr. 35:18-21.) One employee heard Gobble discuss adopting John Doe. (McCoy Dep. Tr. 24:4-9.) Some employees were also aware of marital difficulties between Bobby and Charlene Gobble. (McCoy Dep. Tr. 24:10-15, Powers Dep. Tr. 89:21-22.) One employee also bumped into Gobble, Gobble's parents, Gobble's nephews, and John Doe at Dollywood. (Powers Dep. Tr. 119:5-120:4.)

In February 2014, Gobble was arrested. Jane Doe and John Doe moved out of Russell County "real quick" after Gobble's arrest. (Jane Doe Dep. Tr. 119:7-9.) She did not meet with any school employees prior to moving out of Russell County. (Jane Doe Dep. Tr. 120:19-22.)

## STANDARD OF REVIEW

Rule 56 of the Federal Rules of Civil Procedure provides that either complete or partial summary judgment may be granted when it appears that there is "no genuine issue as to any material fact." A genuine issue exists only "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Shaw v. Stroud*, 13 F.3d 791, 798 (4th Cir. 1994) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." *Anderson* at 247-48 (emphasis original).

"In other words, summary judgments should be granted in those cases where it is perfectly clear that no issue of fact is involved and inquiry into the facts is not desirable to clarify the application of the law." *Miller v. Fed. Deposit Ins. Corp.*, 906 F.2d 972, 973-74 (4th Cir. 1990) (citing *Charbonnages De France v. Smith*, 597 F.2d 406, 414 (4th Cir. 1979); *Stevens v.*

*Howard D. Johnson Co.*, 181 F.2d 390, 394 (4th Cir. 1950)). "On summary judgment, any permissible inferences to be drawn from the underlying facts must be viewed in the light most favorable to the party opposing the motion." *Miller*, 906 F.2d at 974 (citing *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587-88 (1986)). "However, where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, disposition by summary judgment is appropriate." *Miller*, 906 F.2d at 974 (citing *Matsushita Elec. Indus. Co., Ltd*, 475 U.S. at 587; *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248-49 (1986)).

"Only where persons of reasonable minds may not fairly differ on the proper inferences to be drawn from the facts, does the issue of proximate cause become a question of law for the court." *Qura v. D R McClain & Son*, No. 95-1744, 1996 U.S. App. LEXIS 25510, at *11-12 (4th Cir. Sep. 30, 1996) (citing *Hubbard v. Murray*, 173 Va. 448, 3 S.E.2d 397, 402 (Va. 1939)).

## AUTHORITIES

### A. Elements of a Title IX Claim

The elements of a Title IX claim are: "(1) [P]laintiff was a student at an educational institution receiving federal funds; (2) [Plaintiff] was subjected to harassment based on [his] sex; (3) the harassment was sufficiently severe or pervasive to create a hostile (or abusive) environment in an educational program or activity; and (4) there is a basis for imputing liability to the institution." *Jennings v. Univ. of N.C.*, 482 F.3d 686, 695 (4th Cir. 2007).

The fourth element requires showing "an official who has authority to address the alleged discrimination and to institute corrective measures has actual knowledge of discrimination in the institution's programs and fails adequately to respond or displays deliberate indifference to discrimination." *Id*. at 700. Deliberate indifference applies "where the recipient's response to

14

the harassment or lack thereof is clearly unreasonable in light of the known circumstances."

*Davis v. Monroe County Bd. of Ed.*, 526 U.S. 629, 648 (1999).

**B. Elements of a Failure to Train Claim**

The elements of a § 1983 failure to train claim are: (1) "that the subordinates actually violated the plaintiff's constitutional or statutory rights; (2) that the supervisor failed to train properly the subordinates thus illustrating a 'deliberate indifference' to the rights of the persons with whom the subordinates come into contact; and (3) this this failure to train actually caused the subordinates to violate the plaintiff's rights." *Gallimore v. Henrico Cnty. Sch. Bd.*, 38 F. Supp. 3d 721, 726 (E.D. Va. 2014) (citations omitted).

