# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF VIRGINIA
### ABINGDON DIVISION

| | | |
|---|---|---|
| **JOHN DOE, AN INFANT, BY HIS NEXT FRIEND, REELIA WATSON,** | ) ) ) | |
| Plaintiff, | ) ) | Case No. 1:16CV00045 |
| v. | ) ) | **OPINION AND ORDER** |
| **RUSSELL COUNTY SCHOOL BOARD D/B/A RUSSELL COUNTY PUBLIC SCHOOLS, ET AL.,** | ) ) ) ) | By: James P. Jones United States District Judge |
| Defendants. | ) | |

*Monica H. Beck and Douglas E. Fierberg, The Fierberg National Law Group, PLLC, Traverse City, Michigan, and Paul R. Thomson, III, The Thomson Law Firm, PLLC, Roanoke, Virginia, for Plaintiff; Christopher S. Dadak and Jim H. Guynn, Jr., Guynn & Waddell, P.C., Salem, Virginia, and Mary Katherine Patton, Chafin Law Firm P.C., Lebanon, Virginia, for Defendants Russell County School Board d/b/a Russell County Public Schools, Phillip Henley, and Kimberly Hooker; W. Ethan Stewart, Stewart Law Office, P.C., Norton, Virginia, guardian ad litem for Defendant Bobby Gobble.*

Bobby Gobble was an elementary school custodian who over time sexually abused several young boys who were students at the school, including John Doe, the pseudonymously-named plaintiff in this case. Following discovery of his abuse, Gobble pled guilty to state criminal charges and is currently serving a lengthy prison term. As a result of Gobble's abuse, Doe now sues Gobble, as well as the Russell County, Virginia, School Board (the "School Board"), and former school principals Phillip Henley and Kimberly Hooker, based on various state and

federal causes of action, including Title IX and 42 U.S.C. § 1983.[1] This court has subject-matter jurisdiction of the claims under 28 U.S.C. § 1331 and 28 U.S.C. § 1367(a).

Following extensive discovery, the plaintiff has moved for summary judgment against Gobble, and the School Defendants have moved for summary judgment on all counts pending against them. The School Defendants have also moved to exclude certain proposed trial testimony by two of the plaintiff's expert witnesses. The motions have been fully briefed and orally argued and are ripe for decision.

For the following reasons, I will grant summary judgment against Gobble, deny summary judgment to the School Board, grant summary judgment to Henley and Hooker, and grant in part and deny in part the School Defendants' Motion to Exclude.

## I. FACTS.

The following facts are taken from the summary judgment record and, where disputed, are presented in the light most favorable to the nonmoving party.

John Doe began attending Lebanon Elementary School ("LES") in the fall of 2011 as a nine-year-old third grade student. When he began attending LES, Doe had an individualized education plan ("IEP") to address his special learning needs.

---

[1] The School Board and the defendant former school principals will be referred to collectively as the "School Defendants."

He could not write his name, wrote his letters backward, and could not read. His mother, referenced in the record as Jane Doe, was incarcerated, and Doe was living with his grandmother, step-grandfather, and three siblings. His grandmother, who had custody of Doe, was ill and suffered from heart problems.

Defendant Phillip Henley was the principal of LES from 2005 until June 1, 2012, the end of Doe's third-grade year. Defendant Kimberly Hooker was the principal of LES during the 2012-13 school year, when Doe was in fourth grade. Dennis Price ─ who is not a defendant ─ was the assistant principal at LES from 2006 until 2012 and later served as the principal of LES from 2013 to 2015. During the 2013-14 school year, when Doe was in fifth grade, he attended Lebanon Middle School ("LMS"), located across the street from LES.

Gobble began working at LES as a janitor in May 2007 and became the head custodian on July 8, 2011. His sister, Brenda Helbert, worked as the assistant custodian at LES. Helbert had two sons, B.G. and S.G., who were a few years older than Doe and were students at other schools in Russell County.

Gobble first met Doe at LES, where the two talked to one another often. Doe wanted to help Gobble with his custodial duties. Gobble had a practice of encouraging boys to help him collect trash at the end of the school day. Teachers would permit students to leave class during the last five to ten minutes of the

school day for this purpose, and Gobble frequently gave the boys one or two dollars or candy in exchange for helping him.

Gobble and Doe began spending more and more time together, during and after school, at LES and elsewhere. This relationship was encouraged by Doe's teachers, who thought Gobble was a good influence on Doe. Teacher Cecille Lawson Skeens called Gobble to her classroom on several occasions to calm Doe down, and each time Gobble took Doe out of the classroom and into the hallway. Doe's teachers sent him out of the classroom by himself to get supplies and coffee from the custodian office. On at least one occasion, Gobble was allowed to remove Doe from school to get a haircut. While he was enrolled in the after school program, Doe was allowed to leave the program to spend time with Gobble and help him with his cleaning duties around the school. Gobble was not related to Doe and did not have written permission to remove Doe from school, although Doe's grandmother and mother verbally approved of Doe spending time with Gobble.

Gobble signed off on Doe's report cards. Teacher Alisha Powers met with Gobble and Doe to discuss Doe's IEP. Gobble would ask Skeens how Doe had done on tests and assignments, and she would provide that information to Gobble. Gobble told her that he helped Doe study and would bring him a soft drink at lunch

if Doe did well. Doe frequently spent time in the custodian office, the door to which remained closed at Henley's direction.

Gobble gave Doe rides home from school in his personal vehicle on a regular basis. Gobble befriended Doe's family and sometimes stayed to eat dinner with them. Gobble took Doe to Gobble's house along with his nephews, B.G. and S.G., to play video games, and Doe ended up spending the night there. Doe would eventually stay at Gobble's house for days on end and essentially lived with Gobble for a period of several months. B.G. and S.G. introduced Doe to Henley at LES one day and told Henley that Gobble was taking them all out to dinner. Henley incorrectly assumed that Doe was related to B.G., S.G., and Gobble.

Henley became aware that Doe would help Gobble gather trash and also participated in the after-school program. As the school year went on, Gobble mentioned to Henley that Doe would go to Gobble's house because he did not like to stay at his own home. Henley did not ask Gobble any questions about Doe being at his house, including whether he had the permission of a parent or guardian. Henley never talked to Doe's grandmother, his guardian.

Doe's teachers were aware that Gobble bought him shoes, clothes, and an expensive video game console that he had to finance. Doe's teachers also knew that Gobble often bought him food, which he took to Doe in the school cafeteria during lunch, and that Gobble paid Doe's expenses related to little league football.

Teacher Powers encountered Doe with Gobble and his nephews at the amusement park known as Dollywood, some distance from Russell County. Henley did not ask teachers if they had any concerns about Doe spending time with Gobble. Henley never checked on Gobble as part of his regular workday. He had no set supervisory schedule for Gobble. Henley never reviewed security camera footage to see what Gobble was doing.

Gobble began sexually abusing Doe in early 2012. The abuse continued until the summer of 2013, when Jane Doe, who had regained custody of him, stopped allowing Doe to spend time with Gobble. Gobble has admitted to repeatedly molesting Doe in the LES boiler room and custodian office, in his vehicle, at the home Gobble shared with his then-wife, and at the home of Gobble's sister Helbert, where Gobble lived while separated from his wife. The abuse occurred on a near-daily basis.

According to Gobble, Henley and Hooker knew that Gobble was regularly at school before his shift began and that children spent time in the custodian office with him before school started. Henley and Hooker knew that teachers sometimes sent students by themselves to the custodian office during the school day to get supplies, like sponges or paper towels. Henley and Hooker further knew that Doe spent time in the custodian office after school and that Gobble spent time in the custodian office with Doe, S.G., and B.G., with the door to the office closed. In

addition, Henley and Hooker were aware that Doe and Gobble's nephews were with Gobble at the school when school was not in session. Henley and Hooker knew that Gobble brought Doe to school in the mornings and that Doe left school with Gobble at the end of the day. Gobble testified that neither principal asked him why he was at school before his shift began or told him he should not have children in the custodian office with him.

In 2012, Gobble's wife Charlene made a complaint to the Russell County Department of Social Services ("DSS") about Gobble's relationship with Doe. Charlene reported that Doe was staying at the couple's house and spending an excessive amount of time with Gobble. She stated that Gobble was no longer sleeping with her and was instead sleeping in the same room as Doe. Charlene reported that Gobble's relationship with Doe was negatively affecting the couple's marriage.

