# EXHIBIT 2

Case 1:16-cv-00045-JPJ-PMS    Document 99-2    Filed 02/19/18    Page 2 of 36
Page ID# 2592
Case 1:14-cv-00403-JTN-ESC    ECF No. 309 filed 04/04/17    PageID.5036    Page 1 of 7

## UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF MICHIGAN

MADISON KING; K.S.,
by and through her next friend MATT
STEWARD; D.K., by and
through her next friend TOM KOSTEN; and
JANE DOE, by and through her
next friend JOHN DOE;

      Plaintiffs,

v.

CHAD CURTIS; LAKEWOOD PUBLIC
SCHOOLS; THE LAKEWOOD PUBLIC
SCHOOLS BOARD OF EDUCATION; and JAMES
ROES 1-10;

      Defendants,

v.

PROFESSIONAL CONTRACT MANAGEMENT, INC.

      Third-Party Defendant.

Case No.:  1:14-cv-00403-JTN

Judge Janet T. Neff
Magistrate Judge Ellen Carmody

---

### PLAINTIFFS' MOTION IN LIMINE AND BRIEF IN SUPPORT
### TO EXCLUDE EVIDENCE AND ARGUMENT REGARDING CONSENT

It is expected that Defendants will attempt to introduce at trial evidence and argument

Plaintiffs "consented" to Defendant Chad Curtis's criminal sexual misconduct and tortious

battery against them, and that this absolves them, or at least limits their liability or damages on

Plaintiffs' pending claims.  This Court has already precluded Defendant Curtis from asserting

any "consent" defense, and Defendants Lakewood Public Schools and Lakewood Public Schools

Board of Education ("Lakewood Defendants") should be similarly precluded, as evidence and

argument in this vein are not relevant and are otherwise inadmissible under the Federal Rules of

Evidence and as a matter of law and public policy.

Case 1:16-cv-00045-JPJ-PMS     Document 99-2     Filed 02/19/18     Page 3 of 36
Pageid#: 2593
Case 1:14-cv-00403-JTN-ESC     ECF No. 309 filed 04/04/17     PageID.5037     Page 2 of 7

## I.     Only Relevant Evidence Is Admissible

The Federal Rules of Evidence allow only evidence that is relevant to a material issue. The Rules define "relevant evidence" as "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Fed. R. Evid. 401. Evidence that is not relevant is never admissible. Fed. R. Evid. 402. And even if it is relevant, "evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." Fed. R. Evid. 403. Thus, for any evidence to be admissible, it must be pertinent to a question that the trier of fact is required to resolve. Evidence and argument prohibited as a matter of law cannot, therefore, be relevant, and are inadmissible.

## II.     Evidence and Argument that Plaintiffs "Consented" to Defendant Curtis's Criminal Sexual Misconduct and Tortious Battery Is Irrelevant and Otherwise Inadmissible, and Must Be Excluded

### A.     Defendant Curtis Is Precluded from Asserting Consent as a Defense

This Court has already held, as a matter of law based on the undisputed facts, Defendant Curtis – who was found guilty and criminally convicted of sexually assaulting three of the Plaintiffs[1] – is liable for tortious battery against Plaintiffs, each of whom was a minor at the time of Curtis's abuse. (ECF No. 190 (Rep. & Rec. on Pls.' Summ. J. Mot. against Def. Curtis), PageID.1055-58; ECF No. 207 (Order adopting same).) The only issue remaining for trial on Plaintiffs' battery claim against Curtis is damages.

---

[1] Defendant Curtis was convicted of four felony offenses of criminal sexual misconduct under MCL §§ 750.520c and 520d, and two misdemeanor offenses of criminal sexual conduct under § 750.520e. (See ECF No. 564 (Pls.' Summ. J. Mot. against Def. Curtis), PageID.564.)

1

Case 1:16-cv-00045-JPJ-PMS    Document 99-2    Filed 02/19/18    Page 4 of 36
Pageid#: 2594
Case 1:14-cv-00403-JTN-ESC    ECF No. 309 filed 04/04/17    PageID.5038    Page 3 of 7

This Court also held Curtis is precluded from asserting Plaintiffs' alleged "consent" as a defense to his victims' battery claims against him. (ECF No. 190, PageID.1056.) In so ruling, this Court noted "consent" is an affirmative defense that must be asserted in a party's answer to a complaint, and found Defendant Curtis waived the defense because he did not assert it in his Answer. (*Id.*, PageID.1056-57.) This Court further explained:

> As is well recognized, consent is not a defense to charges of criminal sexual conduct with a minor. *See People v. Duenaz*, 854 NW.2d 531, 538 (Mich. Ct. App. 2014). This represents a determination by the Michigan legislature that a minor is incapable of consenting to sexual activity with an adult. Defendant Curtis has identified no authority permitting a defendant to assert as a defense to a battery claim a circumstance, specifically the victim's consent, which the Michigan legislature has determined is **legally impossible**. The Court, therefore, concludes that the defense of consent is unavailable to Defendant Curtis in this matter. This is certainly consistent with the authority identified above holding that where an adult engages in sexual activity with a minor, the intent to harm as well as harm to the victim is inferred as a matter of law regardless of consent. *See Linebaugh v. Berdish*, 376 N.W.2d 400, 504 (Mich. Ct. App. 1985) (when an adult engages in sexual activity with a minor, the "intent to injure or harm can be inferred as a matter of law"); *Allstate Ins. Co. v. Granger*, 2003 WL 22092716 at *2 (Mich. Ct. App., Sept. 9, 2003) ("[o]ur Legislature, by criminalizing sexual relations with minors, determined that harm results to underage persons who engage in sexual intercourse whether they consent to the act or not").

(*Id.*, PageID.1057 (emphasis added).)

**B.    Lakewood Defendants Must Be Similarly Precluded from Presenting Argument or Evidence Regarding Plaintiffs' So-Called "Consent" to Defendant Curtis's Sexual Abuse**

Lakewood Defendants, like Defendant Curtis, have contended Plaintiffs' supposed "consent" to Curtis's sexual predation and abuse "is relevant to Lakewood Defendants' defenses – especially as to questions of credibility and damages." (ECF No. 150 (Lakewood Defs.' Reply to Pls.' Summ. J. Mot. against Def. Curtis), PageID.584.) Lakewood Defendants also stated they will oppose this motion to exclude such argument and evidence. As set forth below, Lakewood Defendants must be precluded from presenting any so-called "consent" argument or evidence at trial in defending against Plaintiffs' Title IX and § 1983 failure to train claims.

Case 1:16-cv-00045-JPJ-PMS    Document 99-2    Filed 02/19/18    Page 5 of 36
Case 1:14-cv-00403-JTN-ESC    ECF No. 369 filed 04/04/17   PageID.5039   Page 4 of 7
PageID#.2595

First, like Curtis, Lakewood Defendants waived any "consent" defense because they did not assert it as an affirmative defense in their Answer. (*See* ECF No.7, PageID.60-61.)

Second, as this Court previously stated, the Michigan Legislature has deemed it "legally impossible" for minors, as were Plaintiffs at the time of Curtis's sexual abuse, to consent to an adult male teacher's sexual misconduct. (ECF No. 190, PageID.1057.) Consent is not an available defense here, and Lakewood Defendants' argument or evidence regarding such a legal impossibility would be a waste of time.

Third, Plaintiffs' alleged "consent" is irrelevant to the Title IX and §1983 failure to train claims pending against Lakewood Defendants. Pursuant to this Court's rulings on the parties' summary judgment motions, the only issues remaining for trial on those claims are: (i) Lakewood Defendants' post-April 27, 2012 deliberate indifference to the sexual harassment Plaintiffs suffered; (ii) the close relation between violation of Plaintiffs' 14th Amendment substantive due process right to be free from Curtis's sexual abuse and Lakewood Defendants' failure to provide Title IX training to administrators, teachers, and staff on, *inter alia*, preventing, recognizing, responding to, investigating, and remediating educator sexual misconduct against students; and (iii) damages on those claims. (*See* ECF No. 286 (Rep. & Rec. on Pls.' and Lakewood Defs.' Summ. J. Mots.); ECF No. 300 (Order adopting same).) Any argument or evidence regarding Plaintiffs' supposed "consent" has absolutely no relevance or probative value with respect to those issues.

Fourth, permitting Lakewood Defendants' to argue "consent," when Defendant Curtis is precluded from doing so, would obviously confuse issues and mislead the jury with respect to – on one hand – Plaintiffs' pending claims against the school district and – on the other hand – Plaintiffs' claim for damages against Curtis.

Case 1:16-cv-00045-JPJ-PMS   Document 99-2   Filed 02/19/18   Page 6 of 36
Pageid#: 2596
Case 1:14-cv-00403-JTN-ESC   ECF No. 309 filed 04/04/17   PageID.5040   Page 5 of 7

Fifth, allowing evidence or argument concerning Plaintiffs' supposed "consent" to Curtis's criminal sexual misconduct and tortious battery would be severely unduly prejudicial to Plaintiffs. Although Plaintiffs' counsel has not found case law within the Sixth Circuit addressing the likelihood of prejudice in these circumstances, the Seventh Circuit, in *Mary M. v. North Lawrence Community School Corp.*, 131 F.3d 1220 (7th Cir. 1997), addressed this very issue. The *Mary M.* court held permitting questioning at trial of a 13-year-old student plaintiff regarding her consent to or "welcomeness" of criminal molestation by a 21-year-old school employee, when the state's criminal sexual misconduct statute deemed such consent impossible, severely prejudiced the plaintiff on her Title IX claim against the defendant school district, and the court remanded the case for a new trial with the instruction that "welcomeness" not be an issue. *Mary M.*, 131 F.3d at 1227-28. The court stated, "[e]vidence that [plaintiff] did not reject [the assailant] sufficiently misled the jury and resulted in an inconsistent verdict . . . we find that the instruction regarding welcomeness is so intertwined with the issue of damages as to severely prejudice her." *Id.* at 1228. Here, "consent" or "welcomeness" is not at issue on any of Plaintiffs' pending claims, and "consent" is so intertwined with the issue of damages that inquiry on the same at trial will severely prejudice Plaintiffs' claims.

Sixth, allowing questioning or presentation of evidence regarding Plaintiffs' supposed "consent" is contrary to the policy behind Title IX. The Seventh Circuit explains:

> An opposite holding would defeat the purposes of Title IX and make children claiming sexual discrimination under Title IX subject to intense scrutiny. Title IX was created to avoid the use of federal resources to support discriminatory practices and to provide individual citizens effective protection against discriminatory actions. If welcomeness were properly an issue for the jury to consider in cases involving elementary students, the very children bringing the suits would be subject to intense scrutiny regarding their responses to their alleged abusers. Trial transcripts would be replete with insinuations that a child dressed or acted in such a manner as to <u>ask for</u> the very conduct she or he is seeking to redress.

4

*Id.* at 1227 (citation omitted) (emphasis added). The *Mary M.* court concluded allowing such

questioning would mean, "a five year old clad in a sexy dress would have a difficult time proving

she did not welcome sexual discrimination. We find such a suggestion untenable, and refuse to

transfer the onus to the child to prove that in fact she or he did not welcome the complained-of

advances." *Id.* at 1227. Here, Plaintiffs underwent excruciatingly intense scrutiny regarding

Defendant Curtis's sexual abuse and their credibility during Curtis's criminal trial, including

during cross-examination, and then again during Defendants' lengthy depositions of each

Plaintiff. To permit yet further questioning on whether Plaintiffs "asked for" Curtis's sexual

abuse improperly places the onus on them to prove they, as vulnerable young female students,

did not "welcome" a 40-year-old male adult school volunteer and substitute teacher's criminal

sexual misconduct, and is at odds with the purpose of Title IX in preventing sexual

discrimination against, and intense scrutiny of, a student's response to sexual assault.

  Finally, permitting Lakewood Defendants to present evidence or argument on "consent"

is contrary to public policy underlying Michigan statutory and case law deeming an adult's

sexual misconduct against a minor as a strict liability offense. For over 90 years, the Michigan

Supreme Court has held an individual "under the statutory age is legally incapable of

consenting" to sexual conduct with an adult. *People v. Gengels*, 218 Mich. 632, 641 (1922).

The Michigan Legislature enacted statutes that carve out special protection for children from

sexual assault by adults standing in a position of authority over them, like teachers, substitute

teachers, and school volunteers. *See* MCL §§ 750.520c-e.; *People v. Lewis*, 302 Mich. App. 338,

346-47 (2013). The public interest in protecting children from adult sexual predation is so

important that an adult's sexual conduct with a minor is a strict liability criminal offense in

Michigan, and mistake of age or lack of intent is no defense. *People v. Cash*, 419 Mich. 230,

Case 1:16-cv-00045-JPJ-PMS    Document 99-2    Filed 02/19/18    Page 8 of 36
Case 1:14-cv-00403-JTN-ESC    ECF No. 309-2 filed 04/04/17    PageID.5042    Page 7 of 7
PageID#:2599

242 (1984).  The strict liability nature of the offense "has been upheld as a matter of public policy because of the need to protect children below a specified age from sexual intercourse on the presumption that their immaturity and innocence prevents them from appreciating the full magnitude and consequences of their conduct."  *Id.*  Accordingly, Defendants should not be allowed to question Plaintiffs on their so-called "consent" to an adult educator's criminal sexual misconduct, when they cannot be said to have even understood the significance or consequences of that conduct, to which – in any event – their consent is a legal impossibility.

III.    **Conclusion**

As a matter of law, Plaintiffs could not have consented to Defendant Curtis's criminal sexual misconduct and tortious battery; Michigan law removes consent of the minor victim as a defense.  Because consent is not a defense, and liability has already been established with respect to Curtis, any argument or evidence of consent is superfluous and irrelevant.  To the extent that it could be considered relevant in any way, it would be unduly prejudicial because it could only serve to confuse or mislead the jury into thinking that Plaintiffs' consent should enter their consideration.  For these reasons, any and all argument and evidence regarding consent, through testimony or otherwise, should be excluded in this matter.