**C. Elements of Supervisory Liability**

There are three elements the Plaintiff must establish for supervisory liability under § 1983: (1) that Henley or Hooker had actual or constructive knowledge that a subordinate was engaged in conduct that posed a pervasive and unreasonable risk of constitutional injury to the Plaintiff; (2) that Henley's or Hooker's response to that knowledge was so inadequate as to show deliberate indifference to or tacit authorization of the alleged offensive practices, and (3) that there was an affirmative causal link between Henley's or Hooker's inaction and the particular constitutional injury suffered by the Plaintiff. *See, e.g., Shaw v. Stroud*, 13 F.3d 791, 799 (4th Cir. 1994).

**D. Elements of Gross Negligence**

The elements of a negligence action are "a legal duty, a breach of the duty, and proximate causation resulting in damage." *McGuire v. Hodges*, 273 Va. 199, 206, 639 S.E.2d 284, 288 (2007) (citations omitted).

"Stated in somewhat different terms, gross negligence is that degree of negligence which shows an utter disregard of prudence amounting to complete neglect of the safety of another."

*Wright v. Osborne*, 175 Va. 442, 445, 9 S.E.2d 452, 454 (1940). "[G]ross negligence is the absence of slight diligence, or the want of even scant care." *Colby v. Boyden*, 241 Va. 125, 133, 400 S.E.2d 184, 189 (1991)

## ARGUMENT

### A. Henley had no notice of discrimination

There is no evidence that Henley had any actual or constructive notice that Gobble "was engaged in conduct that posed a pervasive and unreasonable risk of constitutional injury to the Plaintiff." Everything Henley and the school employees at the time witnessed was in line with John Doe's legal guardians' permission and knowledge of Gobble's interactions with John Doe. John Doe's grandparents were aware and approved of Gobble transporting John Doe to and from school, John Doe helping Gobble after school and on the farm, John Doe staying prolonged periods of time at the Gobble home, and Gobble giving John Doe money for his help. At no point in time during Henley's tenure as principal at LES were any issues or concerns raised about Gobble's relationship with John Doe.

Without that knowledge, as a matter of law Henley could not have been deliberately indifferent in his response (or lack thereof). Nor is there any evidence of an affirmative causal link between Henley's actions and the particular injuries suffered by John Doe. Henley is entitled to judgment in his favor as a matter of law on the § 1983 supervisory liability claim and gross negligence claim asserted against him.

### B. Claims against Hooker deficient as a matter of law

Hooker was principal when DSS came to LES and investigated Gobble, John Doe, and Jane Doe. However, as a matter of law her response to that investigation was not deliberately indifferent (or grossly negligent) nor were any of her actions (or lack thereof) the proximate cause of Gobble's abuse of John Doe.

Hooker sat in on DSS interviews of Gobble and John Doe. She followed up with questions for Gobble after the interview. She spoke with Kincaid regarding the conclusion of DSS's investigation and was informed the complaint was unfounded. She instructed teachers not to allow students to help Gobble with the trash. She told Gobble that John Doe should be in the after-school program. As such, as a matter of law Hooker was not deliberately indifferent nor did she show "an utter disregard of prudence" or the "want of even scant scare."

Furthermore, none of her actions (or lack thereof) were the proximate cause or moving force behind Gobble's abuse of John Doe. Any investigation by Hooker would have discovered the same information available to DSS and John Doe's legal guardians. That same information was insufficient for DSS to find a founded complaint (or make a report to law enforcement). Meanwhile, John Doe's legal guardians would have confirmed that Gobble had permission regarding the activities witnessed by school employees that Hooker could have uncovered, such as the permission to transport John Doe to and from school, have John Doe stay after school to help, have John Doe help on the farm, have John Doe stay the night, provide meals to John Doe, provide gifts to John Doe, and be involved in both John Doe's and their lives. There is no evidence that Hooker's actions (or inactions) were a proximate cause or moving force behind Gobble's abuse of John Doe and therefore Hooker is entitled to judgment as a matter of law in her favor on the § 1983 supervisory liability claim and gross negligence claims asserted against her.