Pam Kincaid, Kathy Brickey, and two other DSS personnel went to Gobble's home to investigate the complaint. Charlene showed them where Gobble slept and a small cot next to the bed where Doe slept. After leaving the Gobble home, the DSS workers went to LES and spoke to Hooker about the complaint. Hooker told them that Gobble had taken the child under his wing because Doe was insecure and he looked up to Gobble as a father figure. Hooker stated that Gobble made sure that Doe got home in the evenings and would take him to ball games.

Following this conversation, the focus of the DSS investigation shifted from Gobble to Jane Doe.

The DSS workers spoke to Gobble, who told them that Doe's mother had allowed him to take the child under his wing and to help him with things at school and give him rides home. Gobble stated he was very fond of Doe. Brickey asked Gobble about Doe spending the night at his house, and Gobble said that the boy's mother approved. Hooker sat in on this interview of Gobble but did not ask any questions.

The DSS workers spoke to Doe, who stated that he wanted to spend more time with his mother rather than spending so much time with Gobble. Doe said that he liked Gobble and that Gobble took him places. Hooker sat in on the DSS interview of Doe, but she did not ask any questions.

Kincaid then instructed Gobble to take the child to Doe's home, where the DSS workers met them. Kincaid asked Jane Doe about the relationship between Gobble and Doe, and Jane Doe said she was aware that Gobble was taking Doe to his house, that Gobble had become a friend of the family, and that he had been to the Doe house several times for dinners and birthdays. The DSS workers told Jane Doe that Doe should spend more time at home. Kincaid concluded that the complaint was unfounded, and DSS closed the case. Kincaid notified the school of the results of the investigation.

Charlene made another complaint to DSS about a month after the initial investigation. Charlene reported that Gobble had moved out of her home and the child was still spending nights with Gobble. Charlene told Kincaid that Doe would sit on Gobble's lap, hug him, and call him Daddy, and Charlene was concerned that they might get in trouble if Doe got hurt. Charlene told Doe to get off of Gobble's lap. Gobble told Charlene she was jealous. No school official talked to Charlene about Doe or Gobble's relationship with him.

Gobble told teacher Naomah McCoy that he planned to adopt Doe. Gobble's wife did not want to do this, but according to McCoy, Gobble seemed obsessed with the idea. McCoy thought it was strange that Gobble would jeopardize his marriage over Doe. Gobble complained to teacher Powers that his wife had called DSS. He was furious about it and told Powers that he was going to leave his wife.

Hooker recalls learning of Charlene's complaint to DSS and sitting in on DSS interviews of Doe and Gobble in the spring of 2013, when Doe was in fourth grade. She learned through the interviews that Doe stayed at Gobble's home. Gobble said he was helping Doe's mother monetarily and by giving Doe rides. Hooker did not talk to Doe after the interview about anything that came up during the interviews. She did talk to Gobble and asked him some of the same questions DSS had asked, to which he gave the same answers he had given to DSS.

Hooker testified that after Kincaid told her that DSS ruled Charlene's complaint unfounded, Hooker called the school system's central office to ask whether she needed to do anything else. According to Hooker, the superintendent told her she did not need to take any further action because DSS had completed its investigation. Hooker stated that she discretely inquired of several teachers as to whether they had any concerns about Gobble, but most of the teachers testified that they did not recall Hooker ever asking them about Gobble.

Earlier in the school year, prior to the DSS investigation, Hooker had instructed LES teachers that students should not be allowed to help Gobble collect trash and that they needed to be in the classroom during class time. Hooker told the teachers and Gobble that Gobble was not permitted to pay students for helping him do his work. When Hooker noticed that Doe was staying after school with Gobble, she called Doe's grandmother, who gave permission and expressed her appreciation for Gobble. Hooker did not obtain written permission from the grandmother for Gobble to take Doe to activities or to keep him after school. Hooker told Gobble that if Doe was going to stay after school, he had to be enrolled in the after-school program. Hooker checked Doe's grades and saw that they were low, and she thought he could benefit from the academic support of the after-school program. Even after he was enrolled in the after-school program, teacher Powers told Hooker that Doe would try to leave the program to help

Gobble. Hooker then told Doe that he could not stay at school if he was not in the after-school program. Doe began riding the bus home, but Powers told Hooker that Doe's grandfather would drive him back to school and he would again spend time with Gobble. Hooker did not talk to the grandfather, grandmother, mother, or Doe about this.

Hooker called Jane Doe, who told her that Gobble had her permission to take Doe home and take him to practices and games. Hooker knew that DSS had talked to Jane Doe, and Hooker brought up the investigation on the phone call. Jane Doe said that Gobble was helping her and she appreciated him. Hooker did not talk to either of the school's guidance counselors about Gobble or Doe.

Like Henley, Hooker required the custodian door to be closed. Hooker knew there were security cameras in the school, but they did not always work while she was principal. The school day ended at 3:20, and Hooker usually left around 4:00 or 4:15. The after-school program took place from 3:30 to 5:30. Hooker knew that Gobble was transporting Doe in his personal vehicle. There was an understanding that school employees should always have another adult with them when transporting a student in a personal vehicle, but Hooker did not investigate whether Gobble had another adult with him when transporting Doe.

In the summer or fall of 2013, Jane Doe cut off communications between Doe and Gobble. She had noticed Gobble following Doe around at his birthday

party, which was held in the LES cafeteria, and she got a "bad feeling." She later saw Gobble following Doe around at football games and threatened to call law enforcement. Doe's step-grandfather testified that at some point during or after the birthday party, Doe indicated that he did not want to go to Gobble's house and told his younger brother not to go to Gobble's house. At that point, the grandfather became suspicious that Gobble may have touched Doe inappropriately. The grandfather also witnessed Gobble's behavior at a football game and talked to law enforcement officers who were present there. The officers talked to Gobble, who stopped following Doe around. After Jane Doe cut off contact with Gobble, Gobble repeatedly sent text messages to Doe and had Doe's bus driver pass love notes to Doe.

Brenda Hess was assistant superintendent from March to June 2012 and became superintendent in June 2012. She remained superintendent until 2016. When Hess first started working in the central office, Harry Steffey was the Title IX Coordinator. He was succeeded by Rebecca Dye, who was followed by Cathy Gent.

Around the fall of 2012, Hooker told Hess that Gobble's wife had made a complaint to DSS because she was jealous of a student and that the complaint was unfounded. Hess understood that DSS had been investigating a charge that Gobble had sexually abused a student. Hess emphatically denied that she told Hooker not

to conduct her own investigation. She testified that Hooker was supposed to do her own investigation. Hess testified, "She should have followed through with questioning and got the specifics of the behavior and what had happened and taken action for whatever needed to be done. Just because DSS did theirs, does not excuse the school from doing our[] [investigation]." Pl.'s Br. in Opp'n to Sch. Defs.' Mot. for Summ. J. Ex. 3, 55, ECF No. 69-3. The Title IX Coordinator should have been involved, and Hess set forth a number of steps Hooker should have taken to investigate the complaint. According to Hess, Hooker should have reviewed video footage after learning of the first complaint to DSS. Hess said that after the DSS investigation, Hooker should have been diligent in closely supervising Gobble.

In February 2014, Gobble molested student A.M. at LES. A.M. told his stepfather about the incident, and his stepfather reported the incident to Price. Gobble was placed on paid leave pending an investigation. Gobble ultimately confessed to the abuse of A.M., Doe, and others, was arrested, and pleaded guilty to numerous state charges.

Following Gobble's confession, Doe continued to attend LMS for a short time and then the family moved to Pulaski County. Doe eventually returned to Russell County and currently attends a school there. After his return, he has experienced bullying by his classmates regarding Gobble's sexual abuse. Teachers

have witnessed the bullying and have not done anything about it. Doe got into a fight on the school bus with one of the students who bullied him. As a result, Doe was suspended for four days and transferred to an alternative school for several months.

Doe testified that because of his experience with Gobble, he does not like to be around people and avoids crowds where people are watching him. He does not feel normal. He would like to undergo counseling. He is not getting any special services from the school system. He has had several girlfriends, but he does not like to be touched by males or females, even on the hand or shoulder. It takes him a long time to trust a person and become affectionate. He does not trust any adults other than his mother and step-grandfather.

Psychiatrist Richard S. Epstein, M.D., an expert witness for the plaintiff, has opined that Doe suffers severe and chronic posttraumatic stress disorder ("PTSD") as a result of Gobble's abuse. He avoids social interactions, lashes out at times, has self-medicated with alcohol, and does not trust most men. He is depressed and anxious. Earlier in his childhood, before Gobble's abuse, Doe was generally outgoing and happy. Since being abused by Gobble, he has lost interest in many of the activities he previously enjoyed. Dr. Epstein opined that without proper treatment, Doe is at risk for future psychological decompensation and employment-related impairments as a result of Gobble's abuse.