Respectfully Submitted,

**THE FIERBERG NATIONAL LAW GROUP, PLLC**

Dated:  April 4, 2017

By: /s/ Monica H. Beck
    Douglas E. Fierberg (P76429)
    Monica H. Beck (P78555)
    Attorneys for Plaintiffs
    105 E. Philip St.
    P.O. Box 121
    Lake Leelanau, MI  49653
    (231) 256-7068
    Fax: (231) 256-7069

Case 1:16-cv-00045-JPJ-PMS    Document 99-2    Filed 02/19/18    Page 9 of 36
Pageid#: 2599
Case 1:14-cv-00403-JTN-ESC   ECF No. 322-1 filed 04/18/17   PageID.5211   Page 1 of 5

# Attachment A

## *Bolick v. City of E. Grand Rapids*

United States District Court for the Western District of Michigan, Southern Division

September 6, 2013, Decided; September 6, 2013, Filed

No. 1:11-cv-1101

**Reporter**
2013 U.S. Dist. LEXIS 192161 *

STEPHEN BOLICK, as Personal Representative of the Estate of Matthew Bolick, deceased, Plaintiff, -v- CITY OF EAST GRAND RAPIDS, et al., Defendants.

**Subsequent History:** Decision reached on appeal by *Bolick v. City of E. Grand Rapids, 580 Fed. Appx. 314, 2014 U.S. App. LEXIS 17288 (6th Cir.), 2014 FED App. 686N (6th Cir.) (6th Cir. Mich., 2014)*

**Counsel:** [*1] For Stephen Bolick, as Personal Representative of the Estate of Matthew Bolick, deceased personal representative, Estate of Matthew Bolick, plaintiff: William F. Mills, Gruel Mills Nims & Pylman LLP, Grand Rapids, MI.

For East Grand Rapids, City of, a Municipal Corporation, Brian Davis, Sgt., Gary Parker, Officer, Mark Herald, Director East Grand Rapids Department of Public Safety, defendants: John J. Gillooly, Julie L. Druzinski, Garan Lucow Miller, PC, Detroit, MI.

For Facilitative Mediator, mediator: Bruce W. Neckers, Rhoades McKee P.C., Grand Rapids, MI.

**Judges:** HONORABLE PAUL L. MALONEY, Chief United States District Judge.

**Opinion by:** PAUL L. MALONEY

## Opinion

### OPINION AND ORDER DENYING PLAINTIFF'S MOTION IN LIMINE

Plaintiff Stephen Bolick filed a motion in limine seeking to exclude evidence related to three subjects. (ECF No. 103.) Defendants filed their response. (ECF No. 113.) Upon review of the briefs and relevant legal authority,

the matter will be resolved without a hearing. *See* W.D. Mich. L.R. Civ. P. 7.3(d).

Matthew Bolick, an adult male, died tragically on November 16, 2009. He had been acting erratically that evening and, believing he was either a threat to himself, to others, or both, Stephen Bolick called the police. A [*2] chase through the neighborhood ensued, with Matthew eventually finding his way back to his house where he and two police officers engaged in a struggle. After being transferred to emergency medical personnel, Matthew passed away. This lawsuit was filed by Stephen, Matthew's father, and Jonathan and Kevin Bolick, Matthew's brothers. Jonathan and Kevin have since withdrawn their claim in the complaint. The complaint alleges *§ 1983* claims for violations of the *Fourth* and *Fourteenth Amendments* and several tort claims against two police officers. The complaint also alleged a failure to train against the City of Grand Rapids. This action is currently with the Sixth Circuit Court of Appeals, where the parties have appealed this Court's resolution of qualified immunity. The pending motion in limine does not affect any of the issues on appeal and is ripe for resolution.

### LEGAL FRAMEWORK

"A motion in limine is 'any motion, whether made before or during trial, to exclude anticipated prejudicial evidence before the evidence is actually offered.'" *Louzon v. Ford Motor Co., 718 F.3d 556, 561 (6th Cir. 2013)* (quoting *Luce v. United States, 469 U.S. 38, 40 n.2, 105 S. Ct. 460, 83 L. Ed. 2d 443 (1984))*. The Federal Rules of Evidence do not specifically contemplate the use of motions in limine, however, their use has evolved under the federal courts' inherent authority to manage [*3] trials. *See Luce, 469 U.S. at 41 n.4; see also Figgins v. Advance America Cash Advance Ctrs. of Michigan, Inc., 482 F.Supp.2d 861, 865 (E.D.*

2013 U.S. Dist. LEXIS 192161, *3

_Mich. 2007)_ (explaining that such motions find some basis for authority under _Fed. R. Evid. 103(c)_ which provides that jury proceedings should be conducted "so as to prevent inadmissible evidence from being suggested."). The decision to grant or deny a motion in limine is within a trial court's discretion. _See United States v. Humphrey, 608 F.3d 955, 957 (6th Cir. 2010)_. Motions in limine are used to "narrow the evidentiary issues for trial and to eliminate unnecessary trial interruptions." _Louzon, 718 F.3d at 561_ (citation omitted); _see Jonasson v. Lutheran Child and Family Servs., 115 F.3d 436, 440 (7th Cir. 1997)_.

Under the Federal Rules of Evidence, all relevant evidence is admissible and evidence that is not relevant is not admissible.[1] _Fed. R. Evid. 402_. The rules define "relevant evidence" as any "evidence having any tendency to make the existence of any fact of consequence to the determination of the action more probable or less probable than it would be without the evidence." _Fed. R. Evid. 401_. The Supreme Court has remarked on several occasions that the standard for relevancy is liberal. _See e.g. Daubert v. Merrell Dow Pharms., Inc., 509 U.S. 579, 587, 113 S. Ct. 2786, 125 L. Ed. 2d 469 (1993)_; _see also Churchwell v. Bluegrass Marine, Inc., 444 F.3d 898, 905 (6th Cir. 2006)_ (noting same). Evidence of a crime is not admissible to provide a person's character in order to show that on a particular occasion the person acted in accordance with that character. _Fed. R. Evid. 404(b)(1)_. However, the evidence of a crime may be admitted for some other purpose, such as to [*4] prove motive, opportunity, or knowledge. _Fed. R. Evid. 404(b)(2)_.

Motions in limine allow the trial judge to eliminate from consideration evidence that should not be introduced at trial because it would not be admissible for any purpose. _Jonasson, 115 F.3d at 440_; _Indiana Ins. Co. v. Gen. Elec. Co., 326 F. Supp.2d 844, 846 (N.D. Ohio 2004)_ (citing _Jonasson_); _Bouchard v. American Home Prods. Corp., 213 F.Supp.2d 802, 810 (N.D. Ohio 2002)_ ("The court has the power to exclude evidence in limine only when the evidence is clearly inadmissible on all potential grounds.") Only when evidence is not admissible for any potential purpose, evidentiary questions should be deferred until trial so that the parties are afforded the opportunity to lay the proper foundation and relevancy, and prejudice may be resolved with proper context. _Bouchard, 213 F.Supp.2d at 810_. Denial of a motion in limine means only that the Court is unable to determine whether the evidence in question should be excluded. Denial of a motion in limine does not require the Court to admit the disputed evidence at trial

## ANALYSIS

Plaintiff requests this Court exclude from trial introduction of evidence [*5] related to three subjects: (1) whether Matthew, and his brothers Jonathan and Kevin, smoked marijuana, (2) whether the Bolick residence was messy and disorganized, and (3) whether the Bolick family was negligent for failing to get treatment for Matthew prior to November 16, 2009.

### A. Use of Marijuana

Plaintiff has not established that evidence about the use of marijuana is not admissible for any purpose. Plaintiff first argues that the record does not support the factual conclusion that Matthew smoked marijuana. Plaintiff also argues that none of Defendants' experts have indicated that the use of marijuana would have contributed to the psychosis that Matthew experienced the night he died. Motions in limine test the admissibility of evidence. _Louzon, 718 F.3d at 561_. Motions in limine are not properly used to resolve disputed facts. _See Louzon, 718 F.3d at 563_ ("Where, as here, the motion in limine is no more than a rephrased summary-judgment motion, the motion should not be considered.") Plaintiff's argument here addresses the veracity of a factual conclusion, not the admissibility of the evidence.

Plaintiff also argues that evidence suggesting that Matthew, Jonathan, and Kevin smoked marijuana is not relevant to the claims in the [*6] complaint. Plaintiff reasons that the evidence would be introduced by Defendants in an attempt to smear the characters of the three brothers. The Court infers from the brief that Plaintiff believes the evidence would not be admissible under _Rule 404(b)(1)_, which prohibits evidence of a

---

[1] Both parties include perfunctory references to _Rules 401, 402_, and _404(b)_ in their briefs. With one exception, where Defendants refer the Court to _Rule 613_, the Court has not considered the possibility that any of the disputed evidence would be admissible or inadmissible under any other rule.

2013 U.S. Dist. LEXIS 192161, *6

crime as character evidence.

Defendants have established that the evidence that Jonathan and Kevin may have smoked marijuana the night of the incident would be admissible. Evidence that Jonathan and Kevin used marijuana on the evening of the incident would be relevant to their ability to recall the events of that evening. See *United States v. DiPaolo, 804 F.2d 225, 229-30 (2d Cir. 1986)* ("It is, of course, within the proper scope of cross-examination to determine whether a witness was under the influence of drugs or narcotics or alcohol at the time of observation of events in dispute[.]").

Defendants have not established that the evidence would be admissible for other reasons. Defendants offer as other reasons, personal histories and Jonathan and Kevin's credibility. Defendants argument about the personal histories of the members of the Bolick family is not explained. Defendants have not demonstrated that the family background and personal histories of the brothers with regard [*7] to controlled substances constitutes the sort of inextricably intertwined *res gestae* evidence that would be necessary for context.

Defendants have not established that prior statements by Jonathan and Kevin regarding Matthew's drug use are admissible. Defendants argue that the brothers have made prior inconsistent statements and that the brothers can be impeached by the statements. Defendants point to *Federal Rule of Evidence 613*.[2] (Response 4 PgID 2121.) Defendants argue that Jonathan and Kevin told the police that Matthew used marijuana, but testified at their depositions that Matthew did not use marijuana. *Rule 613* does not allow Defendants to explore at trial the alleged inconsistencies between these prior statements. Under *Rule 613(b)*, a witness's prior inconsistent statement is admissible if the witness is afforded an opportunity to explain or deny the statement and the adverse party is given an opportunity to examine the witness about it. In order for the rule to apply, the prior statement must be inconsistent with present trial testimony. See *United States v. Reed, 167 F.3d 984, 987 (6th Cir. 1999)*; *United States v. White, 68 F.App'x 870,*

873-74 (10th Cir. 2003). See also *Manley v. AmBase Corp., 337 F.3d 237, 247-48 (2d Cir. 2003)* (noting that a *de bene esse* deposition is the equivalent of trial testimony to which impeachment under *Rule 613(b)* would apply). *Rule 613(b)* does not extend so far as to allow impeachment by [*8] inquiring about inconsistent statements unrelated to statements made at trial.

Even if *Rule 613* allowed Defendants to admit both statements and question the brothers about the statements, Defendants have not established that the statements were inconsistent. See *United States v. Hale, 422 U.S. 171, 176, 95 S. Ct. 2133, 45 L. Ed. 2d 99 (1975)* ("As a preliminary matter, the court must be persuaded that the statements are indeed inconsistent."). At his deposition, Jonathan testified that, to the best of his knowledge, Matthew had not used illegal drugs around the date of his death. (ECF No. 113-4 "Jonathan Dep." 11 PgID 2121.) This statement is entirely consistent with the statement included in the supplemental police report in which Jonathan is reported to have told an officer that "Matthew smoked marijuana and drank alcohol sometimes, and that he had never known Matthew to do any other drugs." (ECF No.l 113-5 PgID 2128.) Matthew could have smoked marijuana sometimes, but not smoked marijuana around the time of his death. The exact same statement about Matthew's drug use is attributed to [*9] Kevin in a different supplemental police report. (ECF No. 113-7 PgID 2124.) The officer claims Kevin stated that "Matthew smoked marijuana and drank alcohol sometimes, but he had never known Matthew to do any other drugs." (*Id.*) Defendants insist that Kevin testified at his deposition that Matthew did not smoke marijuana. The portion of the deposition cited by Defendants must be read in context.

Q. Did he smoke pot?

A. No.

Q. He didn't?

A. He's - - he told me he did it once or a couple of times when he went to those shows. But other than that, I never seen him actually using marijuana.

(ECF No. 113-6 "Kevin Dep." 23 PgID 2132.) Defendants quote the first two lines only and ignore the follow-up question and answer. Kevin's deposition testimony, all of it not just the two lines quoted by Defendants, is entirely consistent with the statement Kevin gave the police. Again, Matthew could have smoked marijuana at a few concerts, but not smoked

---

[2] Defendants also point to *Rules 602* and *607*. *Rule 602* requires that the witness have personal knowledge of the matter to which he or she is testifying. *Rule 607* authorizes any party to attack a witness's credibility.

2013 U.S. Dist. LEXIS 192161, *9

marijuana around the time of his death.

## B. State of the Bolick Residence

Plaintiff argues that Defendants will use the evidence to show that Matthew was in a downward spiral prior to the night of his death. Defendants readily admit that they intend to use [*10] the evidence precisely for that purpose. (Response 6 PgID 2092.) Plaintiff argues that Defendants will use the evidence to shift some responsibility of Matthew's demise from the officers to the family. Defendants argue that evidence of comparative fault is not applicable in federal civil rights cases, citing *McHugh v. Olympia Entm't, Inc., 37 F.App.'x 730, 736 (6th Cir. 2002)*.

Plaintiff has not established that evidence of the disarray and disorganization of the Bolick residence is inadmissible for any reason. Defendants argue that the evidence is relevant to show that Matthew had been suffering mentally for some time and that the events of the evening were not some sudden, acute episode, as Plaintiff intends to argue. Should Defendants lay a proper foundation for that connection between the tidiness of the residence and Matthew's mental state on the night of the events, the evidence would be relevant and, therefore, admissible. Defendants also argue that evidence about the condition of the home would be relevant to the officers' state of mind when they engaged Matthew. Again, with the proper foundation, the status of the area of the residence that the officers' observed during their struggle with Matthew would be relevant.