### C. School Board's Actions Were Not Clearly Unreasonable in Light of Known Circumstances

The Fourth Circuit Court of Appeals has held "that the district could be liable for damages only where the district itself intentionally acted in clear violation of Title IX by remaining deliberately indifferent to acts of teacher student harassment of *which it had actual knowledge*." *Baynard v. Malone*, 268 F.3d 228, 237-238 (4th Cir. 2001). In other words, "a damages remedy

will not lie under Title IX unless an official who at a minimum has authority to address the alleged discrimination and to institute corrective measures on the [district's] behalf *has actual knowledge* of discrimination' and is deliberately indifferent to it." *Rosa H. v. San Elizario Indep. Sch. Dist.*, 106 F.3d 648, 660 (5th Cir. 1997) (emphasis added). To prevail on his Title IX Claim, John Doe must prove that the School Board's "response to the harassment or lack thereof is clearly unreasonable in light of the known circumstances."

First, during Henley's tenure as principal there is no evidence he (or any other relevant school official) had "actual knowledge" of discrimination. Therefore, Henley's actions or inactions cannot support a Title IX claim against the School Board.

Second, the only evidence of "actual knowledge" as it relates to the School Board was the DSS investigation. However, there is no evidence that the School Board's response was clearly unreasonable. The known circumstances were that DSS investigated and concluded the complaint involving John Doe was unfounded. DSS has the training and expansive statutory authority to investigate such complaints or concerns. It is undisputed that John Doe's legal guardians knew of and approved of the interactions witnessed by school employees. As a matter of law, the School Board's reliance on DSS, which had specialized training and great investigative authority, and John Doe's legal guardians, who had greater information regarding John Doe's relationship with Gobble and approved of it, cannot be clearly unreasonable.

**D. Failure to provide counseling not a recognized cause of action and fails due to leaving school system and mother's acceptance that he does not want counseling now**

Plaintiff's Count II, a failure to provide counseling post-February 2014 is not a cause of action upon which relief may be granted.[1] Furthermore, the Plaintiff does not meet the elements of a Title IX cause of action. Immediately following Gobble's arrest, John Doe and his family

---

[1] Which the Plaintiff appears to concede in their brief in opposition to the School Defendants' motion to dismiss by stating that this claim may be considered as part of Count 1. (Pl.'s Br. in Opp., at 12-13 n. 4 ECF No. 24.)

18

moved out of Russell County. Therefore, he was not a student at Russell County Public Schools. John Doe eventually returned to Russell County Schools. However, he has been in and out of foster care since his return to Russell County and has received some counseling through DSS. There is no evidence either he or his legal guardian requested or authorized any counseling from Russell County Schools. In fact, Jane Doe, his mother and current legal guardian, specifically testified that he does not want to receive counseling and that it is his decision to make. (Jane Doe Dep. Tr. 135:16-19.) Russell County Schools cannot offer or refer John Doe to counseling without the authorization of his legal guardian.

As a matter of law, Count II of the Complaint must be dismissed as it is not a cognizable cause of action and the Plaintiff's evidence entitles the school to judgment as a matter of law.

### E. Defendants unaware of risk or deficiency in training

The Plaintiff focuses on the general risk of sexual harassment by an employee of a student. However, this case involves a unique situation where a student's legal guardians permitted Gobble to assume a de facto caretaker role in transporting John Doe to and from school, having John Doe stay at Gobble's home overnight, having John Doe help Gobble after school, having John Doe help Gobble at his family farm, taking John Doe on out-of-town trips, having John Doe help Gobble during the summer, and attending birthdays and holidays with the family.