A Virginia State Board of Education document entitled "Guidelines for the Prevention of Sexual Misconduct and Abuse in Virginia Public Schools" states, "Responsibility for protecting students from sexual misconduct and abuse is shared by the school board, superintendent, administrators, teachers and other school board employees, school volunteers, parents, state agencies, and law enforcement." Br. in Supp. Mot. for Summ. J. Ex. 1, 1, ECF No. 63-1.  The document provides that a school board's responsibilities include, among other things, "[t]he development, effective implementation and enforcement of clear and reasonable policies governing the interaction of students and school board employees and volunteers" as well as "[t]he establishment of channels for reporting by students and parents of suspected misconduct and abuse, and the prompt notification of law enforcement when criminal activity is alleged or suspected." *Id.*  According to the guidelines, school board sexual misconduct policies should include "[c]lear and reasonable rules governing communication and interaction between students and school board employees" and "[t]raining of school personnel and volunteers and the dissemination of sexual misconduct and abuse prevention policies to school board employees, volunteers, students, and parents." *Id.* at 1-2.

The guidelines advise that

Educators, other employees, and volunteers should be aware of behaviors often associated with inappropriate conduct that can create an appearance of impropriety, including:

- Conducting ongoing, private, conversations with individual students that are unrelated to school activities or the well-being of the student that take place in locations inaccessible to others;

- Inviting a student or students for home visits without informing parents;

- Visiting the homes of students without the knowledge of parents;

- Inviting students for social contact off school grounds without the permission or knowledge of parents; and

- Transporting students in personal vehicles without the knowledge of parents or supervisors.

*Id.* at 2. Violations of appropriate employee-student boundaries include, inter alia, "[p]hysical contact with a student that could be reasonably interpreted as constituting sexual harassment" and "[s]ingling out a particular student or group of students for personal attention and friendship beyond the bounds of an appropriate educator/mentor-student relationship." *Id.* The guidelines state that "[s]chool boards also should provide training for employees and volunteers on the prevention of misconduct and abuse and disseminate information about relevant division policies to employees, volunteers, students, and parents." *Id.* at 3.

Henley developed a faculty handbook when he was principal of LES, but he could not recall whether it specifically addressed employee sexual harassment of students or Title IX. Representatives of DSS and the Russell County Sheriff's Department provided training to administrators, including principals, about once

per school year. Teachers did not attend these training sessions. Principals were expected to disseminate the information they learned to the teachers and staff at their schools. The training sessions sometimes covered sexual abuse and sometimes addressed child neglect. They did not specifically address Title IX. Posters about mandatory reporting of child abuse and neglect were placed in the copying area and teacher's lounge. Henley did not receive or give any training on investigating reports of sexual abuse or on preventing abuse of students by school employees. Students did participate in a training program once a year called "Good Touch, Bad Touch."

Henley could not identify the school system's Title IX Coordinator or describe that person's duties. He testified in his deposition that if he received a complaint of abuse or harassment, he was supposed to report it to the superintendent and to DSS, and at that point, he considered the complaint to be in DSS's hands.

Principal Price also could not identify the Title IX Coordinator. Upon receiving a complaint, Price would contact the superintendent and report to DSS. He does not recall anyone telling him that he should make a report to the Title IX Coordinator. He testified in his deposition that he could not think of any steps that the School Board could take to prevent another employee from sexually abusing a student.

A lawyer gave an annual presentation on school law to administrators, and his presentations touched upon mandatory reporting and sexual harassment issues. He discussed how to recognize staff-to-student harassment, what to do about it, and the need to report it. He emphasized that teachers needed to report to administrators but also follow up to ensure that the conduct was reported to DSS. The portion of the presentation addressing sexual harassment usually lasted fifteen or twenty minutes.

Hooker did not receive any formal training from the school system regarding investigating a complaint of employee sexual abuse of a student. She had training through the state that was required to obtain her teaching license, and that training addressed abuse, neglect, and grooming. She completed that training in the early 2000s. Hooker stated that upon receiving a report of harassment or abuse, her duty was to report to DSS, report to the superintendent, take notes, and follow up with DSS. Though the school system's harassment policies were publicly available, the superintendent never provided training on them.

When Hooker was LES principal, she developed a handbook for LES faculty and staff. The handbook did not address Title IX or sexual harassment because Hooker thought those things were addressed in the Student Conduct Code ("SCC") issued by the School Board. Neither the LES handbook nor the faculty handbook stated to whom a student should report sexual abuse by an employee. The SCC

stated that the principal must require a written note from a parent or guardian in order for another adult to pick up a student during school hours. Hooker testified that she usually complied with that policy, but sometimes she called the parent or guardian rather than requiring a written note. The SCC contained a sexual harassment policy, but it did not give examples of what constitutes sexual harassment, nor did it mention Title IX. The SCC was sent home with students and parents were supposed to sign and return a page stating that they had gone over it with their children. The school system did not provide any training or education regarding the sexual harassment policy contained in the SCC.

On August 13, 2012, Hooker held a two-and-a-half hour faculty meeting for all teachers and staff of LES. She addressed 72 agenda items, including mandatory reporting, which she discussed for ten or fifteen minutes. Hooker knew that educators could be held legally liable if they were aware of sexual harassment and did not take immediate and appropriate action. She stated that she regularly told teachers that they should report to her if they saw anything that made them feel uncomfortable. She told them if they called DSS, they should also involve her. She told teachers not to be in a classroom alone with a student, not to add students as friends on Facebook, not to text with students, and to be careful what they said to students and parents.

After DSS visited the school to interview Gobble and Doe in 2013, Hooker did not provide any training to LES employees about employee-on-student harassment, and she did not request that the school system bring anyone into the school to provide that training. She did not ask teachers to keep an eye on Gobble's interactions with Doe.

According to Hess, the Title IX Coordinator is not responsible for determining whether a complaint is truthful or founded, but the coordinator is to assume that the complaint is true until they can prove differently. In the case of a sexual abuse or harassment complaint, the coordinator should follow up to ensure that the child is receiving services if needed. DSS or law enforcement would make the finding as to whether the complaint was founded.

Steffey, who retired in 2012, was an administrator in the central office and was in charge of security. No one ever informed him that he was the Title IX Coordinator. He did not receive any additional pay for serving as Title IX Coordinator. He did not seek out any training on Title IX and has never seen any of the Dear Colleague Letters issued by the Department of Education, Office for Civil Rights ("OCR"). He does not remember reviewing the Title IX implementing regulations. He testified that he thought the principals or assistant principals should have reviewed security footage daily, but he did not know whether that happened. If Steffey received a parental complaint, he would verbally

notify the principal and the superintendent. He testified that he did not have any responsibility after that. He thinks the superintendent was responsible for overseeing Title IX compliance, but he is not sure. As an administrator, he was not aware of any reports or complaints that a school employee was sexually harassing a student. If anyone within the school system had concerns that an employee was harassing a student, Steffey said DSS should have been notified. DSS would have conducted an investigation, and according to Steffey, the school should have relied on that investigation without taking any further action. He does not know of anything that the school system did to prevent sexual harassment of students. He does not remember the school system providing any training on employee sexual harassment of students.

Rebecca Dye testified that she was never informed that she was the Title IX Coordinator until she was preparing for her deposition in this case. Dye thought the purpose of Title IX was to prevent discrimination in college sports and sexual harassment in college settings. She learned something about Title IX in 2004 when she was working on her administrative degree. She was not involved in the Gobble investigation.

Cathy Gent is the current Title IX Coordinator and oversees parental complaints. She became the Title IX Coordinator in 2013. When she receives a complaint, she writes it down in a notebook. The person receiving a complaint is

supposed to put the complaint into writing and give it to Gent, Scotty Fletcher, the Alternate Title IX Compliance Officer, or their principal. There is no set procedure for what is supposed to happen with the written complaint.

Gent testified that in her mind, the standard for investigating a Title IX complaint is beyond a shadow of a doubt. She stated that Title IX covers race discrimination and applies to athletics, policies, and procedures, as well as sexual harassment. She testified that her duty as Title IX Coordinator is to report the details of complaints to the superintendent. It is her duty to investigate and to make sure that students have equal opportunities and are not discriminated against. The superintendent would decide whether or not a complaint is founded and would determine consequences or further action. Gent simply investigates complaints and passes along the information she collects. She is not required to complete any forms regarding complaints. Gent stated that DSS is called about every complaint accusing an employee of sexually harassing or assaulting a student. DSS then leads the investigations. School personnel can sit in on interviews, but according to Gent, the school does not have any obligation to gather additional information.