## C. Testimony that the Bolick [*11] family was negligent for failing to get treatment for Matthew before November 16, 2009

Plaintiff has not established that evidence related to the family's attempts, or failed attempts, to get Matthew into a facility for psychiatric treatment is not relevant for any reason. As evidence of comparative negligence, the evidence is not applicable to *§ 1983* cases. See *McHugh, 37 F.App.'x at 736*. Defendants insist the evidence would be relevant for the same reason that the evidence of the disheveled residence would be relevant. Should Plaintiff present evidence that Matthew's mental condition the night of the incident was some acute and sudden manifestation, the evidence that Matthew had a history of mental problems would be relevant to refute Plaintiff's evidence. The evidence of Matthew's mental

history, however, would not be relevant to the officers' state of mind when they engaged Matthew, as the officer had no knowledge of Matthew's history. The parties disagree whether Matthew meets the definition of a person requiring treatment under the Michigan Mental Health Code, *Mich. Comp. Laws § 330.1401*. Neither party cites any authority indicating that a family or any other private individual has a duty to commit another person for treatment or assist [*12] in committing another person for treatment. Whether Matthew meets the statutory definition of a person requiring treatment is, therefore, not determinative.

## CONCLUSION

Plaintiff has not established that the disputed evidence would not be relevant for any reason and, therefore, inadmissible. Defendants have successfully identified situations in which the disputed evidence would be admissible. Should those situations arise during the course of the trial, and with the proper foundation, the disputed evidence could be relevant and, therefore admissible.

## ORDER

For the reasons identified in the accompanying Opinion, Plaintiff's motion in limine (ECF No. 103 is **DENIED. IT IS SO ORDERED**.

Date: September 6, 2013

/s/ Paul L. Maloney

Paul L. Maloney

Chief United States District Judge

---

End of Document

# Attachment B

Case 1:16-cv-00045-JPJ-PMS   Document 99-2   Filed 02/19/18   Page 15 of 36
Case 1:14-cv-00403-JTN-ESC   ECF No. 322-2 filed 04/18/17   PageID.5217   Page 2 of 5
Pageid#: 2605

## _Jane Doe by Mary Roe v. Orangeburg County Sch. Dist. No. 2_

Supreme Court of South Carolina

June 9, 1999, Heard ; July 12, 1999, Filed

Opinion No. 24964

### Reporter

335 S.C. 556 *; 518 S.E.2d 259 **; 1999 S.C. LEXIS 124 ***; 139 Lab. Cas. (CCH) P58,720

Jane Doe, by her Guardian ad Litem, Mary Roe, and Mary Roe, individually, Petitioners, v. Orangeburg County School District No. 2, Respondent.

**Subsequent History:** Petitions for Rehearing Denied August 17, 1999.

**Prior History:** [***1] Appeal From Orangeburg County. A. Victor Rawl, Circuit Court Judge.

**Disposition:** AFFIRMED AS MODIFIED.

**Counsel:** Preston F. McDaniel, of Columbia, and Clyde C. Dean, of Orangeburg, for petitioners.

William E. Craver, III, Bruce E. Davis, and Wendy L. Wilkie, all of Davis, Craver, Hagood, and Kerr, of Charleston, for respondent.

**Judges:** WALLER, A.J. FINNEY, C.J., TOAL, MOORE, and BURNETT, JJ., concur.

**Opinion by:** WALLER

## Opinion

[*557] [**259] ON WRIT OF CERTIORARI TO THE COURT OF APPEALS

**WALLER, A.J.:** We granted a writ of certiorari to review the Court of Appeals' opinion in _Doe v. Orangeburg County School District No. 2, 329 S.C. 221, 495 S.E.2d 230 (Ct. App. 1997)_. We affirm as modified.

### FACTS

This is a negligent supervision case. Doe, age 14, a student at Bowman High School in Orangeburg, was sexually assaulted in the girl's bathroom of the school gymnasium by an educably mentally handicapped 16 year old student. Thereafter, Doe and her mother sued the Orangeburg County School District (District) for negligent supervision alleging that the teacher who was supposed to be supervising the special education students, Coach Corder, had left the students unsupervised in the gymnasium, thereby allowing [***2] the assault to occur.

As a defense to her claim of negligent supervision, District asserted Doe had consented to the sexual encounter. Doe moved _in limine_ to exclude any evidence of her consent to the assault, contending a minor under the age of sixteen is legally incapable of consenting to sexual battery. The trial court, relying on the Court of Appeals' opinion in _Doe v. Greenville Hospital System, 323 S.C. 33, 448 S.E.2d 564 (Ct. App. 1994)_, agreed that evidence of Doe's consent was improper. [1] The [*558] Court of Appeals reversed and [**260] remanded for a new trial, holding District should have been permitted to introduce evidence of Doe's consent for purposes of determining liability and damages.

[***3] ISSUE

2

---

[1] District sought to introduce evidence that Doe and the alleged assailant had had a prior relationship, that she went to the gym asking for "her friend" and willingly accompanied him into the bathroom, and that Doe told a friend that the incident wasn't really rape. District also proffered the deposition testimony of the assailant, who testified that the sex was originally consensual, but that he did not get up as soon as Doe asked him to. Finally, District proffered testimony tending to dispute the claim Doe was a sweet, innocent young girl with testimony that she had been overheard making sexually explicit statements.

[2] Doe also asserts the assailant's guilty plea renders the issue of consent _res judicata_. Given that District was neither a party nor a

335 S.C. 556, *558; 518 S.E.2d 259, **260; 1999 S.C. LEXIS 124, ***3

Did the Court of Appeals err in holding District should have been permitted to introduce evidence of Victim's alleged consent?

## DISCUSSION

Pursuant to *S.C. Code Ann. § 16-3-655 (3)*:

A person is guilty of criminal sexual conduct in the second degree if the actor engages in sexual battery with a victim who is at least fourteen years of age but who is less than sixteen years of age and the actor is in a position of familial, custodial, or official authority to coerce the victim to submit [***4] or is older than the victim.

In *Doe v. Greenville Hospital System, 323 S.C. 33, 37, 448 S.E.2d 564, 566 (Ct.App.1994)*, *cert. dismissed as improvidently granted, 320 S.C. 235, 464 S.E.2d 124 (1995)*, the Court of Appeals held that in enacting *section 16-3-655*, "as a matter of public policy, the General Assembly has determined a minor under the age of sixteen is not capable of voluntarily consenting to a sexual battery committed by an older person. . . . [*559] **This is the law of this state, whether it is applied in a criminal or civil context.**" [3] (Emphasis supplied). [***5] In both Doe v. Greenville and the present case, the Court of Appeals held a jury charge that the victim was legally incapable of consenting to the sexual conduct was proper. [4]

Doe asserts that to instruct the jury she could not legally consent to the sexual battery, and simultaneously permit the jury to consider evidence of her consent is logically inconsistent. We disagree. Initially, we see no reason

privy to the plea, the matter is not *res judicata* as to District. *Sub-Zero Freezer Co. v. R.J. Clarkson Co., 308 S.C. 188, 417 S.E.2d 569 (1992)* (res judicata bars subsequent actions by the same parties when the claims arise out of the same transaction or occurrence that was the subject of a prior action between those parties).

[3] The South Carolina Constitution also prohibits an unmarried female's consent. See *S.C. CONST, Art.3, § 33* (No unmarried woman shall legally consent to sexual intercourse who shall not have attained the age of fourteen years). Given our constitutional provision, we concur with the Court of Appeals' holding in Doe v. Greenville Hospital that the prohibition on consent applies in both the criminal and civil context.

[4] Accordingly, contrary to Doe's contention, the Court of Appeals did not limit this principle to criminal cases.

why an instruction limiting the jury's use of the victim's consent would not serve to eliminate any potential prejudice. [5] See *Berry v. Deloney, 28 F.3d 604 (7th Cir. 1994)* (trial court's repeated admonitions to jury that it could consider victim's consent only as to damages sufficient to eliminate the need for bifurcation). Second, if the trial court were to find the potential for prejudice [**261] too severe, it could order bifurcation of the issues of liability and damages pursuant to SCRCP, Rule 42(b). See *Creighton v. Coligny Plaza Limited Partnership, 334 S.C. 96, 512 S.E.2d 510 (Ct. App. 1998)*.

[***6] [*560] In similar contexts courts have held a victim's willing participation is relevant to her civil claim for damages, notwithstanding statutory provisions negating the minor's ability to consent. See *Parsons v. Parker, 160 Va. 810, 170 S.E. 1, 2-3 (Va. 1933)*(statute rendered minor incapable in law of consenting to sexual act and defendant is liable in a civil suit for damages without regard to any question of consent; however, proof that the female consented is admissible on the quantum of damages); *LK v. Reed, 631 So. 2d 604 (La. 1994)* (holding that irrebuttable statutory presumption that minor could not consent to crime of carnal knowledge can not fully invalidate minor's consent to sexual intercourse in subsequent suit for damages; better analysis is to include principles of comparative fault); [6] *Berry v. Deloney, supra* (evidence concerning victim's prior and subsequent abortions not barred by Rape

[5] There are numerous situations in this state in which evidence, inadmissible for one purpose, is admissible for another and the jury is instructed that it may consider the evidence only for the limited purpose for which it was admitted. For example, a defendant's prior convictions are generally not admissible to prove guilt of the crime for which the defendant is on trial, but go only to credibility. See *State v. Smalls, 260 S.C. 44, 194 S.E.2d 188 (1973)* (evidence of the prior convictions could only be considered on the issue of his credibility as a witness and not upon the question of guilt; court found reversible error in refusal of trial court to so charge). See also SCRE, Rule 609 (impeachment by evidence of conviction of crime); SCRE, Rule 105 (when evidence which is admissible as to one party or for one purpose but not admissible as to another party or for another purpose is admitted, the court, upon request, shall restrict the evidence to its proper scope and instruct the jury accordingly); SCRE, Rule 407 (subsequent remedial measures).

[6] The court in LK v. Reed found that the victim's consent could be vitiated by such factors as her age, intellect, social skills, and family stress.

Page 2 of 4

Case 1:16-cv-00045-JPJ-PMS   Document 99-2   Filed 02/19/18   Page 17 of 36
Case 1:14-cv-00403-JTN-ESC   ECF No. 322-2 filed 04/18/17   PageID.5219   Page 4 of 5

335 S.C. 556, *560; 518 S.E.2d 259, **261; 1999 S.C. LEXIS 124, ***6

Shield Statute since jury could find it diminished amount of plaintiff's claimed damages for pain, suffering and emotional injuries allegedly caused by victim's sexual relationship with her school truant officer); *Barton v. Bee Line, Inc., 238 A.D. 501, 265 N.Y.S. 284 (N.Y. 1933)* [***7] (public policy would not be served by permitting victim to recover damages for her willing participation in that against which the law sought to protect her).

As noted by the Court of Appeals, the rationale for these holding was aptly stated in *Barnes v. Barnes, 603 N.E.2d 1337, 1342 (Ind. 1992)*:

> Unlike the victim in a criminal case, the plaintiff in a civil damage action is "on trial" in the sense that he or she is an actual party seeking affirmative relief from another party. Such plaintiff is a voluntary participant, with strong financial incentive to shape the evidence that determines the outcome. It is antithetical to principles of fair trial that one party may seek recovery from another based on evidence it selects while precluding opposing relevant evidence on grounds of prejudice. [7]

[*561] Accord, *LK v. Reed, supra* [***8] (credibility of participants is an essential determination in a civil suit for sexual assault). While *Barnes* involved Indiana's Rape Shield Statute, we find the same underlying policy considerations apply here.

In accordance with these authorities, we hold evidence of a victim's willing participation or consent is admissible insofar as it pertains to a claim for damages. To prohibit such evidence would effectually allow a victim to come in and tell a one-sided version [***9] of events, without being subject to any real cross-examination or impeachment as to the damages actually suffered. Such a result is untenable. Accordingly, we hold the Court of Appeals' properly held District should have been permitted to introduce evidence of Doe's

willing participation relevant to her damages. [8]

However, given our [***10] statutory and constitutional provisions, we agree with Doe that the fact that she may have consented to the intercourse is simply irrelevant for purposes of determining **liability**. Cases addressing similar issues hold that a victim's [**262] willing participation is only admissible on the issue of **damages**. See *Parsons v. Parker, supra*; *LK v. Reed, supra.* In holding otherwise, the Court of Appeals essentially held consent could be a **complete defense** to Doe's claim of negligent supervision. Given that *§ 16-3-655(3)* applies to negate a victim's consent in both the criminal and civil context, *Doe v. Greenville, supra*, we hold consent is not a **defense** in either context. Accordingly, to the extent the Court of Appeals held evidence of Doe's consent was admissible on the [*562] issue of District's **liability**, its opinion is modified, and the matter remanded for a new trial.

**CONCLUSION**

We affirm the Court of Appeals' holding that evidence of a Victim's willing participation in a sexual encounter is relevant in her subsequent civil suit for **damages**. [9] However, such evidence is limited to a victim's claim [***11] of damages, and is not admissible on the issue of liability. Accordingly, the Court of Appeals' opinion is modified to this extent it held evidence of Doe's consent was also admissible on the issue of liability.

**AFFIRMED AS MODIFIED.**

**FINNEY, C.J., TOAL, MOORE, and BURNETT,**

---

[7] The *Barnes* court analogized the case to that of personal injury plaintiff who seeks to conceal evidence relevant to the claimed injury by invoking the physician-patient privilege. **"By placing one's mental or physical condition in issue, a** party has done an act which is so incompatible with an invocation of the physician-patient privilege that the **privilege is deemed waived as to that condition."** *603 N.E.2d at 1343*, citing *Canfield v. Sandock, 563 N.E.2d 526 (Ind. 1990)*(emphasis supplied).

[8] Doe contends the Court of Appeals should have specifically enumerated which evidence was admissible at trial, and decided whether the erroneous exclusion required reversal. This issue was not raised in Doe's petition for rehearing to the Court of Appeals and is therefore not preserved for review. *Anonymous v. State Bd. of Medical Examiners, 329 S.C. 371, 496 S.E.2d 17 (1998)* (issue not ruled on by Court of Appeals and upon which rehearing is not sought is not preserved for this Court's review). In any event, in reversing and remanding for a new trial, it is inherent that the Court of Appeals found exclusion of this testimony prejudicial to the defense. We agree.

[9] As noted previously, it is within the trial court's discretion either to instruct the jury as to the limited admissibility of such evidence, or to bifurcate the trial on the issues of liability and damages.