"[W]hen city policymakers are on actual or constructive notice that a particular omission in their training program causes city employees to violate citizens' constitutional rights, the city may be deemed deliberately indifferent if the policymakers choose to retain that program." *Connick*, 563 U.S. at 61, 131 S. Ct. at 1360. "Without notice that a course of training is deficient in a particular respect, decisionmakers can hardly be said to have deliberately chosen a training program that will cause violations of constitutional rights." *Id*. at 62, 131 S. Ct. at 1360.

19

To establish deliberate indifference, "a plaintiff must present some evidence that the municipality knew of a need to train and/or supervise in a particular area and the municipality made a deliberate choice not to take any action." *Lewis v. City of W. Palm Beach*, 561 F.3d 1288, 1293 (11th Cir. 2009.) *Id.* The defendant can be put on notice either by "a pattern of constitutional violations," or "if the likelihood for constitutional violation is so high that the need for training would be obvious." *Id.*

There is no evidence of any similar instances in the past where a Russell County School employee received such permission and responsibilities from a student's legal guardians and proceeded to sexually harass or abuse the student. There is no applicable pattern of constitutional violations that supports John Doe's failure to train claim.

John Doe is proceeding under the second prong "based on a supervisory power's failure to train its employees concerning an obvious constitutional duty that the particular employees are certain to face." (Pl.'s Br. in Opp. at 22, ECF No. 22 (citing *Gallimore v. Henrico Cnty. Sch. Bd.*, 38 F. Supp. 3d 721, 726 (E.D. Va. 2014).) The Plaintiff argues this applies "in situations where the underlying constitutional right is quite clear and is one that the subordinates reasonably can be expected to confront with some regularity."(Pl.'s Br. in Opp. at 22, ECF No. 22 (citing *Gallimore v. Henrico Cnty. Sch. Bd.*, 38 F. Supp. 3d 721, 726-27 (E.D. Va. 2014).) However, the situation at hand is not one that school employees were expected to confront with regularity. The students' legal guardians at all relevant times were aware of the relationship between John Doe and Gobble and specifically approved all interactions that school employees witnessed. The situation where legal guardians allow a non-relative, including a school employee, to essentially serve as a caretaker for a student is not a situation the Defendants "are certain to face" nor did the Defendants have any actual or constructive notice of training deficiencies in that particular respect.

As a matter of law, the Defendants were not deliberately indifferent as it relates to training offered to school employees.

**F. Failure to train not a proximate cause of abuse**

"We hold today that the inadequacy of . . . training may serve as the basis for § 1983 liability only where the failure to train amounts to deliberate indifference to the rights of persons with whom the [defendant's employees] come into contact." *City of Canton v. Harris*, 489 U.S. 378, 388-389, 109 S. Ct. 1197, 1204-1205 (1989). The Defendants "can be liable under § 1983 only where its policies are the moving force behind the constitutional violation." *Id*. "Only where a failure to train reflects a deliberate or conscious choice by a municipality—a 'policy' as defined by our prior cases—can a city be liable for such a failure under § 1983." *Id*. "A municipality's culpability for a deprivation of rights is at its most tenuous where a claim turns on a failure to train." *Connick v. Thompson*, 563 U.S. 51, 61, 131 S. Ct. 1350, 1359 (2011). As discussed below, the failure to train, as a matter of law, cannot be and was not the moving force behind Gobble's abuse of John Doe.