Gent was not informed of the October 2012 or early 2013 DSS investigations of Gobble. Hooker only told her about those investigations in connection with this lawsuit. She was aware of the February 2014 police investigation. Hess told Gent there had been a complaint by a parent and sent Gent

and Fletcher to LES to investigate. They talked to Price and immediately called DSS. They talked to Gobble at the end of the school day, and he denied everything. They did not allow him to come back to school the next day. DSS interviewed A.M. and his mother the next morning, as well as Helbert, Gobble, and other students. The worker told Hess that Gent and Fletcher would be allowed to sit in on the interviews but were not allowed to ask any questions. Fletcher asked one question during one of the interviews, and the DSS worker became very upset and told him not to speak again.

Gent and Fletcher watched surveillance videos and documented when students came and went from the custodian office. A.M. and M.S., the children of two school employees, were among the children shown entering and leaving the custodian office in the mornings. The videos showed children alone with Gobble in the office. Gent does not recall how many days' worth of video footage they reviewed. She does not recall talking to teachers about Gobble or undertaking any other investigation. Gent was not informed which children Gobble had abused. Hess later told her that DSS was going to interview Doe. Gent never asked any other students whether Gobble had inappropriately touched them. She was never informed whether DSS determined that Gobble had abused Doe. She does not recall anyone telling her that Gobble had admitted to abusing anyone other than A.M. She did not talk to Doe's grandparents or mother until years later. She does

not know whether any counseling or services were offered to Doe, although she thinks the school told him he could talk to a guidance counselor.

Gent has attended some trainings through the Department of Criminal Justice that addressed sexual harassment, but her responsibilities as Title IX Coordinator were not addressed. She was not required to attend these sessions but sought them out on her own. She explained the concept of grooming by pedophiles and stated that Gobble allowed kids to play on his computer and bought them breakfast, which could be considered grooming. As Title IX Coordinator, she never educated teachers about grooming behaviors or asked them to report such behaviors, and she is unaware of any training on grooming that the school system provided to teachers.

The School Board's sexual harassment policy in place at the time of the relevant events discussed sexual harassment in general but did not specifically mention harassment of students by employees. It did not identify the Title IX Coordinator or mention a compliance officer. Gent has never asked an attorney or other third party to review the policy, aside from principals and administrators. Gent is not aware of the Title IX implementing regulations. When she became Title IX Coordinator, no one sat her down and explained Title IX to her. The school system recently conducted a civil rights review, but Gent does not know of any Title IX audit or review of the school system. She does not know whether

anyone is tasked with following up with students or parents who have not signed and returned the sexual harassment policy acknowledgement form.

When asked to explain the beyond a shadow of a doubt standard she uses for complaints, Gent explained she would look for a concrete bit of knowledge that proved something happened or did not happen. She would look for video evidence or a witness who saw the incident or something of that nature. She stated that she would want to be convinced beyond a reasonable doubt.

Fletcher, the Alternate Title IX Compliance Officer, testified that it is not the school's job to independently investigate complaints or concerns. Instead, the school's job is to make a report to DSS and let DSS investigate. If the conduct is not criminal in nature, the school may discipline the employee involved. He did not recall any policies regarding sexual harassment or mandatory reporting. The school board approves the SCC, which is discussed and revised annually at a principal's meeting. There is no district-wide handbook for school employees, but some principals have created handbooks for the staff of their schools. Fletcher would probably be notified if Gent received a complaint of sexual harassment of a student by a teacher, but there is no set procedure addressing that. He testified that whether he was notified would depend on how the superintendent chose to handle the complaint. Fletcher has received some training on Title IX through continuing education courses. He has never received training regarding grooming techniques

that predators often use to gain access to children, and he is unaware of any such training provided by the School Board. He has been the alternate compliance officer for four to six years, and he has never received training on his duties as an alternate compliance officer. He is not aware of any survey conducted with respect to Title IX or sexual harassment of students.

Over the past three decades, complaints have been made by students and parents against a number of Russell County teachers, coaches, and employees for inappropriate conduct, sexual relationships with students, and sexual harassment. Most of the complaints involved high school students, and the conduct varied in severity. The complaints were handled inconsistently and often not according to written policies.

II. PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AGAINST GOBBLE.

The plaintiff has asserted four state law claims against Gobble: negligence per se, assault, battery, and intentional infliction of emotional distress. The plaintiff has moved for summary judgment in his favor on his claims against Gobble. Gobble opposes the Motion for Summary Judgment, arguing that the plaintiff has not adequately established that Gobble's actions caused Doe's injuries.

Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a

matter of law." Fed. R. Civ. P. 56(a).  To raise a genuine issue of material fact sufficient to avoid summary judgment, the evidence must be "such that a reasonable jury could return a verdict for the nonmoving party."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  In making this determination, "the court is required to view the facts and draw reasonable inferences in a light most favorable to the nonmoving party."  *Shaw v. Stroud*, 13 F.3d 791, 798 (4th Cir. 1994).  "Mere unsupported speculation . . . is not enough to defeat a summary judgment motion."  *Ennis v. Nat'l Ass'n of Bus. & Educ. Radio, Inc.*, 53 F.3d 55, 62 (4th Cir. 1995).

Count IX of the Complaint asserts a state law negligence per se claim against Gobble based on alleged violations of Va. Code Ann. §§ 18.2-371 and 16.1-228.  The first statute, section 18.2-371, provides that any adult who "willfully contributes to, encourages, or causes any act, omission, or condition that renders a child delinquent, in need of services, in need of supervision, or abused or neglected as defined in § 16.1-228" is guilty of a Class 1 misdemeanor.  Section 16.1-228 defines "[a]bused or neglected child" to include a child "[w]hose parents or other person responsible for his care creates or inflicts, threatens to create or inflict, or allows to be created or inflicted upon such child a physical or mental injury by other than accidental means."  The statute defines "[c]hild in need of services" as "a child whose . . . condition presents or results in a serious threat to

the well-being and physical safety of the child." *Id.* A "[c]hild in need of supervision" includes "[a] child who, while subject to compulsory school attendance, is habitually and without justification absent from school," if the school has satisfied certain requirements to procure regular attendance. *Id.*

To succeed on a negligence per se claim, the plaintiff must establish that: (1) "the defendant violated a statute that was enacted for public safety"; (2) the plaintiff "belongs to the class of persons for whose benefit the statute was enacted, and that the harm that occurred was of the type against which the statute was designed to protect"; and (3) "the statutory violation was a proximate cause of his injury." *Halterman v. Radisson Hotel Corp.*, 523 S.E.2d 823, 825 (Va. 2000).

Counts XII and XIII assert state law claims of assault and battery against Gobble. Under Virginia law, "[t]he tort of assault consists of an act intended to cause either harmful or offensive contact with another person or apprehension of such contact, and that creates in that other person's mind a reasonable apprehension of an imminent battery." *Koffman v. Garnett*, 574 S.E.2d 258, 261 (Va. 2003). "The tort of battery is an unwanted touching which is neither consented to, excused, nor justified." *Id.* at 261. In Virginia, a minor under the age of thirteen is legally incapable of consenting to sexual acts. *Martin v. Commonwealth*, 630 S.E.2d 291, 292 (Va. 2006); Va. Code Ann. §§ 18.2-67.1, 18.2-67.3. "[T]he quality of the act's offensiveness is judged by an objective

standard, not by whether the plaintiff found the act offensive." *Balas v. Huntington Ingalls Indus., Inc.*, 711 F.3d 401, 411 (4th Cir. 2013) (citing Restatement (Second) of Torts § 18 (Am. Law Inst. 1965)).

Count XIV asserts a claim of intentional infliction of emotional distress against Gobble. Under Virginia law, a plaintiff alleging intentional infliction of emotional distress must prove the following elements: "(i) the wrongdoer's conduct was intentional or reckless, (ii) the conduct was outrageous and intolerable, (iii) the alleged wrongful conduct and emotional distress are causally connected, and (iv) the distress is severe." *Ostolaza-Diaz v. Countrywide Bank, N.A.*, 360 F. App'x 504, 507 (4th Cir. 2010) (unpublished) (citing *Ogunde v. Prison Health Servs.*, 645 S.E.2d 520, 526 (Va. 2007)). The second element requires that the conduct was "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." *Russo v. White*, 400 S.E.2d 160, 162 (Va. 1991) (internal quotation marks and citation omitted).

Gobble's only argument opposing summary judgment on all of these claims is a speculative contention that other factors, rather than Gobble's abuse, might have caused Doe's emotional distress and psychological injuries. There is ample evidence in the record to satisfy the elements of all of the claims against Gobble, and Gobble has offered no evidence in opposition to the plaintiff's motion. I find

that there is no genuine dispute of material fact as to the claims against Gobble, and that Doe is entitled to judgment as a matter of law against Gobble on Counts IX, XII, XIII, and XIV.