335 S.C. 556, *562; 518 S.E.2d 259, **262; 1999 S.C. LEXIS 124, ***11

JJ., concur.

---

End of Document

Case 1:16-cv-00045-JPJ-PMS     Document 99-2     Filed 02/19/18     Page 19 of 36
Case 1:14-cv-00403-JTN-ESC   ECF No. 822-3 filed 04/18/17   PageID.5221   Page 1 of 18
PageID#: 2609

# Attachment C

*Miss. State Fedn. of Colored Women's Club Hous. for the Elderly in Clinton, Inc. v. L. R.*

Supreme Court of Mississippi

December 16, 2010, Decided

NO. 2009-CA-00508-SCT

**Reporter**
62 So. 3d 351 *; 2010 Miss. LEXIS 657 **

MISSISSIPPI STATE FEDERATION OF COLORED WOMEN'S CLUB HOUSING FOR THE ELDERLY IN CLINTON, INC. d/b/a FEDERATION TOWER AND SOUTHLAND MANAGEMENT CORPORATION v. IN THE INTEREST OF L. R., A MINOR CHILD BY AND THROUGH HER MOTHER AND NEXT FRIEND, AND HER MOTHER, INDIVIDUALLY

**Prior History:** [**1] COURT FROM WHICH APPEALED: HINDS COUNTY CIRCUIT COURT. DATE OF JUDGMENT: 06/20/2008. TRIAL JUDGE: HON. WILLIAM F. COLEMAN.

*Doe v. Mississippi State Fed'n of Colored Women's Club Housing for the Elderly in Clinton, Inc. (In re Minor Child), 941 So. 2d 820, 2006 Miss. App. LEXIS 194 (Miss. Ct. App., 2006)*

**Disposition:** ON DIRECT APPEAL: REVERSED AND REMANDED. ON CROSS APPEAL: REVERSED AND REMANDED.

**Counsel:** FOR APPELLANT: MICHAEL WAYNE BAXTER, ANDY LOWRY, WALKER REECE GIBSON.

FOR APPELLEES: JAMES ASHLEY OGDEN, JAMES W. SMITH, JR.

**Judges:** RANDOLPH, JUSTICE. CARLSON, P.J., DICKINSON AND LAMAR, JJ., CONCUR. KITCHENS, J., CONCURS IN PART AND DISSENTS IN PART WITH SEPARATE WRITTEN OPINION. CHANDLER, J., CONCURS IN PART AND DISSENTS IN PART WITH SEPARATE WRITTEN OPINION, JOINED BY PIERCE, J.

WALLER, C.J., AND GRAVES, P.J., NOT PARTICIPATING.

**Opinion by:** RANDOLPH

## Opinion

[*354] NATURE OF THE CASE: CIVIL - PERSONAL INJURY

EN BANC.

**RANDOLPH, JUSTICE, FOR THE COURT:**

P1. In this premises-liability case, the jury was presented with starkly conflicting stories about the facts surrounding the rape of L.R., an eleven-year-old girl, at Federation Tower, an apartment building where her father lived. As a result of the rape, L.R. was impregnated by Tony Kelly and gave birth to a normal, healthy child. L.R.'s father and mother brought suit, individually and on behalf of L.R., against the building owner, Mississippi State Federation of Colored Women's [**2] Club Housing for the Elderly in Clinton, Inc. d/b/a Federation Tower; and the apartment management company, Southern Management Corporation (collectively "Federation"). A jury established L.R.'s total damages to be $200,000. The jury separately allocated fault: forty percent to Federation and sixty percent to her father. The trial court entered final judgment against Federation for $80,000 on June 20, 2008. Following post-trial motions, by order dated October 31, 2008, the trial court assessed fault entirely to Federation and ordered additur of $800,000 to the $200,000 total damages assessed by the jury, contingent upon acceptance. Judgment was then entered against Federation for $1,000,000. Neither party agreed to the additur. Federation appealed, asking this Court to

62 So. 3d 351, *354; 2010 Miss. LEXIS 657, **2

reinstate the jury verdict. L.R. cross-appealed, seeking a new trial.

## FACTS AND PROCEDURAL HISTORY

P2. In the summer of 2000, L.R. often visited her father at Federation. She also helped the apartment manager, Gladys Miller, by doing office work and delivering notes to tenants throughout the building. Miller testified that she watched over L.R. and other children who visited the complex. Once school started in the fall [**3] of 2000, L.R. discontinued assisting Miller. L.R. then visited her father only on weekends when the office was closed and Miller was not present. During the week, L.R. lived in Jackson with her mother. Federation housed elderly and disabled persons, but it was not a nursing home. Kelly and L.R. testified that they first met when he was walking near the apartment complex. Kelly further testified that he had relatives and friends, including Reverend Ambrose Brown, whom he visited at Federation. The first sexual encounter occurred in September 2000. The jury heard and saw L.R.'s version of the events. She stated that she was returning from another apartment where her father had sent her on an errand, and that Kelly grabbed her, pulled her into a stairwell, and forcibly raped her. She further related that the apartment's night manager, James Gray, saw this event, but walked by them, ignoring her calls for help. L.R. testified that afterwards, Kelly threatened to harm her father if she told anyone. She stated that [*355] she had sex with Kelly on six other occasions, with Kelly forcing himself on her each time when she was alone in or near the stairwell. She said that the last of these events [**4] occurred in February 2001. By this time, L.R. was twelve years old.

P3. In contrast, Kelly testified that L.R. let him into the building through a back door. He testified that "[he] didn't force her to have sex with [him]," "never once held her down and forced her to have sex . . .," and "about . . . four or five times we done had sex in her daddy's [apartment]." Kelly disputed the claim that Gray or anyone else had witnessed them having sex. Kelly testified that L.R. would call him and tell him when to visit her. Derrick Mounger, Kelly's friend and coworker, testified that a girl, who never identified herself, called him many times in 2000 and 2001, looking for Kelly. At least one call was from a phone at Federation.

P4. Gray denied that he had witnessed a rape. However,

he did observe on one occasion L.R. coming out of a stairwell and putting on her clothes. He testified:

> I was doing my night round. I was going up the stairs. And all of a sudden I heard somebody running, and I speeded up. . . . So when I got to the top of the stairs and got right down the hall, she was standing there putting one of her things up on her shoulder and reaching and grabbing the other one to hook it.

He said [**5] that he thought that something of a sexual nature had occurred and that he then told L.R.'s father and Miller what he had seen. Miller testified that she had no knowledge of these incidents prior to the institution of this suit. She said, "I wish I had have. I might have done something about it." She also testified that at the time of the incidents, a resident told her that she had seen L.R. in the stairwell with a man. Miller said this was what prompted her to tell L.R.'s father to keep L.R. in the apartment.

P5. Other testimony was presented regarding the relationship between L.R. and Kelly. Rev. Brown, who lived on the same floor as L.R.'s father, said that Kelly visited him in his apartment and that, on one occasion in December 2000, L.R. had been there with them. Rev. Brown testified that, when L.R.'s father saw the three of them together on the couch in Rev. Brown's apartment, her father told L.R. to leave.

P6. Linda Morris, another of L.R's father's neighbors, testified that L.R. confided to her that L.R. was in love and had kissed a man outside the door of her apartment. Morris further testified that once, when L.R. was in Morris's apartment on the phone talking to someone, she [**6] said to Morris, "This is he. You want to talk?" Later, when Morris thought L.R. was watching television, L.R. left the apartment and returned saying, "He said he loved me. He kissed me." When admonished by Morris for allowing someone in her apartment, L.R. replied, "He didn't come in. He was outside the door." Morris said L.R. never told her that anyone had raped her. Morris stated, "She would tell me, 'I'm practically raising myself,' meaning her mama wasn't there for her." Morris said that L.R. "was lonesome. The child was lacking in love." Morris also said that L.R. associated with another young girl, going from floor to floor in the building, and that L.R had said, "There's a cute boy out there. He like me." Morris said

62 So. 3d 351, *355; 2010 Miss. LEXIS 657, **6

that the apartment manager had told L.R.'s father that if he could not keep L.R. in his apartment, she should not be there. She recalled one occasion in which L.R.'s father had gone to sleep and then had to go out and look for L.R. Morris stated that there were other children at the apartment, but that their parents or [*356] grandparents "kept them in the apartment." Morris concluded that L.R.'s father was not "watching out for her like he should have been" and that it [**7] could have been prevented, but for the fault of L.R.'s parents.

P7. In March 2001, L.R. told her mother that she was pregnant and that Kelly was the father. Using a phone number L.R. furnished, L.R.'s mother and older sister called Mounger, obtained Kelly's full name, and reported him to the police. Kelly was later convicted of the crime of statutory rape[1] and served seven years in prison.

P8. In the months following the discovery of her pregnancy, L.R. received counseling at the Child Advocacy Center ("CAC"). As a part of this counseling, L.R. wrote a "Letter to the Perpetrator" in which she stated that she had believed that Kelly had loved and cared for her. She wrote, "I want to tell you that sometimes I love you & other times I don't."

P9. L.R.'s [**8] parents, on her behalf, brought suit against Federation, and also brought individual claims for their separate emotional distress.[2] Initially, the trial court granted Federation's motion for summary judgment, but the Court of Appeals reversed and remanded. See *Minor Child ex rel. John Doe v. Miss. State Fed'n of Colored Women's Club Hous. for the Elderly in Clinton, Inc., 941 So. 2d 820, 831 (Miss. Ct. App. 2006)*.

P10. Upon remand, both sides presented motions *in limine*. L.R. moved to exclude reference to sexual

molestation she experienced at ages five and eight. She argued that this would violate *Mississippi Rule of Evidence 412*. Federation countered that *Rule 412* applies only in criminal cases and that L.R.'s psychological expert had downplayed the molestation events in his report, and had concluded that all of L.R.'s psychological problems had resulted from her encounters with Kelly. The trial court denied L.R.'s motion, stating that *Rule 412* was inapplicable and that the evidence would be admitted, as it was relevant to damages. [**9] L.R. also moved to exclude evidence of consent, as she had been a minor. L.R. argued that, because minors are considered by criminal statute to be incapable of consent, Federation could not use evidence of consent in a civil case. The trial court also denied that motion, stating that "the issue of statutory rape . . is not pertinent . . . ." as it did not affect the duty owed to L.R. by the landowner. L.R. further moved to exclude reference to a sexual encounter she had years later. Federation argued that this later consensual sex with a boy was relevant to damages and for impeachment, as L.R. had claimed that the encounters at Federation had left her unable to have relationships with males. The trial court granted L.R.'s motion.

P11. Federation moved pretrial to exclude testimony from L.R.'s economic expert, Dr. Glenda Glover, on the cost of raising L.R.'s child. As no Mississippi caselaw existed on this subject, the parties relied on cases from other jurisdictions. Federation asserted that the majority rule is that a mother can recover for the expense [*357] of giving birth, *inter alia,* but not for raising the child, as "the plaintiff gets the love and affection of the child as a benefit [**10] . . . ." The trial court granted the motion, and Glover did not testify. Federation submitted another motion *in limine* seeking to dismiss L.R.'s mother's emotional-distress claim. The court denied the motion.

P12. Testimony was presented in an attempt to allocate fault to L.R.'s parents. At trial, the father's deposition was read to the jury. He acknowledged that he had primary responsibility for L.R.'s supervision while she was visiting the apartment building, and that he had allowed her to leave his apartment and wander through the building by herself. He admitted that, before the incidents involving his daughter, he had seen several people in the building whom he believed to be trespassers. Specifically, he had seen a man whom he later learned was Kelly. He described Kelly as a "guy

---

[1] "The crime of statutory rape is committed when: . . . [a] person of any age has sexual intercourse with a child who: (i) Is under the age of fourteen (14) years; (ii) Is twenty-four (24) or more months younger than the person; and (iii) Is not the person's spouse." *Miss. Code Ann. § 97-3-65(1)(b)* (Rev. 2006). Neither the victim's consent nor the victim's lack of chastity is a defense to this crime. *See Miss. Code Ann. § 97-3-65(2)* (Rev. 2006).

[2] Her father's individual claim was voluntarily dismissed, as he died before trial. The trial court dismissed her mother's claim by granting a directed verdict.

coming through there all the time dirty, nasty, smelling like beer and stuff . . . ." Federation's security expert, Warren Woodfork, testified that there was insufficient history of sex crimes at Federation and the surrounding area to make rape foreseeable, yet he opined that these unforeseeable rapes could have been prevented by parental supervision.

P13. L.R. presented medical bills totaling $14,453.53 [**11] for prenatal care, sexually transmitted diseases, childbirth by caesarian section, and postnatal infections. Although she never sought treatment for emotional problems in the multiple years preceding trial, her psychiatric expert, Dr. Wood Hiatt, opined that approximately $50,000 in future psychiatric care would be required for her to overcome her problems. Dr. Hiatt testified that L.R. had "several different psychiatric diagnoses," including post-traumatic stress disorder, depression, "personality quirks," and paranoia, all of which were directly attributable to Kelly's conduct. Dr. Hiatt testified that, except for school, L.R. was isolated, homebound, and unable to have normal relations with friends, and especially not any sexual relationships. He described L.R.'s subsequent sexual experience as L.R.'s unsuccessful attempt to become normal. He stated that she had gained weight intentionally to make herself unattractive to men.

P14. Federation painted a different picture for the jury's consideration, through other witnesses and cross-examination. The jury heard evidence that L.R. had been sexually molested at least twice by her stepbrother before the occurrences at Federation, which [**12] Federation argues accounted for some of her alleged emotional problems. The jury considered L.R.'s academic accomplishments, such as completing high school in the top third of her graduating class and attending community college. The jury also received evidence of L.R.'s postings on social-networking websites.

P15. Denease Bishop, a CAC employee who interviewed L.R. in 2001, was tendered as an expert witness in forensic interviewing. The trial court sustained hearsay objections when Bishop was asked what L.R. had told her. L.R. argued that Bishop, as an expert witness, could consider hearsay. Bishop was allowed to testify, over Federation's objection, that L.R. had "made a credible disclosure of rape." Bishop based

her opinion on the detail, consistency, and context of L.R.'s statements.