    *a. VDOE Guidelines Support School Defendants' Actions*

The Plaintiff, and his expert, Dr. Shakeshaft, rely on and refer to the "Guidelines for the Prevention of Sexual Misconduct and Abuse in Virginia Public Schools" issued and approved by the Board of Education in March 2011. (VDOE, Guidelines, Exhibit 1.) The guidelines indicate that school employees "should be aware of behaviors often associated with inappropriate conduct that can create an appearance of impropriety." (*Id*.) The examples include: "Inviting a student or students for home visits *without informing parents*; Visiting the homes of students *without the knowledge of parents*; Inviting students for social contact off school grounds *without the permission or knowledge of parents*; and Transporting students in personal vehicles *without the knowledge of parents or supervisors*." (*Id*. (emphasis added).) According to the Plaintiff's

expert, Dr. Shakeshaft, the term "parents" in these guidelines would also include legal guardians, in this case at times John Doe's grandparents.  (Shakeshaft Dep. Tr. 30:16-18, 30:24-31:1, 31:7-10, 31:16-19.)

As noted in the Defendants' brief in support of their motion to exclude opinions of Dr. Shakeshaft and Dr. Epstein, these guidelines confirm the Defendants' responses to the known information regarding interactions between John Doe and Gobble.  John Doe's legal guardians knew and allowed Gobble to pay for John Doe's help; Gobble to pay for John Doe's meals; John Doe to stay overnight with Gobble; Gobble take John Doe on out-of-town trips; Gobble to take John Doe to sporting events such as football or basketball games; Gobble to buy John Doe gifts; Gobble to transport John Doe to and from school; John Doe to stay after school and help Gobble with his work; John Doe to spend time and help Gobble at the school during summer hours; and knew of Gobble's and Charlene's marital difficulties.  Both Jane Doe and John Doe's grandfather confirmed that John Doe always had their permission to spend time with Gobble.

As a matter of law, the School Defendants' actions cannot constitute deliberate indifference when they are in line with the guidelines relied on by the Plaintiff and when John Doe's legal guardians are fully cognizant of and approve of the interactions between John Doe and Gobble witnessed by the School Defendants.

> b.  *DSS and guardians were aware of all information available to school*

There is no causal connection between the alleged failure to train and the crimes committed by Gobble.  The Plaintiff's allegations as to Title IX, sexual harassment training, and mandatory reporting trainings are irrelevant as a matter of law and no rational juror could find that this training, or lack therefore, was the "moving force" behind Gobble's abuse of John Doe.

The information known to the teachers and principals in terms of interactions between John Doe and Gobble was essentially that John Doe spent time with Gobble before and after

school, provided meals to John Doe, helped Gobble with the trash, paid him for his help, went on trips out-of-town, and John Doe stayed overnight with Gobble. It is undisputed John Doe's grandparents and mother, his legal guardians at relevant times, were not only aware of these activities but also approved of them. This information was also available, either explicitly or implicitly, to DSS during its investigations involving John Doe, Gobble, and/or Jane Doe. It is irrational to claim that a teacher or principal reporting or investigating this duplicative information would have affected DSS's investigation and conclusions or John Doe's legal guardians' permission. In fact, as discussed below, it is clear that this information would have had no bearing on the DSS investigations and conclusions as to Gobble nor would it have affected John Doe's legal guardians' permission for John Doe to spend time with Gobble, because both DSS and John Doe's legal guardians had access to even more information regarding Gobble's relationship with John Doe.

       *c. DSS and John Doe's legal guardians had more information than the Defendants*

Meanwhile, DSS and John Doe's legal guardians had information that was never available to the Defendants. DSS interviewed Charlene Gobble and had an opportunity to flesh out her concerns (particularly their lack of intimacy and that John Doe was sleeping next to Gobble and that the married couple was no longer sleeping in the same bedroom), physically investigated the Gobble household, physically investigated Jane Doe's household, interviewed Gobble multiple times, interviewed Jane Doe multiple times, and had the opportunity to interview other potential witnesses, such as John Doe's grandparents or Jane Doe's live-in boyfriend at the time. Furthermore, not only does DSS enjoy much broader legal authority in its investigations, it has workers who are specially trained and whose daily responsibilities involve responding to complaints of, investigating, and uncovering potential sexual abuse of minors. DSS employees had specialized training, had access to more information than the School

Defendants, and responded to multiple complaints or investigations involving John Doe without discovering Gobble's sexual abuse of John Doe. DSS never shared any concerns with the Defendants and its final communication with the Defendants regarding the investigation was to confirm that it concluded the complaint related to John Doe was unfounded.