### III. SCHOOL DEFENDANTS' MOTION FOR SUMMARY JUDGMENT.

The School Defendants previously moved to dismiss the plaintiff's claims against them, and I partially granted that motion. *Doe v. Russell Cty. Sch. Bd.*, No. 1:16CV00045, 2017 WL 1374279 (W.D. Va. Apr. 13, 2017). Following disposition of the Motion to Dismiss, the remaining claims against the School Board consist of two claims (Counts I and II) under Title IX of the Educational Amendments of 1972 and one claim pursuant to 42 U.S.C. § 1983 (Count III) based on a failure-to-train theory. In addition, there are three pending claims against Henley and Hooker each in their individual capacities — a § 1983 supervisory liability claim (Counts IV and V), a § 1983 failure-to-train claim (Count III), and a state law gross negligence claim (Count XI). The School Defendants have now moved for summary judgment in their favor on all of these remaining claims.

### *A. Count I.*

Count I claims that the School Board's actions and inactions violated Title IX of the Educational Amendments of 1972, 20 U.S.C. §§ 1681-1688. Title IX states that "[n]o person in the United States shall, on the basis of sex, be excluded

from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance." 20 U.S.C. § 1681(a). This prohibition encompasses sexual harassment or abuse of a student by a public school employee, for which money damages can be awarded in a private legal action. *See generally Franklin v. Gwinnett Cty. Pub. Schs.*, 503 U.S. 60 (1992).

> To establish a Title IX claim on the basis of sexual harassment, a plaintiff must show that (1) she was a student at an educational institution receiving federal funds, (2) she was subjected to harassment based on her sex, (3) the harassment was sufficiently severe or pervasive to create a hostile (or abusive) environment in an educational program or activity, and (4) there is a basis for imputing liability to the institution.

*Jennings v. Univ. of N.C.*, 482 F.3d 686, 695 (4th Cir. 2007). In *Gebser v. Lago Vista Independent School District*, 524 U.S. 274, 277 (1989), the Supreme Court held that under Title IX, a school district is not liable for damages based on sexual harassment of a student by a teacher "unless an official of the school district who at a minimum has authority to institute corrective measures on the district's behalf has actual notice of, and is deliberately indifferent to, the teacher's misconduct." The Court adopted that rule because the Title IX remedial scheme "is predicated upon notice to an 'appropriate person' and an opportunity to rectify any violation," and the Court defined an "appropriate person" as "an official of the [federal funding] recipient entity with authority to take corrective action to end the

discrimination." *Gebser*, 524 U.S. at 290 (citation omitted). The appropriate person, and thus the school board, is deliberately indifferent to sexual harassment where the response to notice of misconduct is "clearly unreasonable in light of the known circumstances." *Davis v. Monroe Cty. Bd. of Educ.*, 526 U.S. 629, 648 (1999).

I previously ruled that Hooker, as LES principal, was an appropriate person as defined by *Gebser*. *Doe*, 2017 WL 1374279, at *6. Doe has produced evidence that Hooker had actual notice of misconduct based on Charlene's complaints to DSS and the resulting DSS investigations that occurred in late 2012 and early 2013. The School Board argues that as a matter of law, it was not deliberately indifferent because Hooker's response to the DSS investigations was reasonable in light of the fact that Doe's guardians approved of and encouraged Gobble's role in Doe's life, and DSS concluded that Charlene's complaints were unfounded. While the School Board can certainly make that argument to the jury at trial, I find that the plaintiff has offered sufficient evidence from which reasonable jurors could conclude that Hooker's response to the DSS investigations was clearly unreasonable in light of the known circumstances.

Hess, the superintendent and Hooker's boss during the 2012-13 school year, testified that Hooker had an obligation to conduct her own investigation of Gobble after Charlene complained of an inappropriate relationship with Doe. Through the

DSS investigation, Hooker learned that Doe, a particularly vulnerable elementary school student, was living in the same bedroom with a school employee to which he was unrelated. She further learned that Doe's relationship with Gobble was causing problems in Gobble's marriage, and she described Charlene as being jealous of Doe. In addition, Hooker knew that Doe was regularly spending time with Gobble at LES behind closed doors, both during the school day and when school was not in session. Some of the facts are in dispute and Hooker's credibility is at issue, but jurors could reasonably find from the record evidence that Hooker undertook little to no investigation in response to this knowledge and did virtually nothing to increase her supervision of Gobble or limit Gobble's access to Doe. Reasonable jurors could conclude that Hooker's inaction allowed Gobble's abuse of Doe to continue for months longer than it might otherwise have occurred.

The question of what constitutes a clearly unreasonable response in light of known circumstances is one best answered by the finder of fact, particularly in a complicated case like this one. Because there are factual disputes and credibility issues that must be resolved by a jury, I will deny the Motion for Summary Judgment as to Count I.

*B. Count II.*

Count II charges the School Board with violating Title IX by failing to take corrective action after Gobble's confession and arrest. The plaintiff claims that despite actual knowledge of abuse, the School Board failed to "provide, offer, recommend, or coordinate adequate health, psychological, counseling, and academic assistance and services to Plaintiff to minimize the harm he suffered," Compl. ¶ 110, and failed to terminate or discipline any School Board personnel as a result of their handling of the situation.[2] According to the plaintiff, this inaction constituted deliberate indifference and materially impaired Doe's access to educational opportunities and benefits. The School Board contends it is entitled to summary judgment on this claim because failure to provide counseling does not amount to a viable cause of action, Doe moved out of Russell County and was not a student for a period of time after Gobble's confession, and Jane Doe testified that Doe does not want counseling at this time.

The premise of a school board's liability under Title IX "is an official decision by the recipient not to remedy the violation." *Gebser*, 524 U.S. at 290. OCR has issued guidance, in the form of a Dear Colleague Letter, that once a

_____

[2] In an earlier brief, the plaintiff stated that Counts I and II "may be considered together as constituting Plaintiff's Title IX claim." Pl.'s Br. in Opp'n to Sch. Defs.' Mot. to Dismiss for Lack of Subject Matter Jurisdiction and Failure to State a Claim 12-13, n.4, ECF No. 24. However, the plaintiff has never sought to amend the Complaint to combine these two claims, so I will continue to treat them as separate claims.

school knows of sexual harassment of a student, it must take steps not only to end the harassment, but also to "prevent its recurrence, and remedy its effects." U.S. Dep't of Educ., Office for Civil Rights, Dear Colleague Letter (Jan. 25, 2006), www2.ed.gov/about/offices/list/ocr/letters/sexhar-2006.pdf; *see also* 34 C.F.R. § 106.3 (requiring schools to take remedial action "to overcome the effects of" discrimination on the basis of sex). Addressing cases of student-on-student sexual violence, OCR has stated that "[i]n addition to counseling or taking disciplinary action against the harasser, effective corrective action may require remedies for the complainant, as well as changes to the school's overall services or policies." U.S. Dep't of Educ., Office for Civil Rights, Dear Colleague Letter (Apr. 4, 2011) (archived) at 15, www2.ed.gov/about/offices/list/ocr/letters/colleague-201104.pdf. Though these statements represent OCR policy in the context of administrative enforcement actions rather than private lawsuits, they bear upon the question of whether the School Board's response to known sexual abuse of a student was appropriate and adequate in this case, or whether the School Board responded with deliberate indifference by failing to take remedial measures following Gobble's arrest.

The fact that Doe ceased to be a student for some period of time following Gobble's confession is not a reason to rule in favor of the School Board on this claim as a matter of law. There is evidence that Doe continued to attend LMS for

some days or weeks following Gobble's confession and arrest, and in any event, he ultimately returned to Russell County and is a student there now. Moreover, Jane Doe's testimony that Doe does not currently want to undergo counseling at best creates a factual dispute. Doe himself testified that he does wish to receive counseling, and in any event, Doe's statements or wishes regarding counseling would not have prevented the School Board from offering it.

I find that the plaintiff has presented sufficient evidence from which a jury could conclude that the School Board acted with deliberate indifference to Gobble's confessed abuse of Doe by failing to offer counseling or other remedial measures to Doe. In addition, a jury could conclude that the School Board failed to take action necessary to prevent future harassment, such as training or disciplining personnel or revising applicable policies, and thus did not comply with its obligations under Title IX. I will deny the Motion for Summary Judgment as to Count II.