P16. Regarding her emotional-distress claim, L.R.'s mother testified that she had had headaches, nausea, vomiting, and insomnia. On cross-examination, she revealed that she had been treated for depression before L.R.'s claim arose and that she had not seen a doctor for emotional [*358] problems since. When asked if she had suffered any physical injury, she replied that she was "hurting deeply." She testified [**13] that she was not present at Federation at the time of these events and did not know about them until the pregnancy manifested itself. She never went to Federation and knew very little about it. When the plaintiffs rested, Federation moved for a directed verdict on her claim. After considering whether bystander liability might control, the trial court granted the motion, comparing the damages she claimed to those rejected in *Adams v. U.S. Homecrafters, Incorporated, 744 So. 2d 736, 743-44 (Miss. 1999).*

P17. Instruction C-29, as given to the jury, reads:

[I]f you find by a preponderance of the evidence that the defendants . . . were guilty of negligence which caused or contributed to the rape incidents complained of, and you further find by a preponderance of the evidence that the negligence of [her father and mother] also contributed to the rape incidents in question, then you should answer the following question: What percentage of fault, if any, do you assign for each of the following parties or non-parties?

Blanks were provided for the jury to enter the percentages assigned to Federation and L.R's parents. L.R. objected to this instruction, arguing that Mississippi caselaw did not permit [**14] allocation under the facts presented in this case. L.R.'s limited argument was that, since the sex had occurred in public areas, no one other than the property owner could be held at fault. L.R. did not offer argument that allocation of fault was legally improper. The court overruled the objection.

P18. A separate form-of-the-verdict instruction (C-30) was given without objection. It read, "Your verdict . . . should be in one of the following forms: 'We . . . find for the plaintiff . . . and assess her total damages in the amount of $___' . . . ." After deliberations began, the jury sent a note asking, *inter alia,* "Do we need to

62 So. 3d 351, *358; 2010 Miss. LEXIS 657, **14

complete 29 & 30?" The court returned the following answer without objection:

> If your verdict be for the plaintiff you will write your verdict as outlined in Instruction Number 30 completing it by filling in the blank with the total damages you find, and also complete Instruction Number 29.

> If your verdict be for the defendants you will write your verdict as outlined in Instruction Number 30 and you need not complete Instruction Number 29.

Subsequently, the jury returned a unanimous verdict for L.R. and assessed her total damages to be $200,000. The jury unanimously [**15] apportioned fault as follows: mother zero percent, father sixty percent, and Federation forty percent.

P19. L.R. filed a "Motion for Judgment Notwithstanding the Verdict (JNOV), or in the alternative New Trial, or in the alternative Additur." At the first motion hearing, the trial court ruled that it had erred in instructing the jury to apportion fault. The trial court opined that insufficient evidence of negligence on the father's part was presented. The litigants were offered the option of avoiding a new trial if they agreed to allow the court to consider additur, as the trial court found the jury's assessment of $200,000 to be inadequate. The trial court suggested $500,000 as an appropriate damages amount, but directed both parties to present argument regarding additur. At a subsequent hearing, the court granted additur of $800,000, increasing the award to $1,000,000. The trial court stated that, in arriving at the additur amount, it had not considered the cost of raising L.R.'s child. In its order, the trial court found, with the exception of allocation of fault and additur, that L.R.'s motion [*359] for JNOV, or in the alternative, new trial, was "not well-taken and should be denied as [**16] to all counts." The order gave the parties thirty days to consider the additur or seek other relief. Neither accepted the additur nor sought other relief of the trial court. After rejecting the additur, L.R. did not file a new motion for new trial in the trial court. Federation appealed, seeking to restore the jury verdict. The next day, L.R. cross-appealed, seeking a new trial from this Court and asserting, *inter alia,* that the additur was inadequate and did not cure the alleged errors at trial.

### ISSUES

P20. In its brief to this Court, Federation raised whether the trial court erred in: (1) "Reversing the jury's 60% apportionment of fault to the father who the jury found failed to supervise and protect Plaintiff while she was under his care and custody"; and (2) "Rejecting the jury's [total damages] of Two Hundred Thousand Dollars to Plaintiff, and in granting an additur of [$800,000, raising the total award to] One Million Dollars." L.R. and her mother, as appellees and cross-appellants, claim the trial court erred in: (1) "Allowing the Jury to Apportion Fault to the Parents of the Minor Child"; (2) "Denying Plaintiff's Motion for a New Trial"; (3) "Granting Defendants' Jury Instruction [**17] [C-29/apportionment]"; (4) "Denying Various Motions in Limine Submitted by the Plaintiff"; (5) "Granting Defendants' Motion in Limine Regarding the Economic Cost of Rearing the Birth Child"; (6) "Dismissing All Claims of Party Plaintiff Jane Doe Parent"; and (7) "Limiting the Trial testimony of Plaintiffs' Expert Witness Denease Bishop." Federation raised an additional issue as cross-appellee: "Plaintiffs Have Waived Any Appeal of the Additur Amount."

P21. For purposes of clarity, we rearrange the issues in the order they were considered by the trial court and merge them for consideration, as follows:

I. Whether the trial court erred in its rulings on L.R.'s motions *in limine.*

II. Whether the trial court erred in granting Federation's motion *in limine* regarding the economic cost of raising a child.

III. Whether the trial court erred in sustaining hearsay objections to the testimony of L.R.'s expert witness, Denease Bishop.

IV. Whether the trial court erred in granting a directed verdict on the mother's emotional-distress claim.

V. Whether the trial court erred in allowing apportionment of fault to the father or erred in reversing that decision.

VI. Whether the trial court erred in denying [**18] a new trial and ordering an additur in its post-trial order.

VII. Whether the trial court erred in failing to grant a new trial after additur was rejected by both parties.

### STANDARD OF REVIEW

P22. "'[W]hen a question of law is raised, we apply a de novo standard of review.'" *Corban v. United Servs. Auto. Ass'n, 20 So. 3d 601, 609 (Miss. 2009)* (quoting *Delashmit v. State, 991 So. 2d 1215, 1218 (Miss. 2008))*. "An abuse-of-discretion standard of review is applied to the trial court's admission or exclusion of evidence." *Hartel v. Pruett, 998 So. 2d 979, 984 (Miss. 2008)* (citing *Tunica County v. Matthews, 926 So. 2d 209, 212 (Miss. 2006))*. The standard of review for a directed verdict or a judgment notwithstanding the verdict also is de novo. *See United Am. Ins. Co. v. Merrill, 978 So. 2d 613, 624 (Miss. 2007)*. "'In essence, judgments as a matter of law [*360] present both the trial court and appellate court with the same question -- whether the evidence, as applied to the elements of a party's case, is either so indisputable, or so deficient, that the necessity of a trier of fact has been obviated.'" *Id.* (quoting *White v. Stewman, 932 So. 2d 27, 32 (Miss. 2006))*.

## ANALYSIS

## I. Whether the trial court [**19] erred in its rulings on L.R.'s motions *in limine.*

### A. Consent

P23. L.R. argued pretrial that evidence of consent was barred by criminal statute. *See Miss. Code Ann. § 97-3-65(2)* (Rev. 2006); *Miss. R. Evid. 403*. The trial court rejected this argument and denied the motion. In her arguments post-trial and on appeal, L.R. added a hearsay argument. Federation argues that L.R. has cited no relevant authority, thus, this Court need not review this issue. Federation asserts that: (1) the criminal statute is irrelevant to this civil suit; and (2) the hearsay argument comes too late and is not supported in the record.

P24. This issue is a bit misleading, as Federation never attempted to disprove a crime occurred. It acknowledged throughout the trial and in jury instructions that L.R. was the victim of rape. Criminal statutes do not control evidentiary rulings in a civil trial, absent authority within the rules themselves. There being no such exception, the Rules of Civil Procedure control admissibility of evidence in this civil trial. Criminal and civil proceedings have different purposes. *See Cynthia M. v. Rodney E., 228 Cal. App. 3d 1040,*

*279 Cal. Rptr. 94, 97 (Cal. Ct. App. 1991)*. Deterrence and punishment for criminal [**20] conduct are within the general province of our criminal law. The public's interests are sufficiently protected by imposition of criminal sanctions. *See Zysk v. Zysk, 239 Va. 32, 404 S.E.2d 721, 722, 6 Va. Law Rep. 966 (Va. 1990)*. The dissent fails to address the fundamental unfairness of permitting civil litigants to obtain monetary judgments against nonperpetrators of the crime, while preventing the triers of facts from considering relevant evidence regarding damages and credibility. *See LK v. Reed, 631 So. 2d 604, 607 (La. Ct. App. 1994)*; *Doe v. Orangeburg County Sch. Dist. No. 2, 335 S.C. 556, 518 S.E.2d 259, 261 (S.C. 1999)*. Civil actions for damages should be left to proceed under tort-law principles, addressing fault, damages, and credibility issues. *See Doe v. Mama Taori's Premium Pizza, LLC, 2001 Tenn. App. LEXIS 224, 2001 WL 327906, at *7 (Tenn. Ct. App. Apr. 5, 2001)*.

P25. L.R. asserts the following regarding hearsay:

The only evidence that [Federation] presented that the relationship was consensual were the claims of the perpetrator . . . and inadmissible hearsay statements of neighbors of an 'I thought . . .' nature as well as statements *from* therapy sessions where [L.R.] allegedly said that Tony Kelly told her he loved her. Under . . . [rules] [**21] 801 and 802 this testimony should have never been admitted.

(Emphasis in original.) No hearsay objections were made during Kelly's deposition testimony, and the trial record reveals no objections when the deposition was read to the jury. The only neighbors to testify were Morris and Rev. Brown. Prior to Morris's deposition, the attorneys reserved all objections, except as to the form of the question. However, the trial record reveals no objections when Morris's deposition was read to the jury. Rev. Brown testified about the time Kelly and L.R. were in his apartment, but claimed he could not remember what anyone said. He was then asked about a signed police statement in which he stated that Kelly [*361] told him that L.R. liked Kelly. The trial court overruled a hearsay objection, as this was impeachment based on a prior inconsistent statement, but sustained an objection to admitting a copy of the statement into evidence. During Bishop's testimony, the trial court *sustained* two hearsay objections when Federation asked

Case 1:16-cv-00045-JPJ-PMS   Document 99-2   Filed 02/19/18   Page 26 of 36
Case 1:14-cv-00403-JTN-ESC   ECF Page id #: 2616 04/18/17   PageID.5228   Page 8 of 18

62 So. 3d 351, *361; 2010 Miss. LEXIS 657, **21

what L.R. had told another CAC employee. Thus, L.R.'s hearsay argument has no support in the record.

P26. "'[T]he burden is on the appellant to demonstrate why the lower court [**22] was in error[,]' and 'we presume that the decisions of the lower courts are correct . . . .'" *Baker Donelson Bearman Caldwell & Berkowitz, P.C. v. Seay, 42 So. 3d 474, 491-92 (Miss. 2010)* (quoting *Oakwood Homes Corp. v. Randall, 824 So. 2d 1292, 1294 (Miss. 2002))*. "The well-recognized rule is that a trial court will not be put in error on appeal for a matter not presented to it for decision." *Mills v. Nichols, 467 So. 2d 924, 931 (Miss. 1985)*.

P27. Federation argues that this Court should affirm the trial court ruling that allowed the evidence related to causation and relevant to damages. (*See supra* ¶12.) Federation stresses that it is not asking this Court to hold that "consent by a minor who is a victim of statutory rape constitutes an *absolute defense* to civil liability." (Emphasis in original.) Federation has chosen wisely, for the same public-policy argument made by Justice Kitchens in his dissent would dictate that Federation would fail in such an endeavor, as it conflicts with the majority view. *See Bjerke v. Johnson, 727 N.W.2d 183, 193-94 (Minn. Ct. App. 2007)* (collecting cases).

P28. However, its admissibility in a civil trial is a different issue. A New York court has held [**23] that, as statutory rape has no consent element, a defendant who has pleaded guilty to that crime should not be estopped from claiming consent at a civil trial. *Stavroula S. v. Guerriera, 193 A.D.2d 796, 797, 598 N.Y.S.2d 300, 301 (N.Y. App. Div. 1993)*. The Tennessee Court of Appeals, in an unpublished opinion, collected cases showing the range of views on this issue. *See Mama Taori's, 2001 Tenn. App. LEXIS 224, 2001 WL 327906, at *7*. Some jurisdictions have adopted a *per se* civil-liability rule that would prevent a trier-of-fact from considering consent. *2001 Tenn. App. LEXIS 224, [WL] at *7 n.13*. Other jurisdictions have held that a "plaintiff's consent is relevant in civil proceedings and that the defendant may introduce evidence and cross-examine the plaintiff regarding this issue."[3] *2001 Tenn.*

*App. LEXIS 224, [WL] at *7*. Others go further and hold it "fundamentally unfair to permit a civil litigant to obtain money damages while preventing the trier-of-fact from considering relevant evidence regarding damages and credibility."[4] *Id.*

P29. This Court has held that a relationship between a perpetrator and a victim may be relevant in premises-liability cases, requiring the plaintiff to show that the landowner did more than provide the [*362] condition for the crime, but also to show that it impelled the crime. *See Newell v. S. Jitney Jungle Co., 830 So. 2d 621, 623-24 (Miss. 2002)*; *Davis v. Christian Bhd. Homes of Jackson, Miss., Inc., 957 So. 2d 390, 405 (Miss. Ct. App. 2007)*; *Martin v. Rankin Circle Apartments, 941 So. 2d 854, 864 (Miss. Ct. App. 2006)*. The nature and extent of their overall relationship [**25] is in dispute (although no dispute exists as to the illegality of the rape). Given the conflicting evidence of the events before and after the sexual encounters, evidence of the acts and conduct of all involved was probative and relevant to liability, the duration and extent of damages claimed by the plaintiff, and credibility.

P30. All can agree that L.R. suffered injury as a proximate result of the criminal acts of Tony Kelly, a nonparty. The jury found Federation liable, an issue not appealed. We can all agree that the issue of consent was irrelevant in the prosecution of Kelly for the crime of statutory rape. We can all agree that consent by a minor cannot be a bar to recovery, nor can it be posited as an affirmative defense. The acts and conduct surrounding the crimes were relevant to Federation's defense that it was not negligent and to prove that others' fault led to the plaintiff's damages. The trial judge was correct when he found that consent was not pertinent to the duty owed by the landowner, for rape was committed on the

[**24] *Parsons v. Parker, 160 Va. 810, 170 S.E. 1, 2-3 (Va. 1933)*; *Michelle T. by Sumpter v. Crozier, 173 Wis. 2d 681, 495 N.W.2d 327, 329 (Wis. 1993)* ("evidence that [minor] had consented to the touching would defeat the *civil* battery charge brought against [assailant]" (emphasis in original)).