John Doe's legal guardians had more information available to them regarding Gobble's relationship with John Doe than the School Board. This information specifically led to them harboring suspicions regarding Gobble that were never reported to the Defendants. John Doe's grandfather specifically asked Gobble if there was any "funny business" between him and John Doe. This conversation only happens when one has concerns that "funny business" is actually occurring. Yet he never contacted anyone at the school regarding Gobble or reported any concerns to the school. By July 4, 2013, John Doe's grandfather and mother knew that Gobble had an inappropriate relationship with John Doe that included abuse. Yet, they never contacted the school with this information and Gobble was not arrested until February 2014, over 7 months later.

Meanwhile, Charlene Gobble also never contacted anyone at the School Board regarding her concerns. In fact, prior to Gobble's arrest in February 2014, no one contacted Russell County Schools directly with any concerns regarding inappropriate behavior between Gobble and John Doe.

In light of all this information available to DSS and John Doe's legal guardians but unavailable to the Defendants, no rational juror could conclude that the information available to the Defendants (duplicative to DSS and John Doe's legal guardians) and the School Defendants' response to this information was a proximate cause of or a "moving force" behind Gobble's abuse of John Doe.

####    d.   *No evidence John Doe exhibited signs of sexual abuse*

The Plaintiff alleged deficiencies in the training provided by the Defendants to school employees regarding recognizing signs of child abuse.  However, there is absolutely no evidence that John Doe exhibited any symptoms of sexual abuse that were witnessed and ignored by school employees.  An aide who specifically received such training in her prior employment testified that John Doe did not exhibit any significant behavioral changes at school, even in hindsight.  (Naomah McCoy Dep. Tr. 85:8-15 ("John Doe did not have any behavioral issues that I can remember.").)  This is confirmed by John Doe's grandfather who testified that he saw no changes in John Doe's behavior prior to Gobble's arrest. (C. Dep. Tr. 72:6-16.)  Nor do Plaintiff's experts point to any behavior or symptoms exhibited by John Doe and witnessed by school employees that should have triggered recognition of potential sexual abuse.  Therefore, allegations regarding recognizing signs of child abuse are irrelevant as a matter of law and the inadequacy or lack of such training cannot be a proximate cause of Gobble's abuse of John Doe.

####    e.   *Gross Negligence*

For the same reasons, any alleged gross negligence on behalf of Kim Hooker or Philip Henley cannot be the proximate cause of Gobble's abuse of John Doe.

### G.  Henley and Hooker Are Entitled to Qualified Immunity

Finally, Henley and Hooker have qualified immunity from John Doe's § 1983 claims.  "Generally, qualified immunity operates to protect law enforcement and other government officials from civil damages liability for alleged constitutional violations stemming from their discretionary functions."  *Raub v. Campbell*, 785 F.3d 876, 880-81 (4th Cir. 2015) (citation omitted).  The analysis involves two prongs: "(1) whether the plaintiff has established the violation of a constitutional right, and (2) whether that right was clearly established at the time of the alleged violation."  *Id.*  However, courts can address these two prongs in either order.  *Id.*

25

In the second prong "inquiry turns on the objective legal reasonableness of [the Defendants'] action, assessed in light of the legal rules that were clearly established at the time it was taken." *Id.* (citation omitted.) The court should "look not to whether the right allegedly violated was established as a broad general proposition but whether it would be clear to a reasonable official that his conduct was unlawful in the situation he confronted." *Id.* at 881-82; see also *DesRoches by DesRoches v. Caprio*, 974 F. Supp. 542, 552 (E.D. Va. 1997) *reversed on other grounds* 156 F.3d 57*1* ("[The principal] is immune from monetary damages under 42 U.S.C. § 1983 if his conduct did not violate clearly established rights of which a reasonable official would have known at the time of the conduct.") "Officials are not liable for bad guesses in gray areas; they are liable for transgressing bright lines." *Maciariello v. Sumner*, 973 F.2d 295, 298 (4th Cir. 1992).