### C. Count III.

Count III is a failure-to-train claim asserted against all three of the School Defendants under 42 U.S.C. § 1983. It is based on the violation of Doe's Fourteenth Amendment substantive due process right to bodily integrity and to be free from sexual abuse by a school employee, as well as his property interest in a public education. The School Defendants argue that they are entitled to summary

judgment on this claim because they were unaware of any deficiency in training, and any such deficiency was not a proximate cause of the sexual abuse. Henley and Hooker also assert qualified immunity.

"[T]here are limited circumstances in which an allegation of a 'failure to train' can be the basis for liability under § 1983." *City of Canton v. Harris*, 489 U.S. 378, 387 (1989). In the school context, the failure to train must amount to deliberate indifference to the rights of students, and the deficiency in training "must be closely related to the ultimate injury." *Id.* at 391. "Where a plaintiff claims that the [governmental body] has not directly inflicted an injury, but nonetheless has caused an employee to do so, rigorous standards of culpability and causation must be applied to ensure that the [governmental body] is not held liable solely for the actions of its employee." *Bd. of Cty. Comm'rs v. Brown*, 520 U.S. 397, 405 (1997).

The School Defendants' "continued adherence to an approach that they know or should know has failed to prevent tortious conduct by employees may establish the conscious disregard for the consequences of their action — the 'deliberate indifference' — necessary to trigger [public entity] liability." *Id.* at 407. "Without notice that a course of training is deficient in a particular respect, decisionmakers can hardly be said to have deliberately chosen a training program that will cause violations of constitutional rights." *Connick v. Thompson*, 563 U.S.

51, 62 (2011).  Notice can be established by showing that the need for the training and the risks of not providing the training were obvious.  *See Canton*, 489 U.S. at 390; *Jordan ex rel. Jordan v. Jackson*, 15 F.3d 333, 341 (4th Cir. 1994).

I find that the plaintiff has produced sufficient evidence that the School Defendants had notice of deficient training either based on past incidents of sexual misconduct against students by School Board employees or because the need for training was obvious.  The plaintiff offered evidence of past complaints and investigations of employee-on-student harassment by seven School Board employees, several of whom were repeat offenders.  Incidents involving five of the seven employees occurred less than ten years before Gobble began abusing Doe, and at least two of the incidents occurred around the same time period that Gobble began abusing Doe.  A jury could conclude that these incidents placed the School Defendants on notice that they needed to provide training to administrators, teachers, and staff on how to identify, prevent, and investigate employee-on-student sexual harassment.

Even without this history, however, a jury could reasonably conclude that the School Defendants' need to thoroughly train administrators, teachers, and staff on how to spot and address sexual misconduct was obvious.  In 1998, thirteen years before Gobble began to prey upon Doe, the Supreme Court wrote:

> The number of reported cases involving sexual harassment of
> students in schools confirms that harassment unfortunately is an all

too common aspect of the educational experience. No one questions that a student suffers extraordinary harm when subjected to sexual harassment and abuse by a teacher, and that the teacher's conduct is reprehensible and undermines the basic purposes of the educational system.

*Gebser*, 524 U.S. at 292. The plaintiff has pointed to numerous guidance documents issued by OCR and the Virginia Department of Education conveying to educators the extent of the sexual harassment problem in schools and the need to provide adequate training, adopt appropriate policies, and conduct thorough and timely investigations. The deposition testimony of many of the school employee witnesses in this case suggests that they received little or no training from the School Defendants on how to identify warning signs of sexual harassment, the steps they should take to prevent sexual harassment, how to investigate complaints, and how to remedy sexual harassment. Based on the record evidence, a jury could reasonably conclude that whatever training the School Defendants provided on these topics was woefully inadequate.

I further find that whether insufficient training was closely related to the ultimate injuries suffered by Doe is a jury question. There is evidence that would justify the conclusion that teachers and administrators overlooked numerous red flags and encouraged Gobble's relationship with Doe, which may have emboldened Gobble and intensified the abuse. It is undisputed that Gobble molested Doe on LES grounds on a number of occasions, when he was

unquestionably under the supervisory control of the School Defendants. The School Board was Gobble's employer and was responsible for ensuring the safety of Doe in the school environment. A jury could find that had teachers and administrators been better trained to spot and respond to signs of abuse, they might have curtailed Gobble's access to students while at LES and instructed him not to interact with non-family related students outside of school, regardless of what the students' parents permitted. Had he failed to comply with such a directive, the School Defendants could have taken disciplinary action against him, which may have discouraged the abuse, or even terminated him, which might have affected Doe's guardians' perception of Gobble. Jane Doe testified that she trusted Gobble because he was a school employee, and teachers and administrators presented him as a positive influence on Doe. Had school officials raised concerns to her about Gobble, she may have ended Doe's contact with Gobble sooner or restricted their unsupervised interactions. A jury could conclude that the DSS investigations may have proceeded differently had Gobble's wife not been the only complainant, or had teachers voiced concerns to the DSS investigators about Gobble's behavior. In sum, there is sufficient evidence to allow a jury to infer that a lack of appropriate training proximately contributed to Doe's constitutional injuries.

Henley and Hooker contend that they are entitled to qualified immunity on Count III. A § 1983 claim requires proof of the following three elements: "(1) the

deprivation of a right secured by the Constitution or a federal statute; (2) by a person; (3) acting under color of state law." *Jenkins v. Medford*, 119 F.3d 1156, 1159-60 (4th Cir. 1997). While state officials sued in their official capacities are not "persons" under § 1983, *Will v. Mich. Dep't of State Police*, 491 U.S. 58, 71 (1989), state officials sued in their individual capacities are "persons" within the meaning of the statute and are not absolutely immune from suit, *Hafer v. Melo*, 502 U.S. 21, 31 (1991). A government official sued in his individual capacity under § 1983 may, however, be entitled to qualified immunity. *Id.* at 25 ("[O]fficials sued in their personal capacities . . . may assert personal immunity defenses such as objectively reasonable reliance on existing law.")

Qualified immunity "shields government officials from liability for civil damages, provided that their conduct does not violate clearly established statutory or constitutional rights within the knowledge of a reasonable person." *Meyers v. Balt. Cty.*, 713 F.3d 723, 731 (4th Cir. 2013). The doctrine "seeks to balance two interests, namely, the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." *Sims v. Labowitz*, 877 F.3d 171, 177 (4th Cir. 2017) (internal quotation marks and citations omitted). Qualified immunity is immunity from suit rather than merely immunity from liability; therefore, the question of qualified immunity should be decided before

trial. *Id.* A defendant asserting qualified immunity has the burden of proving the defense. *Id.*

"To overcome the qualified immunity defense at the summary judgment stage, the plaintiff must have shown facts that make out a violation of a constitutional right, and the right at issue must have been clearly established at the time of the defendant's alleged misconduct." *Thompson v. Virginia*, 878 F.3d 89, 97 (4th Cir. 2017) (internal quotation marks and citations omitted). In assessing whether a defendant is entitled to qualified immunity, the court must first

> identify the specific right that the plaintiff asserts was infringed by the challenged conduct. [The court] then engage[s] in a two-step inquiry, asking whether a constitutional violation occurred and whether the right violated was clearly established at the time of the official's conduct. Courts have discretion to take these steps in either order.
>
> . . . A right is clearly established only if its contours are sufficiently clear that a reasonable official would understand that what he is doing violates that right. The unlawfulness of the official's conduct must be apparent in light of pre-existing law. To be clearly established, existing precedent must have placed the statutory or constitutional question beyond debate.

*Booker v. S.C. Dep't of Corr.*, 855 F.3d 533, 537-38 (4th Cir. 2017) (internal quotation marks and citations omitted).

The Fourth Circuit has stated that "[u]nder established precedent," students have a right to bodily integrity and to be free from sexual abuse by state actors. *Doe v. Rosa*, 795 F.3d 429, 436-37 (citing *Hall v. Tawney*, 621 F.2d 607, 612-13 (4th Cir. 1980)). Doe's constitutional right to be free from school-based

molestation was clearly established at the time of these events. Henley and Hooker argue, however, that they were confronted with an unusual situation in that Doe's guardians allowed Gobble to be Doe's caretaker. The principals assert that this specific situation was unlikely to occur with any regularity, and reasonable principals would not have known that they needed to provide training regarding such a circumstance.