[4] *Orangeburg County, 518 S.E.2d at 261*; *Reed, 631 So. 2d at 607* ("The credibility of the participants is an essential determination in a civil suit for sexual assault." "[W]e disagree with the trial judge's legal conclusion that age alone can fully invalidate consent to sexual intercourse. We believe the better analysis must include the principles of comparative fault.").

[3] *Beul v. ASSE Int'l, Inc., 233 F.3d 441, 450-51 (7th Cir. 2000)*; *Cynthia M., 279 Cal. Rptr. at 97* ("The different treatment civilly of the concept of consent is striking."); *McNamee v. A.J.W., 238 Ga. App. 534, 519 S.E.2d 298, 302-03 (Ga. Ct. App. 1999)*;

Case 1:16-cv-00045-JPJ-PMS    Document 99-2    Filed 02/19/18    Page 27 of 36
Case 1:14-cv-00403-JTN-ESC    ECF Page id#: 2617 04/18/17    PageID.5229    Page 9 of 18

62 So. 3d 351, \*362; 2010 Miss. LEXIS 657, \*\*24

premises. Thus, he properly allowed the evidence and instructed the jury to determine whose conduct proximately caused L.R.'s injury and the nature and **[\*\*26]** extent of L.R.'s damages. The jury heard conflicting testimony that L.R. not only called Kelly, but let him enter a back (or side) door to the building, as opposed to L.R.'s assertion that Kelly entered an unlocked door and subsequently threatened bodily harm to her father. Federation argues that it was within the exclusive province of the jury to determine the facts and circumstances surrounding the rape and accompanying claim of threats of violence to her father were less psychologically damaging. It was within the jury's exclusive province to reject L.R.'s claim of being unable to have sex after these encounters, based on evidence presented at trial. The disposition proposed in Justice Chandler's dissent would allow the jury to hear only the plaintiff's version of events and damages, and would preclude the defendants from presenting testimony to mitigate damages.

P31. Jurors normally are instructed, as this jury was, that they "are required and expected to use [their] common sense and sound honest judgment in considering and weighing the testimony of each witness . . . ." The decision of the jury, exercising its common sense and sound honest judgment regarding the evidence it saw **[\*\*27]** and heard firsthand, should not be overturned by a Court, assuming that evidence supporting the verdict is found in the record and that the jury is properly instructed. *See **Miller Transporters v. Guthrie**, 554 So. 2d 917, 918 (Miss. 1989)*.

P32. Without adopting a blanket rule allowing such evidence in all civil trials, we find no abuse of discretion by the trial court in determining that the actions and conduct of all involved were appropriate for consideration, given that the defendants did not plead "consent": (1) as a bar to the action; (2) as an affirmative defense; or (3) to disprove that a crime occurred. The conflicting events leading up to and following the rapes were presented to the jury and were both relevant and probative to causation, damages, and credibility. Thus, we find no error by the trial court.

**B. Prior sexual molestation**

P33. L.R. argued pretrial that this evidence should be excluded, as it violated *Rule 412*. *See Miss. R. Evid.*

*412*. In her **[\*363]** post-trial motion and on appeal, she adds relevance arguments. The trial court denied the motion *in limine*, holding that *Rule 412* applies only to criminal trials, and further, that the evidence was relevant to L.R.'s claim of damages. **[\*\*28]** Federation argues that relevance need not be considered by this Court, as an objection on only one ground (*Rule 412*) waives objection on all other grounds (including *Rule 403*). *See **Burns v. State**, 729 So. 2d 203, 219 (Miss. 1998), abrogated on another issue by **Pitchford v. State**, 45 So. 3d 216, 246 (Miss. 2010)*; ***Gary v. State**, 796 So. 2d 1054, 1056 (Miss. Ct. App. 2001)*.

P34. *Rule 412(a)* is as follows: "[I]n a *criminal case* in which a person is accused of a sexual offense against another person, reputation or opinion evidence of the past sexual behavior of an alleged victim of such sexual offense is not admissible." *Miss. R. Evid. 412(a)* (emphasis added). We find no abuse of discretion in the trial court's denial of the motion on this ground.

P35. Federation asserts waiver for failure to argue relevance pretrial. However, a trial court is to consider relevance in all evidentiary decisions. Even were we not to apply the procedural bar, L.R.'s argument still misses the mark, for L.R. argues that this evidence is irrelevant to *Federation's duty to secure the building,* an issue not raised on appeal. Federation argued and the trial court ruled that the evidence was relevant to *L.R.'s damages.* **[\*\*29]** In neither her post-trial motion nor her appellate brief does L.R. address its relevance *vel non* to damages. We find that L.R. failed to (1) argue the issue, (2) cite relevant authority, or (3) overcome the presumption of a correct decision. Notwithstanding the procedural bar, the evidence here was relevant. The jury received the testimony of L.R.'s psychiatric expert that the prior molestation had not harmed her and that all of her psychiatric problems had resulted from Kelly's actions. However, the jury was not bound by this testimony. Credibility and weight accorded to expert testimony, like all witness testimony, is a decision for the jury. *See **Smith v. State**, 925 So. 2d 825, 839 (Miss. 2006)*. The jury, exercising its common sense and sound honest judgment could have found the prior molestation to be relevant to the determination of L.R.'s damages. Thus, we find that L.R.'s assertion of error is without merit, as a prior injury is relevant to damages if pertinent to a plaintiff's damage claim. *See **Boyd v. Smith**, 390 So. 2d 994, 998 (Miss. 1980)*.

Case 1:16-cv-00045-JPJ-PMS   Document 99-2   Filed 02/19/18   Page 28 of 36
Case 1:14-cv-00403-JTN-ESC   ECF No. 22-3 filed 04/18/17   PageID.5230   Page 10 of 18

62 So. 3d 351, *363; 2010 Miss. LEXIS 657, **29

## C. Subsequent sexual history

P36. L.R. asserts that the trial court erred by denying her motion. The trial court granted the motion. Testimony [**30] regarding L.R.'s subsequent sexual history was introduced by L.R. during her direct examination of Dr. Wood Hiatt. This Court need go no further in reviewing this assignment of "error."

P37. We find no error.

## II. Whether the trial court erred in granting Federation's motion *in limine regarding the economic cost of raising a child.*

P38. L.R. asserts that it was error to exclude testimony on the cost of raising her child, citing two cases from other jurisdictions. L.R. also argues, for the first time in this appeal, that it would be unconstitutional for this Court to deny her those damages, given that pain and suffering damages have a statutory cap. This Court declines to consider the constitutional argument, as it comes too late and is not properly before the Court.

P39. The admissibility of testimony related to the costs of raising a child is matter of first impression for this State. The overwhelmingly prevailing rule in other jurisdictions is that a child is not damage. *Chaffee v. Seslar, 786 N.E.2d 705, 707-09 [*364] (Ind. 2003).* Even if it were otherwise, the benefits of having a child – a value impossible to determine – would have to be deducted from the award. *See Girdley v. Coats, 825 S.W.2d 295, 298 (Mo. 1992)* [**31] ("an attempt to quantify the expense of raising a child and offsetting that expense by the 'benefits' conferred on the family is neither workable nor desirable.").

P40. L.R. cites only two cases, asserting that they represent a minority rule. *See Jones v. Malinowski, 299 Md. 257, 473 A.2d 429 (Md. 1984)*; *White v. Ohio Dep't of Rehab. & Corr., 2005 Ohio 7114, 2005 WL 3642708 (Ohio Ct. Cl. 2005)*. We think otherwise. In *Jones,* the court dealt with a birth that occurred after an unsuccessful sterilization procedure. That court reasoned that it should allow damages for the expense of raising the child, deducted by the benefits gained, by holding that the doctor's negligence had forced upon the

couple the very burden they had sought to avoid.[5] *Jones, 473 A.2d at 435-37*. *White* is an unpublished opinion from the Ohio Court of Claims. It cites no authority and inexplicably defies the rule established by the Ohio Supreme Court. *See White, 2005 Ohio 7114, 2005 WL 3642708, at *1*; *Johnson v. Univ. Hosp. of Cleveland, 44 Ohio St. 3d 49, 540 N.E.2d 1370, 1378 (Ohio 1989)*. The *Johnson* Court stated:

> [I]n a "wrongful pregnancy" action, Ohio recognizes the "limited damages" rule which limits the damages to the pregnancy itself and does not include child-rearing [**32] expenses. The extent of recoverable damages is limited by Ohio's public policy that the birth of a normal, healthy child cannot be an injury to her parents.

*Johnson, 540 N.E.2d at 1378*.

P41. A New York court, in a case involving the rape of a woman in a coma, stated, "Damages cannot be recovered for the 'wrongful birth' of a healthy child." *Doe v. Westfall Health Care Ctr., Inc., 303 A.D.2d 102, 755 N.Y.S.2d 769 (N.Y. App. Div. 2002)* (citing *O'Toole v. Greenberg, 64 N.Y.2d 427, 477 N.E.2d 445, 488 N.Y.S.2d 143 (N.Y. 1985))*. The *O'Toole* Court discussed this issue at great length, as it was a matter of first impression in New York. *O'Toole, 477 N.E.2d at 447-48*. The Court held "that the birth of a healthy child, as but one consequence of defendant's tortious conduct, does not constitute a harm cognizable at law." *Id. at 448*.

P42. The Supreme Court of Indiana collected cases on the issue of allowing damages for the cost of raising a child born as a result of a negligently performed sterilization. *Chaffee, 786 N.E.2d at 707-09*. [**33] The "vast majority of jurisdictions" oppose allowing recovery. *Id.* *Chaffee* lists four states that allow recovery of child-rearing costs without offset for benefits. *Id. at 707*. Three states allow recovery offset by benefits. *Id. at 707-08*. Thirty states and the District of Columbia would deny an award for child-rearing expenses to the parents of a healthy child. *Id. at 708 n.2*.

---

[5] In subsequent cases, Maryland has declined to extend this narrow holding. *See Kassama v. Magat, 368 Md. 113, 792 A.2d 1102, 1115 (Md. 2002)* ("wrongful life" claims not cognizable). *See also Gaver v. Harrant, 316 Md. 17, 557 A.2d 210, 217 (Md. 1989)*.

Case 1:16-cv-00045-JPJ-PMS   Document 99-2   Filed 02/19/18   Page 29 of 36
Case 1:14-cv-00403-JTN-ESC   ECF No. 322-3 filed 04/18/17   PageID.5231   Page 11 of 18

62 So. 3d 351, *364; 2010 Miss. LEXIS 657, **33

P43. We are persuaded that the view held by an overwhelming majority of jurisdictions is sound, and we cannot say that the trial court erred.

## III. Whether the trial court erred in sustaining hearsay objections to the testimony of L.R.'s expert witness, Denease Bishop.

P44. L.R. argues that she was prejudiced by the trial court's limiting [*365] Bishop's expert testimony. L.R. alleges, without explanation, that preventing Bishop from repeating what L.R. had told her was a violation of the expert-witness rules. *See Miss. R. Evid. 702, 703.* L.R. was not prejudiced by the trial court's sustaining Federation's objections. Even if the trial court had allowed Bishop to testify to the specifics of L.R's version of events, it would have been cumulative evidence, as other witnesses (L.R.; Robert Mahaffey, a policeman; John Tisdale, [**34] a security expert; Dr. Hiatt; L.R.'s mother; and Morris) testified on the same subject matter. Further, Bishop was allowed to testify that L.R. had "made a credible disclosure of rape." We find no merit in L.R.'s argument on this issue.

## IV. Whether the trial court erred in granting a directed verdict on the mother's emotional-distress claim.

P45. Federation successfully argued at trial that the mother's claims of the consequences of emotional distress (untreated headaches, stomachaches, and insomnia) did not meet the standard set by caselaw. *See Adams, 744 So. 2d at 743-44.* The *Adams* Court found that "vague testimony about loss of sleep and worry . . . was insufficient to support an instruction or award of damages for emotional distress." *Id. at 744.*

P46. The mother counters that her claims were sufficient evidence of a physical manifestation of emotional distress. Alternatively, she cites cases stating that no physical injury is required under certain circumstances. *See Sears, Roebuck & Co. v. Devers, 405 So. 2d 898 (Miss. 1981)* (implied overruling recognized by *Adams, 744 So. 2d at 741-42*); *First Nat'l Bank v. Langley, 314 So. 2d 324, 338-39 (Miss. 1975)* (abandoning the impact rule). [**35] She asserts that no physical injury is required, as this was not a case of simple negligence.[6]

However, *Langley* and the other cases cited are inapposite. The plaintiffs in *Langley, Devers,* and *Adams* were the persons upon whom the negligent conduct was inflicted, not third persons who only heard about it later. *See Adams, 744 So. 2d at 737*; *Devers, 405 So. 2d at 899, Langley, 314 So. 2d at 325.* Here, she testified that she was not present during any of these events. Nothing in the record indicates that she was ever on the premises. She does not qualify as a bystander, thus, she has no bystander claim. *See Ill. Cent. R.R. Co. v. Hawkins, 830 So. 2d 1162, 1174 (Miss. 2002)* (quoting *Summers v. St. Andrew's Episcopal Sch., Inc., 759 So. 2d 1203, 1210 (Miss. 2000)).*

P47. This Court has adopted the *Dillon* factors "in determining whether a defendant should reasonably foresee injury to a plaintiff, thereby owing a duty of care." *Summers, 759 So. 2d at 1210* (citing *Dillon v. Legg, 68 Cal. 2d 728, 69 Cal. Rptr. 72, 441 P.2d 912 (Cal. 1968)).* The factors are:

> (1) Whether plaintiff was located near the scene of the accident as contrasted with one who [**36] was a distance away from it. (2) Whether the shock resulted from a direct emotional impact upon plaintiff from the sensory and contemporaneous observance of the accident, as contrasted with learning of the accident from others after its occurrence. (3) Whether plaintiff and the victim were closely related, as contrasted with an absence of any relationship or the presence of only a distant relationship.