No reasonable principal with the same knowledge as Henley would have thought that his conduct was unlawful in the situation he confronted. John Doe's grandparents, his legal guardians, and Jane Doe, the mother, were aware and approved of Gobble's interactions with John Doe, which included Gobble transporting John Doe to and from school, John Doe helping Gobble after school and on the farm, John Doe staying prolonged periods of time at the Gobble home, and Gobble giving John Doe money for his help. Both John Doe's grandfather and Jane Doe regularly saw and talked to Gobble about John Doe. The unique circumstances of Gobble serving as a de facto caretaker with John Doe's legal guardians' permission is the gray that the court warns about in *Maciariello*. In these circumstances, Henley could not have reasonably known that he did not sufficiently train or supervise his subordinates and that John Doe suffered abuse as a result.

As to Hooker, the Plaintiff appears to rely on the DSS investigation to assert liability against her for a failure to train and supervise her subordinates. However, the DSS, which has

Case 1:16-cv-00045-JPJ-PMS   Document 63   Filed 12/27/17   Page 26 of 28   Pageid#: 1105

the training and more expansive legal authority to conduct such investigations, concluded that the report as to John Doe was unfounded. She also participated in the DSS investigation. It is undisputed that John Doe's legal guardians knew and allowed Gobble to pay for John Doe's help; Gobble to pay for John Doe's meals; John Doe to stay overnight with Gobble; Gobble take John Doe on out-of-town trips; Gobble to take John Doe to sporting events such as football or basketball games; Gobble to buy John Doe gifts; Gobble to transport John Doe to and from school; John Doe to stay after school and help Gobble with his work; John Doe to spend time and help Gobble at the school during summer hours; and knew of Gobble's and Charlene's marital difficulties. Both Jane Doe and John Doe's grandfather confirmed that John Doe always had their permission to spend time with Gobble. Just like Henley, Hooker confronted a gray and unexpected area. In these circumstances, Hooker could not have reasonably known that she was failing to train or supervise her subordinates, that her conduct was unlawful, that John Doe suffered abuse as a result.

CONCLUSION

For the reasons stated, Defendants Russell County School Board, Phillip Henley, and Kim Hooker respectfully request that the Court GRANT their Motion for Summary Judgment, and DISMISS Plaintiff's Complaint, with prejudice.

RUSSELL COUNTY SCHOOL BOARD, PHILLIP
HENLEY, and KIMBERLY HOOKER,

By: /s/ Christopher S. Dadak
Jim H. Guynn, Jr. (VSB No. 22299)
Christopher S. Dadak (VSB No. 83789)
GUYNN & WADDELL, P.C.
415 S. College Avenue
Salem, Virginia 24153
Phone: 540-387-2320
Fax:    540-389-2350
Email: jimg@guynnwaddell.com
        christopherd@guynnwaddell.com
*Counsel for Russell County School Board, Kim
Hooker, and Phillip Henley*

## CERTIFICATE OF SERVICE

I do hereby certify that on this 27th day of December, 2017, I electronically filed the
foregoing with the Clerk of Court using the CM/ECF system, which will then send a notification
of such filing (NEF) to counsel of record.

By: /s/ Christopher S. Dadak
Jim H. Guynn, Jr. (VSB No. 22299)
Christopher S. Dadak (VSB No. 83789)
GUYNN & WADDELL, P.C.
415 S. College Avenue
Salem, Virginia 24153
Phone: 540-387-2320
Fax:    540-389-2350
Email: jimg@guynnwaddell.com
        christopherd@guynnwaddell.com
*Counsel for Russell County School Board, Kim
Hooker, and Phillip Henley*

28