The Supreme Court and Fourth Circuit have admonished that "courts must not define clearly established law at a high level of generality," but must instead "examine whether the violative nature of [a defendant's] *particular* conduct is clearly established . . . in light of the specific context of the case, not as a broad general proposition." *E.W. v. Dolgos*, No. 16-1608, 2018 WL 818303, at * 8 (4th Cir. Feb. 12, 2018) (internal quotation marks and citations omitted). The plaintiff has not pointed the court to any controlling authority sufficiently similar to the situation confronted by Henley and Hooker in this case, where a student's parent or guardian expressly approved of a child living with a school employee and a local agency investigated complaints and concluded they were unfounded. Although the evidence could support a finding that Henley and Hooker were deliberately indifferent in their failure to provide training, existing precedent did not provide them sufficient notice that their conduct would give rise to a violation of constitutional rights. They are therefore entitled to qualified immunity, and I will

grant the Motion for Summary Judgment with respect to Count III as to Henley and Hooker. I will deny the motion as to the School Board.

*D. Count IV.*

Count IV is a § 1983 supervisory liability claim against Henley. The plaintiff alleges that Henley had actual or constructive knowledge of conduct by Gobble that posed a pervasive and unreasonable risk of constitutional injury to Doe, and that Henley responded with deliberate indifference. Henley again contends that he did not have knowledge that Gobble posed any risk in light of Doe's guardians' approval of Gobble's activities, and that any failure of Henley to investigate or take action was not the proximate cause of Doe's injuries.

In order to establish supervisory liability under § 1983 in a case like this, a plaintiff must show that (1) the defendant in a supervisory position had knowledge (actual or constructive) that his subordinate was engaged in conduct that "posed a pervasive and unreasonable risk of constitutional injury to citizens like the plaintiff"; (2) the response by the defendant was so inadequate as to show deliberate indifference; and (3) there was a causal link between the inaction and the injury suffered by the plaintiff. *Baynard v. Malone*, 268 F.3d 228, 235 (4th Cir. 2001). The Fourth Circuit has defined constructive knowledge as "[k]nowledge that one using reasonable care or diligence should have, and therefore that is

attributed by law to a given person." *Hoschar v. Appalachian Power Co.*, 739 F.3d 163, 175 (4th Cir. 2014) (citation omitted).

The plaintiff has produced evidence from which a jury could find that Henley had actual knowledge of the following facts:

- Gobble brought Doe to school in the mornings, and Doe left school with Gobble at the end of the day;

- Doe was spending time at Gobble's house;

- Gobble took Doe and Gobble's nephews to dinner in Bristol, Virginia, which is located a distance from Russell County;

- Gobble was regularly at school several hours before his shift began;

- Gobble spent time in the custodian office with children before school started;

- Teachers would send students, alone, to the custodian office during the school day to get supplies;

- Doe spent time in the custodian office after school;

- Gobble spent time in the custodian office with Doe and other children with the door closed;

- Doe and Gobble's nephews were with Gobble at LES when school was not in session; and

- Gobble removed Doe and other students from classes to collect trash.

From this actual knowledge, a jury could reasonably conclude that Henley had a duty to monitor Gobble more closely and conduct an investigation. A jury could conclude that a reasonably prudent principal should have discovered all of the other red flags of which teachers were aware, including Gobble's singling out of Doe, marital problems, tendency to hug Doe and pat him on the head, frequent and relatively expensive gifts to Doe, and more. While individual teachers might not have regarded isolated incidents as red flags, a jury could find that a reasonable principal with knowledge of all of these facts should have recognized the risk Gobble posed to Doe and taken action to limit that risk. A jury could also impute to Henley constructive knowledge of facts that may have been gleaned from security camera footage or from asking detailed questions of Doe's family members. I find that this actual and constructive knowledge, if found by the jury, would be sufficient to satisfy the first element of Doe's supervisory liability claim against Henley.

As to proximate causation, I again find that it is a jury issue for the reasons stated above with respect to Doe's failure-to-train claim. Contrary to the School Defendants' assertions, the home approval and the results of a poorly conducted DSS investigation do not necessarily mean that there was nothing more that could have been done to detect and halt Gobble's abuse of Doe. A jury could reasonably conclude that Henley's lack of diligence facilitated and perpetuated Gobble's

abuse. Indeed, the undisputed facts show that Henley was Gobble's supervisor for years before Doe began attending LES, and Gobble gained access to Doe and developed a relationship with him through his employment at LES. A jury might find that more careful supervision of Gobble from the start of his employment could have prevented Gobble from ever forming that relationship in the first place.

As with Count III, Henley contends that he is entitled to qualified immunity on Count IV. The question as to this count is whether a reasonable principal with Henley's knowledge would have known that failure to properly supervise Gobble was likely to cause a violation of clearly established constitutional rights. Drawing all inferences in favor of the plaintiff, for the reasons stated as to Count III, I conclude that Henley did not have sufficient notice that his conduct was unconstitutional. Therefore, I will grant the Motion for Summary Judgment as to Count IV.

### E. Count V.

Count V asserts supervisory liability under § 1983 against Hooker. The plaintiff has offered evidence that Hooker's actual knowledge far exceeded that of Henley. Viewing that evidence in the light most favorable to the plaintiff, Hooker knew all of the things that Henley knew, plus she learned that Gobble's wife was jealous of Doe and complained to DSS about their relationship, and that Doe and Gobble were living together in the same bedroom. The constructive knowledge

that could be imputed to her likewise continued to grow during her term as principal of LES, as teachers witnessed more of Gobble's behavior and his interactions with Doe. For instance, teachers became concerned that Gobble was singling out Doe for preferential treatment and learned that Gobble was obsessed with adopting Doe and was willing to end his marriage over his wife's complaints about Doe. For the reasons stated above as to the supervisory liability claim against Henley, I find that the plaintiff has presented sufficient evidence to overcome the School Defendants' Motion for Summary Judgment as to the first and third elements of the supervisory liability claim against Hooker.

Hooker argues that as a matter of law, she was not deliberately indifferent. A number of the facts surrounding Hooker's actions regarding Gobble are in dispute. It appears to be undisputed that she instructed teachers not to allow Gobble to remove students from class to help him with his janitorial duties, although it is unclear whether that action was taken in response to mounting knowledge of potential abuse. It is undisputed that Hooker sat in on the DSS interviews of Gobble and Doe and that she did not ask any questions in those interviews. It is undisputed that she did not review security camera footage of Gobble's activities at LES. She may have talked to certain teachers and family members about Gobble, but what she asked in those alleged conversations is disputed. The occurrence and content of any conversations she had with Gobble

are also in dispute.  These factual disputes would need to be resolved by a jury, as the scant undisputed facts are insufficient for me to conclude as a matter of law that Hooker did not act with deliberate indifference to the knowledge that Gobble posed an unreasonable risk to Doe.

However, like Henley, Hooker asserts that she is entitled to qualified immunity on Doe's supervisory liability claim.  I again conclude that, when faced with the unusual scenario presented here ─ express home approval of the child spending time alone with the school employee and a local agency's investigation and unfounded disposition of complaints ─ existing precedent did not give Hooker adequate notice that her failure to more thoroughly investigate and supervise Gobble was likely to amount to a constitutional violation.  Therefore, I must grant Hooker's Motion for Summary Judgment as to Count V on the ground of qualified immunity.

*F.  Count XI.*

Count XI asserts a claim of gross negligence under Virginia law against Henley and Hooker.  They assert that they are entitled to summary judgment on this claim because the plaintiff has not produced evidence that would allow a rational jury to conclude that their conduct rose to the level of negligence required to succeed on a gross negligence claim.

"Gross negligence is a degree of negligence showing indifference to another and an utter disregard of prudence that amounts to a complete neglect of the safety of such other person." *Elliott v. Carter*, 791 S.E.2d 730, 732 (Va. 2016) (internal quotation marks and citation omitted). The tort "requires a degree of negligence that would shock fair-minded persons, although demonstrating something less than willful recklessness." *Id*. (citations omitted). "Ordinarily, the question whether gross negligence has been established is a matter of fact to be decided by a jury. Nevertheless, when persons of reasonable minds could not differ upon the conclusion that such negligence has not been established, it is the court's duty to so rule." *Id*. (citation omitted). "Because the standard for gross negligence in Virginia is one of indifference, not inadequacy, a claim for gross negligence must fail as a matter of law when the evidence shows that the defendants exercised some degree of care." *Id*. (internal quotation marks, alterations, and citations omitted).

In short, the standard for gross negligence in Virginia is very high. As to Henley, I find that the plaintiff has not produced evidence showing that he acted in a way that would shock a reasonable person or that exhibited a complete neglect of Doe's safety. As to Hooker, the undisputed facts reveal that she undertook some degree of care, however slight, with regard to Doe's safety when she sat in on DSS interviews, called Doe's grandmother to verify that she gave permission for Gobble to give Doe rides, and instructed teachers not to allow Gobble to remove

students from class to collect trash.  For these reasons, I will grant the Motion for Summary Judgment as to Count XI.