*Dillon, 441 P.2d at 920.*

P48. This Court in *Summers* dealt with mental-anguish claims by parents based on an alleged sexual assault on [*366] their child at school. *Summers, 759 So. 2d at 1206.* The *Summers* Court considered a case in which a federal district court granted summary judgment, finding that family members could not recover mental-distress damages after witnessing the mistreatment of their mother. *See Campbell v. Beverly Enters., 724 F. Supp. 439, 440 (S.D. Miss. 1989).* The *Campbell* court concluded that family members could recover if they had sustained or been threatened with physical injury. *See id. Summers* also cited *Moore v. Kroger Company,*

---

[6] She did not advance this argument at trial, but did so in her post-   trial motion.

*800 F. Supp. 429, 433 (N.D. Miss. 1992)*, in which the plaintiff argued that *Campbell* allowed for recovery for gross or wanton negligence even [**37] when the plaintiff was "outside the zone of danger and outside the range of immediate sensory perception." *Summers, 759 So. 2d at 1210*. However, the *Moore* court held otherwise, reasoning that the emotional distress at issue was that of the immediate victim, and that the "range of foreseeable plaintiffs does not include after-the-fact witnesses of the results." *Id.* (citing *Moore, 800 F. Supp. at 433-34*). The *Summers* Court held that the parents did not meet the bystander criteria, as they were not near the scene, "nor was their shock caused by 'contemporaneous observance of the accident.'" *Summers, 759 So. 2d at 1210*. L.R.'s mother, like the *Summers* plaintiffs, meets only one of these factors, thus, she cannot be considered a bystander to whom the defendant owed a duty of care. In dicta, the *Summers* Court discussed the plaintiffs' putative claim that they might be due relief if the defendant's alleged conduct had been willful, wanton, malicious, or intentional. *See id. at 1210-11*. However, the *Summers* Court concluded there was no evidence to support the claim. *Id. at 1211*.

P49. Here, the trial court considered the bystander-liability issue but in the end decided that proof of damages [**38] to support her claim was lacking. As the trial court's decision was in accord with this Court's precedent and consistent with the testimony offered at trial, we find no error in granting a directed verdict regarding L.R.'s mother's claim of emotional distress.

## V. Whether the trial court erred in allowing apportionment of fault to the father or erred in reversing that decision.

P50. The parties dispute whether allocation of fault to a parent is barred. Federation asserts that application of parental-immunity cases, which predate the comparative-fault era, is not justified. L.R. argues the parental-immunity bar extends to allocation of fault, citing *Lucas v. Mississippi Housing Authority Number 8, 441 So. 2d 101 (Miss. 1983)*; and *Bunch v. Shaw, 355 So. 2d 1383 (Miss. 1978)*. However, the trial court was not presented with the issue as now argued by the plaintiff. At trial, the court allowed allocation, rejecting L.R.'s argument then presented, *i.e.,* allocation to anyone other than the named defendants was improper, based on L.R.'s testimony (which was disputed) that all

sexual encounters occurred in the public areas of the building. *Lucas* was never discussed until the post-trial motions. [**39] Post-trial, the trial court reversed itself, not for the legal reason now being presented, but on a factual basis, *i.e.,* lack of evidence. As Federation argues, the trial court essentially entered a judgment notwithstanding the verdict regarding allocation of fault to L.R.'s father, which Federation submits is neither factually nor legally correct. As we find that the trial court was factually correct, we shall refrain from passing judgment or offering opinion on the legal issue of allocation of fault, it being unnecessary to resolve this case.

P51. At a post-trial motion hearing, the trial court stated:

[*367] I am of the opinion that I was wrong, that I assessed and interpreted the allegations and the testimony that came in as establishing a possible negligence on the part of the father. On reconsideration and after a review of all the testimony as I recall it, I see that there's nothing that this father did that led to or contributed to this rape.

The trial court stated in its order:

[L.R]'s motion is not well-taken and should be denied on all counts, except . . . on the issue of apportioning fault . . . whereby the Court finds that it erred . . . and hereby reverses its ruling by removing [**40] the jury's apportionment of fault . . . This Court further finds that the $200,000.00 jury verdict was inadequate and grants an additur of $800,000.00 . . . .

P52. As the court's decision was essentially a judgment as a matter of law, this Court applies that standard to the trial court's reversal of the jury's verdict. "'The judge may not substitute his judgment for that of the jury merely because he would have decided the matter differently.'" *Shelton v. Coleman, 323 So. 2d 90, 91 (Miss. 1975)* (quoting *Ill. Cent. R.R. Co. v. Harrison, 224 Miss. 331, 338-39, 80 So. 2d 23, 26 (1955))*. "[A] verdict is deemed against the overwhelming weight of the evidence when no reasonable hypothetical juror could have reached the conclusion of the jury." *Blossman Gas Inc. v. Shelter Mut. Gen. Ins. Co., 920 So. 2d 422, 426 (Miss. 2006)*.

P53. Thus, we must examine the record for evidence that would support a finding that her father breached an

62 So. 3d 351, *367; 2010 Miss. LEXIS 657, **40

established duty as a parent to provide adequate supervision of L.R., which proximately caused her damage. We agree with the trial court that the criticism of some witnesses fails to rise to a level of a breach of a defined duty that caused or contributed to this [**41] rape. Thus, the jury received improper instruction on allocation of fault based on the facts as presented in this case. We affirm the trial court's decision.

P54. Although the trial court styled it differently, the judge essentially issued a judgment *non obstante veredicto,* meaning a judgment "[w]ith the verdict not standing in the way." Russ Versteeg, *Essential Latin for Lawyers* 148 (Carolina Academic Press 1990). Although a basis existed for the trial court to reverse itself on allocation of fault, no legal or factual basis existed for the trial court to substitute its opinion for that of a unanimous jury that determined L.R.'s total damages to be \$200,000. The standard for JNOV was not met. Unless other error justified a new trial, the jury verdict should stand fast. "A jury's verdict is given great deference by this Court, and 'conflicts of evidence presented at trial are to be resolved by the jury.'" *Causey v. Sanders, 998 So. 2d 393, 403 (Miss. 2008)* (quoting *Johnson v. St. Dominics-Jackson Mem'l Hosp., 967 So. 2d 20, 23 (Miss. 2007)).*

## VI. Whether the trial court erred in denying a new trial and ordering an additur in its post-trial order.

P55. A court's consideration of additur [**42] is governed by statute and caselaw. *See Miss. Code Ann. § 11-1-55* (Rev. 2002); *Dedeaux v. Pellerin Laundry, Inc., 947 So. 2d 900, 908-09 (Miss. 2007).* *Dedeaux* states that a "party aggrieved by the amount of damages awarded pursuant to a jury verdict may file a motion for an additur . . . ." *Dedeaux, 947 So. 2d at 908.* L.R. filed a motion that included a plea for additur as one alternative.

P56. L.R. maintains that the trial court erred by denying her motion for a new trial and in ordering an additur, which [*368] was, in the alternative, the relief sought. The additur statute allows a trial judge to "overrule a motion for a new trial . . . upon condition of an additur . . . ." *Miss. Code Ann. § 11-1-55* (Rev. 2002). Based on our analysis, we find that the trial court was not in error for denying a new trial, as a new trial was not warranted

for the reasons sought, although the trial court's decision was reached through a different analysis.

P57. The trial court's additur order includes no findings of fact. The record reveals that the trial court expressed shock at the amount of the award, but the trial court failed to make a finding that the jury was influenced by bias, passion, or prejudice; [**43] or that the verdict was contrary to the overwhelming weight of the evidence. A finding of one of these is a prerequisite to setting aside a jury verdict. *See Dorrill v. State Highway Comm'n of Miss., 525 So. 2d 1333, 1335 (Miss. 1988).*

P58. "Awards set by jury are not merely advisory and generally will not be 'set aside unless so unreasonable as to strike mankind at first blush as being beyond all measure, unreasonable in amount and outrageous.'" *Patterson v. Liberty Assocs., L.P., 910 So. 2d 1014, 1020-21 (Miss. 2004)* (quoting *Rodgers v. Pascagoula Pub. Sch. Dist.,611 So. 2d 942, 945 (Miss. 1992).* "'Additurs represent a judicial incursion into the traditional habitat of the jury, and therefore should never be employed without great caution.'" *Patterson, 910 So. 2d at 1021* (quoting *Gibbs v. Banks, 527 So. 2d 658, 659 (Miss. 1988)).*

P59. A statute and our caselaw require findings before a judge may grant an additur. *See Miss. Code Ann. § 11-1-55* (Rev. 2002); *Dorrill, 525 So. 2d at 1334-35.* The statute allows a court to order an additur if it finds "that the jury or trier of the facts was influenced by bias, prejudice, or passion, or that the damages awarded were contrary to the overwhelming [**44] weight of credible evidence." *Miss. Code Ann. § 11-1-55* (Rev. 2002). The *Dorrill* Court stated:

> before the trial judge may usurp the jury's function in setting a damage award, he must comply with the language of the statute . . . . Absent either of these findings, the trial court abuses its discretion in ordering a new trial based upon the non-acceptance of an additur or remittitur. . . .

*Dorrill, 525 So. 2d at 1334-35.* Here, the trial court failed to make either finding, and thus, the court abused its discretion. Even without this procedural flaw, the result would be the same. Evidence, as recounted above, existed to support the jury's verdict, and nothing in the record reveals that the jury was influenced by bias, prejudice, or passion. Further, the trial court erred, as

Case 1:16-cv-00045-JPJ-PMS   Document 99-2   Filed 02/19/18   Page 32 of 36
Case 1:14-cv-00403-JTN-ESC   ECF No. 922-3 filed 04/18/17   PageID.5234   Page 14 of 18

62 So. 3d 351, *368; 2010 Miss. LEXIS 657, **44

the jury verdict was not "so unreasonable as to strike mankind at first blush as being beyond all measure, unreasonable in amount and outrageous." *Patterson, 910 So. 2d at 1020-21*. Jury awards of much less have been affirmed for similar injuries. *See Doe ex rel. Doe v. N. Panola Sch. Dist., 906 So. 2d 57, 59, 63-64 (Miss. Ct. App. 2004)* (denial of additur to award of approximately $20,000 to the family of a retarded [**45] girl repeatedly sexually assaulted at school); *Doe ex rel. Doe v. Salvation Army, 835 So. 2d 76 (Miss. 2003)* (boys sexually abused at summer camp awarded $30,000 each).

P60. We find that the trial court abused its discretion in ordering additur, but did not err in denying a new trial.

## VII. Whether the trial court erred in failing to grant a new trial after additur was rejected by both parties.

P61. Both parties cite *Dedeaux*. Federation argues that L.R. has waived [*369] her right to seek a new trial on appeal, for her remedy, if dissatisfied, was to demand a new trial on damages before the trial court. This Court stated the following in *Dedeaux:*

> If the trial judge grants a motion for an additur . . ., such grant . . . shall take effect only if accepted by all the parties. If all the parties do not agree to the additur . . ., then each party shall have the right to either demand a new trial on damages, or appeal the order asserting an abuse of discretion on the part of the trial judge.

*Dedeaux, 947 So. 2d at 908*. Once the trial judge ordered the additur, each party had three options: (1) accept the additur, (2) demand a new trial on damages, or (3) appeal. Neither chose option one or two. Federation [**46] sought appeal first on December 2, 2008. The next day, L.R. chose the same course. L.R. now argues she was denied her right to a new trial on damages. *Dedeaux* is silent on which right – to appeal or to demand a new trial – takes precedence. However, as both parties chose to appeal, the issue of a new trial on damages is not before the Court. L.R. exercised her right to request a new trial based on alleged errors during the course of the trial and renewed those requests in this appeal. However, to the extent L.R. asks this Court to grant a new trial based on the asserted inadequacy or impropriety of the additur, that issue is moot, as we have found that granting the additur was

error.

## CONCLUSION

P62. We reverse the judgment of the Circuit Court of the First Judicial District of Hinds County and remand the case for entry of a final judgment in the amount of $200,000 against Federation.

P63. ON DIRECT APPEAL: REVERSED AND REMANDED. ON CROSS-APPEAL: REVERSED AND REMANDED.

CARLSON, P.J., DICKINSON AND LAMAR, JJ., CONCUR. KITCHENS, J., CONCURS IN PART AND DISSENTS IN PART WITH SEPARATE WRITTEN OPINION. CHANDLER, J., CONCURS IN PART AND DISSENTS IN PART WITH SEPARATE WRITTEN OPINION, JOINED BY [**47] PIERCE, J. WALLER, C.J., AND GRAVES, P.J., NOT PARTICIPATING.

Concur by: KITCHENS (In Part); CHANDLER (In Part)

Dissent by: KITCHENS (In Part); CHANDLER (In Part)

## Dissent

### KITCHENS, JUSTICE, CONCURRING IN PART AND DISSENTING IN PART:

P64. Because I would reverse the judgment and remand the case for a new trial, I respectfully concur in part and dissent in part.

### Facts

P65. The majority omits several relevant facts and only partially recites others. L.R. testified that, when she was eleven years old, she was forcibly raped numerous times by a thirty-six-year-old man. Although the rapist claimed that the sex was consensual, an eleven-year-old child simply cannot consent to having sexual intercourse. According to L.R., each of the rapes took place in the common areas of her father's apartment complex.

P66. Federation Tower was a three-story apartment complex which housed the elderly and disabled. The

doors to all of the apartments faced inward into closed hallways, and the only access to the building was through two doors, which opened into the lobby, and side fire doors, which were designed to remain locked. Shortly before the rapes occurred, management at Federation Tower sent a memorandum to the residents, warning them that [**48] some residents were leaving the fire doors open, allowing trespassers to enter the building. The plaintiffs' position was that the perpetrator [*370] had gained access to the building through these doors that were left open by other residents.

P67. During the father's deposition, which was read to the jury because he had died, he testified that he had notified Federation Tower's management that Kelly had been trespassing on the property, and "[t]hey said they would take care of it." L.R.'s father further testified that Gladys Miller, the head manager, never spoke to him about his daughter's being unsupervised and that Miller would often watch over L.R. and other children who played in the common areas.