IV.  SCHOOL DEFENDANTS' MOTION TO EXCLUDE EXPERT TESTIMONY.

The School Defendants have filed a motion in limine to exclude the testimony of two of plaintiff's disclosed expert witnesses at trial, Charol M. Shakeshaft, Ph.D., and Richard S. Epstein, M.D.  Dr. Shakeshaft, a professor of education at Virginia Commonwealth University, is expected to testify that the School Defendants "failed to adopt, enforce, and/or train on appropriate policies, practices, and procedures to protect students from sexual abuse as that suffered by Plaintiff."  Pl.'s Disclosures 2, ECF No. 61-1.  Dr. Epstein, a psychiatrist, is expected to testify "regarding past, present, and future psychological pain, suffering, and impairment" occasioned by the sexual abuse of the plaintiff, as well as his "future treatment needs."  *Id.* at 1-2.

The case of *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), provides the basic analytical framework for determining the admissibility of expert testimony.  Under *Daubert*, the court acts as a "gatekeeper" by ensuring "that any and all scientific testimony or evidence admitted is not only relevant, but reliable."  *Id.* at 589.  "[T]he trial judge's general 'gatekeeping' obligation . . . applies not only to testimony based on 'scientific' knowledge, but also to testimony based on 'technical' and 'other specialized' knowledge."

*Co. v. Carmichael*, 526 U.S. 137, 141 (1999). The trial court's inquiry into admissibility is "a flexible one" and the court's analysis will "depend[] on the nature of the issue, the expert's particular expertise, and the subject of his testimony." *See id.* at 150 (internal quotation marks and citation omitted). More generally, cases after *Daubert* have shown that "the rejection of expert testimony is the exception rather than the rule." Fed. R. Evid. 702 advisory committee's note to 2000 amendment.

The principles of *Daubert* and its progeny are reflected in the Federal Rules of Evidence, which allow expert evidence under certain circumstances:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
>
> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
> (b) the testimony is based on sufficient facts or data;
>
> (c) the testimony is the product of reliable principles and methods; and
>
> (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702.

As stated by the advisory committee:

> When facts are in dispute, experts sometimes reach different conclusions based on competing versions of the facts. The emphasis

in the amendment on "sufficient facts or data" is not intended to authorize a trial court to exclude an expert's testimony on the ground that the court believes one version of the facts and not the other.

Fed. R. Evid. 702 advisory committee's note to 2000 amendment. The reality is that "the trial court's role as gatekeeper is not intended to serve as a replacement for the adversary system." *Id.* (quoting *United States v. 14.38 Acres,* 80 F.3d 1074, 1078 (5th Cir. 1996)). As noted in *Daubert*, "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." 509 U.S. at 596.

"Testimony from an expert is presumed to be helpful unless it concerns matters within the everyday knowledge and experience of a lay juror." *Kopf v. Skyrm*, 993 F.2d 374, 377 (4th Cir. 1993). Issues associated with the admission of expert testimony may arise when "the evaluation of the commonplace by an expert witness might supplant a jury's independent exercise of common sense." *Id.* (internal quotation marks and citation omitted).

### A. Dr. Shakeshaft.

At oral argument on the present motion, plaintiff's counsel conceded that it would be inadmissible to elicit from Dr. Shakeshaft the opinions set forth in her Rule 29(a)(2) disclosure that the School Defendants were "deliberately indifferent" to the risk of harm to the plaintiff and that the failure to provide adequate policy or

training was a proximate cause of the sexual abuse by Gobble. I agree with the School Defendants that under the particular circumstances of this case, such opinions are beyond the proper role of an expert witness and would supplant the jury's role in evaluating and determining the facts. *See United States v. Barile*, 286 F.3d 749, 760 (4th Cir. 2002) (noting that "[e]xpert testimony that merely states a legal conclusion is less likely to assist the jury in its determination").

Otherwise, I find no grounds to exclude the testimony of Dr. Shakeshaft. While certainly subject to cross examination, her professional qualifications permit her to opine on the standard of care in adopting and enforcing school policies relating to the prevention of sexual abuse of students by school personnel.[3] Whether she considered all of the relevant facts in the case sufficient to state a credible opinion on whether the School Defendants met that standard of care is a matter for the jury, based upon all of the evidence in the case.

*B. Dr. Epstein.*

The School Defendants do not attack Dr. Epstein's professional qualifications as an expert on the effects on child victims of sexual abuse, or on the appropriate medical treatment of such children. They do not dispute his opinion

---

[3] Among other things, Dr. Shakeshaft testified in her deposition that she helped write the guidelines for prevention of sexual misconduct and abuse in public schools approved by the Virginia State Board of Education in 2011. Shakeshaft Dep. 29-30, ECF No. 67-2.

that the plaintiff suffers from PTSD as a result of his sexual abuse by Gobble. Rather, they contend that he has not stated a foundation for his opinions that the plaintiff will require over his lifetime up to 60 days of psychiatric hospitalization and two out-patient visits per week with a psychiatrist, all as a result of the sexual abuse by Gobble. They argue that he has not offered any literature or data to support these opinions, and that his opinion on future hospitalization is speculative because it is based on "an unforeseen thing," such "a parent dying, or a grandparent dying" or "future trauma . . . . [t]hat happens to a lot of people." Epstein Dep. 138-39, ECF No. 61-6.

The plaintiff does not contest that Dr. Epstein has not referenced studies, data, or medical literature to support his challenged opinions, but argues that these opinions are admissible because they are based on his "many years of experience and expertise." Pl's Br. in Opp'n 4, ECF No. 67.

It is correct that Dr. Epstein has an impressive curriculum vitae, and over a lengthy medical practice, has written and lectured on the diagnosis and treatment of PTSD, including that of children with the affliction. It is also true that relevant experience by an expert may be sufficient to support the admissibility of his opinions. *See* Fed. R. Evid. 702 advisory committee's note to 2000 amendment (stating that "the text of Rule 702 expressly contemplates that an expert may be qualified on the basis of experience [and] [i]n certain fields, experience is the

predominant, if not sole, basis for a great deal of reliable expert testimony"). Unfortunately, however, the record provided by the parties as to Dr. Epstein's opinions is very sparse. It does not contain his full Rule 29(a)(2) disclosure and only snippets from his deposition testimony. I do not find on the present record that Dr. Epstein has given any explanation for the basis of his challenged opinions. Do these opinions in fact come from his experience with other patients comparable to the plaintiff? Perhaps yes, but I cannot tell at this point.

When objected to, the proponent of expert testimony has the burden of proof to demonstrate its admissibility. *See* Margaret A. Berger, *Procedural Paradigms for Applying the* Daubert *Test*, 78 Minn. L. Rev. 1345, 1365 (1994). The court has wide discretion in resolving *Daubert* issues, and under the circumstances, I will allow the plaintiff to supplement its response to the School Defendants' objections as to Dr. Epstein's proposed testimony.

V. CONCLUSION.

For the reasons stated, it is **ORDERED** as follows:

1. Plaintiff's Motion for Summary Judgment against Defendant Bobby Gobble, ECF No. 59, is GRANTED as to said defendant's liability under Counts IX, XII, XIII, and XIV of the Complaint, with the amount of the judgment to be determined following the jury's verdict as to the damages to be awarded against said defendant;

2.     Defendants Russell County School Board, Phillip Henley, and Kimberly Hooker's Motion to Exclude, ECF No. 60, is GRANTED IN PART AND DENIED IN PART.  Plaintiff is granted leave to supplement his response to the objections to the testimony of Richard S. Epstein, M.D., provided such response is filed by February 19, 2018, and with any reply thereto by the defendants to be filed no later than February 23, 2018;

3.     Defendants Russell County School Board, Phillip Henley, and Kimberly Hooker's Motion for Summary Judgment, ECF No. 62, is GRANTED IN PART AND DENIED IN PART.  It is GRANTED as to Counts III, IV, V, and XI as to defendants Henley and Hooker, and they are DISMISSED as defendants.  It is otherwise DENIED; and

4.     Defendants designated as "John Roes 1-10" in the Complaint are DISMISSED without prejudice and Counts VIII and X of the Complaint solely against said defendants are DISMISSED without prejudice.[4]

ENTER:  February 13, 2018

/s/  James P. Jones
United States District Judge

---

[4]  Without filing separate motions, the plaintiff has requested the court to impose sanctions on the School Defendants for filing the motion in limine to exclude certain of the plaintiff's expert testimony, and in addition has requested the court to sua sponte enter summary judgment against the School Board under Counts I and II.  These requests are denied.  The motion in limine relating to the expert testimony is not sanctionable, and there are issues of fact in dispute that preclude summary judgment for the plaintiff.