P68. Kelly's deposition also was read to the jury. According to Kelly, no one asked him to leave the property. Instead, Kelly testified that one of the managers, James Gray, warned him that someone had been breaking into cars on the property and Gray did not want Kelly to be blamed. Gray denied that he had ever spoken to Kelly.

P69. Regarding L.R.'s assistance to Miller, according to L.R., Miller would ask her to tape notices on the apartment doors, and would send her throughout the building unsupervised. [**49] Miller was never asked whether she sent L.R. into the hallways alone, but Miller did testify that she had problems with L.R.'s roaming around the building unsupervised. Miller said that she told L.R.'s father to keep her in the apartment, although L.R.'s father denied that any such conversations had taken place.

P70. Although when first questioned, Gladys Miller denied knowing about the sexual assaults, she later testified that she had heard about the sexual assaults from another resident "when it happened." Miller testified that she also told L.R.'s father but took no further action. Thus, the defendants clearly were on notice that L.R. was being sexually assaulted in the stairway.

P71. As for her damages, Dr. Hiatt testified that, although she had been fondled, once at age five and once at age eight, L.R. did not seem to be greatly affected by those two incidents. Thus, Dr. Hiatt did not attribute her mental and emotional problems to the prior incidents. Dr. Hiatt testified that L.R. was an outgoing and happy child until she was raped by Kelly. After the rapes, L.R. was unable to leave the house without her mother, and at one point she weighed three hundred pounds. L.R. tried to attend [**50] a community college, but was forced to drop out and take online courses because she could not handle the anxiety of being around strangers. The majority opinion fails to mention that L.R. dropped out of school or Dr. Hiatt's testimony that he had recommended that L.R. be treated, but her mother had said they simply did not have the money.

P72. Most notably, L.R. had never claimed her daughter, A.B., as her own, because she was too ashamed of being raped and giving birth at twelve years old. At the time of trial, A.B. was eight years old and believed that she was her grandmother's daughter and that L.R. was her sister. L.R. refused publicly to acknowledge A.B. as her daughter, and L.R.'s mother had taken on the responsibility of rearing A.B.

P73. As for her postings on social-networking websites, L.R. testified that had she created these web pages as part of a school project. The defendants tried to use these pages to demonstrate that, contrary to Dr. Hiatt's and L.R.'s testimony, she did have friends and was well-adjusted. However, L.R. had one "friend" on her MySpace page, a man named Tom, who is automatically "friends" with everyone [*371] who has a MySpace account.[7] L.R. had eleven "friends" [**51] on her Facebook page, most of whom were her classmates.

P74. Finally, L.R. had one unsuccessful sexual encounter after the rape. When L.R. was seventeen, she attempted to have a sexual relationship with another teenager, but was unable to continue because the experience brought back the memories of her rape. According to L.R., she became physically ill the one time she tried to have sex, and there was no evidence to suggest that she was otherwise sexually active.

---

[7] In the context of social-networking websites, "friend" simply means an electronic contact.

62 So. 3d 351, *371; 2010 Miss. LEXIS 657, **51

*Evidence of "Consent"*

P75. I disagree with the majority opinion's recognizing that an eleven-year-old child has the capacity to consent to sexual intercourse, as such a recognition is at odds with the established public policy of this state that children of L.R.'s age cannot consent to sexual intercourse. *See Miss. Code Ann. § 97-3-65* (Rev. 2006) (defining statutory rape). When a child is under the age of consent, "[i]t is immaterial whether the rape was accomplished by force or violence or against the will of the child." *Brooks v. State, 242 So. 2d 865, 867 (Miss. 1971)*. "At the heart of these [statutory rape] statutes is the core concern [**52] that children should not be exploited for sexual purposes regardless of their 'consent.' They simply cannot appreciate the significance or the consequences of their actions." *Collins v. State, 691 So. 2d 918, 924 (Miss. 1997)*. Although I agree that Federation properly was allowed to adduce evidence that L.R. had allowed Kelly entry to the building, as this was relevant to causation, evidence of her "subjective consent" to sexual intercourse was not relevant and was far too prejudicial to have been admissible. *M.R.E. 402, 403*. The majority refuses to "adopt a blanket rule allowing such evidence in all civil trials," but surely the facts of the present case would favor exclusion: the defendants knew that an eleven-year-old child was being sexually assaulted by a thirty-six-year-old man on property that was under their control and was home to many vulnerable adults, whose safety depended, in large part, on the defendants providing them and their families a safe environment.

P76. The defendants argue that consent is relevant to causation because "if [L.R.] and Kelly were actively concealing their relationship, then Defendants had no reason to know about it, and thus, could not be held liable [**53] . . . ." Yet, this argument fails because it is undisputed that both managers, Miller and Gray, knew that L.R. was being sexually assaulted in the stairwell. Because their knowledge is imputed to their employers, the defendants, as a matter of law, knew about the assaults. *Glover v. Jackson State Univ., 968 So. 2d 1267, 1276 n.9 (Miss. 2007)* (plurality opinion).

P77. The defendants also argue, with apparent agreement from the majority, that, had L.R. been forcibly raped, her damages would be greater. As Dr. Hiatt testified, an eleven-year-old does not have the

capacity to understand sex, and the psychological and emotional damages to an eleven-year-old who thought she was consenting would be not be lessened. Even were we to accept that L.R.'s damages would be greater had she been forcibly raped, the difference would be too minimal to outweigh the prejudice of arguing that an eleven-year-old may consent to sexual activity with another. *M.R.E. 403*.

P78. The majority opinion cites *Stavroula S. v. Guerriera, 193 A.D.2d 796, 797, [*372] 598 N.Y.S.2d 300 (N.Y. App. Div. 1993)*, which involved a civil action for battery brought against the rapist. That Court held that consent could be litigated because "the issue of [**54] whether he touched the plaintiff without her consent . . . is the gravamen of the tort of battery." *Id.* The present case involves a negligence, premises-liability claim, against a third party to the rape, and consent is not an element of or a defense to this tort.

P79. Furthermore, the Tennessee case relied on by the majority applied the "mature minor" rule or the "Rule of Sevens," meaning "under the age of seven, no capacity; between seven and fourteen, a rebuttable presumption of no capacity; between fourteen and twenty-one, a rebuttable presumption of capacity." *Doe v. Mama Taori's Premium Pizza, LLC, 2001 Tenn. App. LEXIS 224, 2001 WL 327906, at *5 (Tenn. Ct. App. Apr. 5, 2001)* (quoting *Cardwell v. Bechtol, 724 S.W.2d 739, 745 (Tenn. 1987))*. If we were to apply Tennessee's "mature minor" rule to the present case, there would be a rebuttable presumption that L.R. was incapable of consenting to sexual contact.

P80. *Bjerke v. Johnson, 727 N.W.2d 183 (Minn. Ct. App. 2007)*, cited by the majority opinion, recognized that "[a] majority of jurisdictions adopt the Restatement's position and exclude consent as a defense in civil actions arising out of statutory rape." *Id. at 193* (citing *Christensen v. Royal Sch. Dist. No. 160, 156 Wn.2d 62, 124 P.3d 283, 286 (Wash. 2005)*; [**55] *Wilson v. Tobiassen, 97 Ore. App. 527, 777 P.2d 1379 (Or. Ct. App. 1989))*. According to the *Bjerke* court, "[t]hese jurisdictions have reasoned that the enactment of statutes criminalizing sexual activity with minors evidences the legislature's intent to protect minors from sexual exploitation and that allowing civil defenses premised on a minor's consent would be inconsistent with such intent." *Id. at 193-94* (citing

Case 1:16-cv-00045-JPJ-PMS   Document 99-2   Filed 02/19/18   Page 35 of 36
Case 1:14-cv-00403-JTN-ESC   ECF No. 322-3 filed 04/18/17   PageID.5237   Page 17 of 18

62 So. 3d 351, *372; 2010 Miss. LEXIS 657, **55

*Christensen, 124 P.3d at 286*; *Doe v. Greenville Hosp. Sys., 323 S.C. 33, 448 S.E.2d 564, 566 (S.C. 1994))*. Certainly, these same considerations should govern in Mississippi and extend to the issue of damages.

P81. Under Mississippi law, an eleven-year-old child does not have the capacity legally to consent to sexual intercourse. *See Phillipson v. State, 943 So. 2d 670, 672 (Miss. 2006)*; *Miss. Code Ann. § 97-3-65* (Rev. 2006). And the limitations on capacity are not limited to sexual intercourse or to the context of criminal cases. For example, she may not bring a lawsuit on her behalf. *See Lawler v. Gov't Employees Ins. Co., 569 So. 2d 1151, 1153 (Miss. 1990)*; *Miss. Code Ann. § 15-1-59* (Rev. 2003). She is not capable of being held criminally liable. *Miss. Code Ann. § 43-21-151(3)* (Rev. 2009). In the case [**56] of a custody dispute, a chancellor cannot consider an eleven-year-old's preference as to the parent with whom she wishes to live. *Miss. Code Ann. § 93-11-65(1)(a)* (Rev. 2004). She would not be considered a competent juror. *Miss. Code Ann. § 13-5-1* (Rev. 2002). She cannot enter into a valid contract. *See Johnson Motors, Inc. v. Coleman, 232 So. 2d 716, 720 (Miss. 1970)*; *Miss. Code. Ann. § 15-3-11* (Rev. 2003). She cannot obtain an abortion absent parental consent or a court order. *Miss. Code Ann. § 41-41-53* (Rev. 2009). A minor's capacity is legally limited in both civil and criminal contexts, and contrary to the majority's holding otherwise, this case provides no exception.

P82. I respectfully disagree with the majority's blanket holding that "[d]eterrence and punishment for criminal conduct are within the general province of our criminal law," and that "[t]he public's interests are sufficiently protected by imposition of criminal sanctions." It cannot be denied that civil actions also can have deterrent effects and sometimes punish the [*373] wrongdoer, for example, in the case of punitive damages. Criminal conduct often has economic consequences, and our legal system allows victims to recover [**57] for their injuries. In this case, L.R. has suffered extensive damages that cannot be fully redressed by a criminal conviction and punishment of her attacker.

P83. For the foregoing reasons, the trial court erred in allowing evidence of L.R.'s "consent" to be one of the focal points of this litigation, and based on this error, I would reverse the case and remand for a new trial.

**Prior Sexual Molestation**

P84. I agree that this issue is procedurally barred, because the plaintiffs fail to argue that the prior incidents may have contributed to L.R.'s emotional and psychological damages. However, I am not prepared to say, as the majority holds, that evidence of these incidents was admissible in the same way that a prior *physical* injury or pre-existing condition may be used to cross-examine a plaintiff. *See Boyd v. Smith, 390 So. 2d 994, 998 (Miss. 1980)* (cited by the majority opinion).

**Economic Cost of Raising a Child**

P85. To support its holding that the trial judge did not err by excluding evidence of the costs of raising a child, the majority relies mainly on cases involving children born subsequent to failed sterilization procedures. Maj. Op. at ¶¶ 38-41. Were this a medical negligence case, [**58] involving a child born to two consenting adults, I might agree with the majority that the costs of rearing the child cannot be recovered. However, in this case, a child herself was raped and bore a child, and this rape was enabled by the defendants. "It is axiomatic that one is liable for the full measure of the reasonably foreseeable consequences of their actions." *Allred v. Fairchild, 916 So. 2d 529, 532 (Miss. 2005)* (citing *Universal Life Ins. Co. v. Veasley, 610 So. 2d 290, 295 (Miss. 1992))*.

P86. Here, the verdict against the defendants signified the jury's acceptance of the plaintiffs' theory that, in effect, the rapist was enabled in his dastardly criminal enterprise by the defendants' negligent failure to exercise reasonable precautions to secure their premises against infiltration by dangerous persons such as the assailant of this eleven-year-old child. Without question, the child was in a place where she had a lawful right to be. She and her parents were justified in relying on the defendants to deny access to intruders who might prey upon the vulnerable adults who populated the premises, as well as their children and other legitimate guests.

P87. Rape and other kinds of sexual [**59] assault are all too prevalent in American society and are reasonably foreseeable when those who have a duty to provide reasonable security at residential premises under their control fail to perform such duty in a prudent manner. Unwanted pregnancy is a reasonably foreseeable consequence of sexual assault upon female victims.

62 So. 3d 351, *373; 2010 Miss. LEXIS 657, **59

What happened to L.R. in these horrendous circumstances was a reasonably foreseeable consequence of the defendants' negligent failure to provide reasonable security measures, as determined by the jury, resulting in the birth of a child whose presence in L.R.'s life was unanticipated by the hapless young mother, at a time when she was ill prepared in every respect for the responsibilities of parenthood, including the considerable financial aspect of those responsibilities.

P88. It is beyond doubt that money will be needed for the rearing of the child that L. R. did not choose to bear. Upon a retrial, the jury should be tasked with determining how much likely will be required for that purpose, and apportion that component of L. R.'s damages to whomever it may deem to be the tort feasors.

### [*374] *Conclusion*

P89. While I agree that the judgment should be reversed, I would remand [**60] the case for a new trial based on the trial court's allowing evidence of "consent." On remand, the jury should be instructed to consider the costs of rearing the child and should not be allowed to apportion fault to L.R.'s father. For these reasons, I respectfully concur in part and dissent in part.

## CHANDLER, JUSTICE, CONCURRING IN PART AND DISSENTING IN PART:

P90. I would find that the evidence of consent was inadmissible because an eleven-year-old child cannot legally consent to sexual intercourse. *See Miss. Code Ann. § 97-3-65* (Rev. 2006). However, I would find that the error in admitting the consent evidence does not require the remedy of a new trial on both liability and damages. The jury returned a verdict in favor of L.R., and the trial court entered a judgment notwithstanding the verdict that determined Federation to be wholly at fault for the rape of L.R. Thus, L.R. already has received a favorable determination of liability. However, because Federation attempted to show that statutory rape was less psychologically damaging than forcible rape, the improper evidence of consent was offered to dispute the amount of L.R.'s damages. *See* Maj. Op. at ¶30. As the jury considered improper [**61] evidence on damages, I would reverse and remand for a new trial limited to the issue of damages. I

concur with the majority's resolution of the other issues. Therefore, I respectfully concur in part and dissent in part.

## PIERCE, J., JOINS THIS OPINION.

---

End of Document